**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES SMALL BUSINESS** | ) | **Civil Action No.  08-cv-0978** |
| **ADMINISTRATION AS RECEIVER FOR** | ) | |
| **COQUI CAPITAL PARTNERS, L.P.,** | ) | **Related Case No. 06-1564** |
| | ) | |
| **Plaintiff,** | ) | **Judge Laura T. Swain** |
| | ) | |
| **v.** | ) | **ECF Case** |
| | ) | |
| **COQUI CAPITAL MANAGEMENT, LLC,** | ) | |
| **a New York limited liability company; et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF TERRY GEORGE

I, Terry George, hereby affirm and state the following:

1.      I am employed as a financial analyst in the Investment Division's Office of SBIC Liquidation (the "Office of SBIC Liquidation") at the United States Small Business Administration ("SBA"), 409 3rd St. S.W., 6th Floor, Washington, D.C. 20416.  I make this affidavit in my official capacity.

2.      My duties include providing oversight and monitoring the portfolio of Small Business Investment Companies ("SBICs") placed in receivership in United States Federal District Courts, such as Coqui Capital Partners, L.P. ("Coqui").   The foregoing duties are carried out subject to SBA and Office of SBIC Liquidation guidelines.

3.      I have read the Complaint, Defendants' Motion to Dismiss the Amended Complaint and Compel Arbitration and Plaintiff's Opposition thereto and am familiar with their contents.  This Affidavit is based upon my personal knowledge, discussions with various SBA officials, discussions with the former management of Coqui, including

its general partner Coqui Capital Management, LLC, and the documents contained in the files of SBA and Coqui as turned over to the Receiver. The documents attached hereto as Exhibits A through I are true and correct copies of the official business records of SBA and/or Coqui.

4.     I have been the financial analyst charged with overseeing Coqui and its portfolio concerns since approximately March, 2006 when Coqui was placed into receivership by this Court.

5.     In March, 2006, after SBA was appointed receiver for Coqui by this Court, I attended the transfer meeting during which the official books and records of Coqui were transferred to the Receiver. I also met and conferred with members of Coqui's general partner, Coqui Capital Management, LLC.

6.     Coqui's books and records included an Agreement of Limited Partnership as of March, 2000, which Agreement was amended with the consent of over 50% of the Voting Interest in Coqui via Agreement of Limited Partnership as of June 13, 2001 ("ALPA"). Coqui's partnership books and records also included various Subscription Agreements that were executed by each of the defendant limited partners.

7.     SBA is charged with overseeing and regulating the SBIC program. The Act, Regulations and the government's guarantee in the SBIC program assure the public's confidence in SBICs as financial institutions because of the government's regulations to protect its own investment of tax dollars and to insure the integrity of the SBIC as a financial institution.

8.     Section 311(c) of the Act, 15 U.S.C. § 687c(c), further states that "[t]he Administration shall have authority to act as trustee or receiver of the licensee." SBA, in its

capacity as receiver of a SBIC, has the ultimate duty to administer the estate of the SBIC,

liquidate the SBIC's assets in order to satisfy claims of creditors, and to ascertain past

abuses of the Regulations and any other federal law.

9.      Coqui is a Delaware limited partnership which was licensed by the SBA as

a Small Business Investment Company ("SBIC"), a federal financial institution, on

April 7, 2000 under Section 301(c) of the Small Business Investment Act of 1958 (the

"Act"), as amended.  Coqui maintained its principal place of business at 1775 Broadway,

New York, New York.

10.     Via letter dated April 12, 2005, SBA notified Coqui that it would be

placed into Restricted Operations within 15 days of the letter  if it did not cure its

condition of capital impairment as that term is defined in the Regulations at 13 C.F.R.

§107.1850 (2005).

11.     Coqui did not cure its condition of capital impairment and was placed in

Restricted Operations by SBA effective April 27, 2005.  Coqui was subsequently

transferred to liquidation status by SBA effective April 29, 2005.  Coqui was formally

notified of the transfer via letter dated June 7, 2005.

12.     In accordance with Section 311 of the Small Business Investment Act, 15

U.S.C. §687c, by Order dated March 3, 2006 ("the Receivership Order"), this Court

appointed the United States Small Business Administration as the liquidating receiver

("the Receiver") for Coqui.

13.     Via letter dated October 4, 2005 that, among other things, if the General

Partner did not call the unfunded capital commitments, the Receiver would do so.

14.     During the transfer meeting referenced in paragraph 5, above, I personally discussed the remaining balance of the unfunded capital commitments with Isaac Kier, a defendant in this action and a member of Coqui's general partner.  At no time did Mr. Kier mention or express that the collection of the unfunded capital commitments was prohibited or conditional.

15.     Prior to requesting additional Leverage or funding from SBA, Coqui submitted Capital Certificates dated October 31, 2002 and November 19, 2003 to SBA. Paragraph 11 of the Capital Certificates, both of which are executed by defendants Jeffrey Koffman, Isaac Kier and Jeffrey Davidson as members of Coqui's General Partner, state that the capital certificate is "material for the purpose of inducing SBA to . . . disburse SBA funds in reliance upon Applicant's statement." Section E of both Capital Certificates is entitled "Conditions to Exercise of Right to Receive Unfunded Commitments".  Under Section E of both Capital Certificates, executed by defendants Jeffrey Koffman, Isaac Kier and Jeffrey Davidson as members of Coqui's General Partner, is inserted "[None]".

16.     By separate letters ("Call Letters"), the earliest of which was dated May 8, 2006, and in accordance with Section 5.02 of the ALPA, the Receiver made a capital call on each of the Defendants for one hundred percent (100%) of their respective unpaid and unfunded limited partnership capital commitments and/or for 100% of the obligations created by their guaranty of the payment of any unpaid and unfunded limited partnership capital commitments.  Each Defendant was given at least 10 days to remit the amounts due under their respective commitments or obligations.

17.     To date, the Defendants remain in default and the outstanding amount due

Coqui and the Coqui receivership estate from the unfunded capital commitments totals over $4.4 million.

"Under penalty of perjury, I declare that the foregoing is true and correct to the best of my knowledge, information and belief."

Executed on this ⟨5⟩ TH day of May, 2008.

Terry George

Sworn and subscribed to before me
this ⟨5th⟩ day of May, 2008.

Notary Public

My Commission expires: _____

ABRAHAM A. SPEIGHT
Notary Public, District of Columbia
My Commission Expires April 30, 2013

# EXHIBIT A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/03/06

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY

WILLIAM YOUNG (WY9160)
Special Assistant U.S. Attorney
1 Pierrepont Plaza, 14th Fl.
Brooklyn, New York 11201
Telephone:    (718) 254-6957

ARLENE M. EMBREY (AE9718)
Trial Attorney
Small Business Administration
409 Third Street, S.W., Seventh Floor
Washington, D.C. 20416
Telephone:    (202) 205-6976
Facsimile:    (202) 481-0324

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff <br><br> v. <br><br> COQUI CAPITAL PARTNERS, LP <br> a/k/a Tortuga Capital Partners, LP <br><br> Defendant | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civ. Action No. 06-CV-1564 <br> ) (SWAIN, J.) <br> ) (ECF CASE) <br> ) <br> ) <br> ) |

## CONSENT ORDER & JUDGMENT

Before this Court is the Complaint by the United States of America, on behalf of the

United States Small Business Administration ("SBA"), for a preliminary and permanent

injunction and the appointment of the SBA as Permanent Receiver for Coqui Capital Partners,

LP, a/k/a Tortuga Capital Partners, LP. The Court, being fully advised in the merits and having

been informed that Defendant does not challenge entry of this Order,

**HEREBY ORDERS, ADJUDGES AND DECREES THAT:**

1.  Pursuant to the provisions of 15 U.S.C. § 687c, this Court shall take exclusive jurisdiction of Coqui Capital Partners, LP, a/k/a Tortuga Capital Partners, LP (hereinafter "Coqui"), and all of its assets, wherever located, and the United States Small Business Administration ("SBA") is hereby appointed receiver ("the Receiver") of Coqui to serve without bond until further order of this Court. The Receiver is appointed for the purpose of administering, marshalling and, if necessary, liquidating all of Coqui's assets to satisfy the claims of creditors therefrom in the order of priority as determined by this Court.

2.  The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the general partners, managers, officers, and directors of Coqui under applicable state and federal law and by the Certificate and Limited Partnership Agreement of said limited partnership, in addition to all powers and authority conferred upon the Receiver by the provisions of 15 U.S.C. § 687c and 28 U.S.C. § 754. The general partners, managers, directors, officers, employees and agents of Coqui are hereby dismissed. Such persons shall have no authority with respect to Coqui's operations or assets, except as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of Coqui and shall pursue and preserve all of its claims.

3.  The past and/or present officers, directors, agents, managers, general partners, accountants, attorneys and employees of Coqui, as well as all those acting in their place, are hereby ordered and directed to turn over to the Receiver forthwith all books, records, documents, accounts and all other instruments and papers of said limited partnership and all other assets and property of the partnership, whether real or personal upon notice from the Receiver regarding the time and place of such production. Coqui's General Partner, Tortuga Capital Management, LLC, and/or Coqui's management company, Tortuga Capital Advisors, LLC, shall furnish a written statement

to the Receiver within five (5) business days after the entry of this Order, listing the identity, location and estimated value of all assets of Coqui, as well as the names, addresses and amounts of claims of all creditors of Coqui of which Coqui, Tortuga Capital Management, LLC or Tortuga Capital Advisors, LLC have knowledge. All persons having control, custody or possession of any assets or property of Coqui, including Tortuga Capital Management, LLC and Tortuga Capital Advisors, LLC are hereby directed to turn such property over to the Receiver.

4.     The Receiver shall promptly give notice of its appointment to all known general and limited partners, officers, directors, agents, managers, employees, shareholders, creditors, debtors and agents of Coqui. All persons and entities owing any obligations or debts to Coqui shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver, and its receipt for such payments shall have the same force and effect as if Coqui had received such payments.

5.     The Receiver is hereby authorized to open such Receiver's bank accounts, at banking or other financial institutions, to extend credit on behalf of Coqui, to utilize SBA personnel, and to employ such other personnel as necessary to effectuate the operation of the Receivership including, but not limited to, attorneys and accountants, and is further authorized to expend Receivership funds to compensate such personnel in such amounts and upon such terms as the Receiver shall deem reasonable in light of the usual fees and billing practices and procedures of such personnel. The Receiver is not required to obtain Court approval prior to the disbursement of Receivership funds for payments to personnel employed by the Receiver or payments for expenses incidental to administration of the Receivership. In addition, the Receiver is authorized to reimburse the SBA or its employees for travel expenses incurred by SBA personnel in the establishment and administration of the Receivership. The Receiver may, without further order of

this Court, transfer, compromise, or otherwise dispose of any claim or asset, other than real estate, which would result in net proceeds to the Receiver.

6.      Coqui's past and/or present officers, directors, agents, managers, general partners, shareholders, employees, and other appropriate persons (including, without limitation, the defendant's portfolio of small business concerns and banks or other financial institutions doing business with defendant and/or defendant's portfolio of small business concerns) shall answer under oath, pursuant to a Receiver's Notice or Subpoena, to the Receiver, all questions which it may put to them regarding the business of said limited partnership, or any other matter relevant to the operation or administration of the Receivership or the collection of funds due to Coqui. In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons, the production of documents, information, or any other form of discovery concerning the assets, property or business assets of Coqui or any other matter relevant to the operation or administration of the Receivership or the collection of funds due to Coqui, the Receiver shall direct notice for any such appearance by certified mail, and said persons shall appear and give answer to the Receiver, produce documents or submit to any other form of discovery in accordance with the Federal Rules of Civil Procedure.

7.      The parties or prospective parties to any and all civil legal proceedings wherever located, including, but not limited to arbitration proceedings, bankruptcy or foreclosure actions, default proceedings, or any other proceedings involving Coqui or any assets of Coqui, involving Coqui or its present or past officers, directors, managers, or general partners or the Receiver, which parties have brought suit or have been sued for, or in connection with, any action taken by Coqui's officers, directors, managers, or general partners while acting in such capacity whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise, or with respect to any assets of

4

Coqui, are enjoined from taking any action, including discovery, commencing or continuing any legal proceeding of any nature in connection with any proceeding.

8.    All pending civil legal proceedings wherever located, including arbitration proceedings, foreclosure activities, bankruptcy actions, or default proceedings, but excluding the instant proceeding, involving Coqui or any of its assets or any action of any nature taken by Coqui's present or past officers, directors, managers, or general partners which parties have brought suit or have been sued for, or in connection with, any action taken by them while acting in their official capacity whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise, are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.

9.    Coqui and its past and/or present directors, officers, managers, general partners, agents, employees and other persons acting in concert or participation therewith shall be, and they hereby are, enjoined from either directly or indirectly taking any actions or causing any such action to be taken which would dissipate the assets and property of Coqui to the detriment of the Receiver appointed in this cause, including but not limited to destruction of partnership records, or which would violate the Small Business Investment Act of 1958, as amended, (the "SBIA"), 15 U.S.C. Sections 661, et seq., or the regulations promulgated thereunder (the "Regulations"), 13 C.F.R. Sections 107.1, et seq.

10.    The Receiver is authorized to borrow on behalf of Coqui, from the SBA, up to $1,000,000, and is authorized to cause Coqui to issue Receiver's Certificates of Indebtedness in the principal amounts of the sums borrowed, which Certificates will bear interest at or about ten (10) percent per annum and will have a maturity date no later than 18 months after the date of issue. Said Receiver's Certificates of Indebtedness shall have priority over all other debts and obligations

5

of Coqui, excluding administrative expenses of the Receivership, whether presently existing or hereinafter incurred, including without limitation any claims of stockholders of Coqui.

11.    This Court determines and adjudicates that Coqui has violated the capital impairment provisions of the SBIA and the Regulations as alleged in the Complaint filed in this matter. After completing its activities in accordance with this Order, the Receiver may submit a report to this Court recommending that Coqui's license as an SBIC be revoked.

12.    The United States Small Business Administration is further entitled to a judgment against Coqui Capital Partners, LP, a/k/a Tortuga Capital Partners, LP, in the total sum of $5,737,721.39, including principal of $5,457,033.33 and accrued interest and fees in the amount of $280,688.06 as of January 19, 2006 with a per diem rate of $1,113.83, plus post judgment interest pursuant to 28 U.S.C. § 1961 as of the date of entry of this Order.

13.    The election of Tortuga Capital Management, LLC not to challenge this Order shall not affect, alter or waive any rights, claims or defenses of the limited partners of Coqui Capital Partners, LP, a/k/a Tortuga Capital Partners, LP.

**AGREED TO AND ACKNOWLEDGED:**

United States Small Business Administration

By:  _____    ‹ 2.-17-06
       Thomas G. Morris, Director
       Office of Liquidation

Coqui Capital Partners, LP, a/k/a Tortuga Capital Partners, LP

By:  _____
       Tortuga Capital Management, LLC,
       its general partner, through

Isaac Kier

Jeffrey Koffman

_____
Jeffrey Davidson

Its Members.

**SO ORDERED** this _____ day of _____, 2006.

_____
**UNITED STATES DISTRICT JUDGE**

7

_____
Isaac Kier

_____
Jeffrey Koffman

_____
Jeffrey Davidson

Its Members.

SO ORDERED this 3rd day of ___March___, 2006.

_____
UNITED STATES DISTRICT JUDGE

7

# EXHIBIT B (Part 1)



# Coqui Capital
### Partners, L.P.

June 21, 2001

**LIC #: 02/02-0599**

Office of Investment
Attn: Fonda Stevens-Kelly
Suite 6300
Mail Code 7050
Small Business Administration
409 3rd St. SW
Washington, DC 20416

Dear Fonda:

The executed LP Agreement submitted by Coqui Capital Partners, LP dated June 14, 2001, is unchanged from the last version of the LP Agreement submitted to the SBA for review and approval, dated April 1, 2001

Thank you again.  If any additional information is needed, please contact me at (212) 247-4590 x22.

Sincerely,

James McGurk
Associate



Coqui Capital Partners, LP
1775 Broadway, Suite 604
New York, NY 10019
Tel: (212) 247-4590
Fax: (212) 247-4801
www.coquicapital.com

## CONFIDENTIAL

| | |
|---|---|
| **TO:** Fonda Stevens Kelly | **FROM:** Jamie McGurk |
| **COMPANY:** US Small Business Administration | **DATE:** 6/21/01 |
| **FAX NUMBER:** (202) 205-6959 | **TOTAL NO. OF PAGES INCLUDING COVER:** 2 |
| **PHONE NUMBER:** | **SENDER'S CONTACT NUMBER:** 212-247-4590 x22 |
| **RE:** LP Agreement | **SENDER'S E-MAIL ADDRESS:** jmcgurk@coquicapital.com |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

**NOTES/COMMENTS:**

Fonda:

The original will be sent to your attention.

Thanks,

Jamie

06-20-2001    22:28    COQUI CAPITAL → 12022056959    NO.350    P01

Coqui Capital Partners, LP
1775 Broadway, Suite 604
New York, NY 10019
Tel: (212) 247-4590
Fax: (212) 247-4801
www.coquicapital.com



# Coqui Capital
## Partners, L.P.

June 14, 2001

LIC #: 02/02-0599

Office of Investment
Attn: Fonda Stevens-Kelly
Suite 6300
Mail Code 7050
Small Business Administration
409 3rd St. SW
Washington, DC 20416

Dear Fonda:

As discussed, enclosed is the executed copy of our Amended Limited Partnership Agreement. All Limited Partners have consented to the conversion so far, and we have received in excess of 50% ownership response.

Thank you again. If any additional information is needed, please do not hesitate to call me at (212) 247-4590 x22.

Sincerely,

James McGurk
Associate

Enclosures

# COQUI CAPITAL PARTNERS, L.P.
## (A Delaware Limited Partnership)

# AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

Dated as of June 13, 2001

# COQUI CAPITAL PARTNERS, L.P.

## AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

### Table of Contents

ARTICLE 1  General Provisions .................................................................................2

Section 1.01   Definitions. ......................................................................................2

Section 1.02   Annexes .........................................................................................11

Section 1.03   Conflicts.........................................................................................11

Section 1.04   Name...............................................................................................12

Section 1.05   Principal Office; Registered Office; and Qualification....................12

Section 1.06   Commencement and Duration........................................................12

Section 1.07   Admission of Partners. ..................................................................13

Section 1.08   Representations of Partners. .........................................................13

Section 1.09   Notices With Respect to Representations by Private Limited Partners............19

Section 1.10   Liability of Partners. ......................................................................19

ARTICLE 2  Purpose and Powers .........................................................................21

Section 2.01   Purpose and Powers.......................................................................21

Section 2.02   Unrelated Business Taxable Income. .............................................23

Section 2.03   Venture Capital Operating Company. ............................................23

ARTICLE 3  Management.......................................................................................24

Section 3.01   Authority of General Partner. ........................................................24

Section 3.02   Authority of the Private Limited Partners. .....................................25

Section 3.03   Authority of the Preferred Limited Partners...................................25

Section 3.04   Acknowledgement of SBA Authority. .............................................25

Section 3.05   The Investment Adviser/Manager...................................................25

Section 3.06    Restrictions on Other Activities of the General Partner and its Affiliates. ......26

Section 3.07    Management Compensation. .........................................................................27

Section 3.08    Payment of Management Compensation. ......................................................27

Section 3.09    Partnership Expenses. ..................................................................................29

Section 3.10    Valuation of Assets. .....................................................................................30

Section 3.11    Standard of Care. .........................................................................................31

Section 3.12    Indemnification ............................................................................................31

Section 3.13    Partnership Committees................................................................................34

Section 3.14    Investment Company Act; Investor Advisers Act .......................................34

ARTICLE 4  Small Business Investment Company Matters ...............................................36

Section 4.01    SBIC Act. .....................................................................................................36

Section 4.02    Consent or Approval of, and Notice to, SBA. ............................................36

Section 4.03    Provisions Required by the SBIC Act for Issuers of Participating Securities..36

Section 4.04    Effective Date of Incorporated SBIC Act Provisions. .................................37

Section 4.05    Admission of Preferred Limited Partners and Increased Commitments. .........37

Section 4.06    Redemption and Withdrawal of Preferred Limited Partners. ............................38

Section 4.07    Assignment of Right to Distributions by a Preferred Limited Partner. ............39

Section 4.08    Priority of Preferred Limited Partnership Interests on Liquidation. .................39

Section 4.09    SBA as Third Party Beneficiary. .................................................................39

Section 4.10    Interest of the General Partner After Withdrawal. .......................................39

ARTICLE 5  Partners' Capital Contributions .....................................................................40

Section 5.01    Capital Commitments. .................................................................................40

Section 5.02    Capital Contributions by Private Limited Partners. .....................................40

Section 5.03    Capital Contributions by Preferred Limited Partners. ..................................41

Section 5.04    Capital Contributions by the General Partner. .............................................41

Section 5.05    Additional Private Limited Partners and Increased Commitments. ................42

Section 5.06    Conditions to the Commitments of the General Partner and the Private Limited Partners. ...................................................................................................43

Section 5.07    Termination of the Obligation to Contribute Capital......................................44

Section 5.08    Notice and Opinion of Counsel. ..................................................................44

Section 5.09    Cure, Termination of Capital Contributions and Withdrawal. .........................45

Section 5.10    Failure to Make Required Capital Contributions............................................45

Section 5.11    Notice and Consent of SBA with respect to Capital Contribution Defaults.....45

Section 5.12    Interest on Overdue Contributions. ..............................................................46

Section 5.13    Termination of a Private Limited Partner's Right to Make Further Capital Contributions. ...........................................................................................47

Section 5.14    Forfeiture of a Private Limited Partner's Interest in the Partnership. ...............47

Section 5.15    Withholding and Application of a Private Limited Partner's Distributions. .....47

Section 5.16    Required Sale of a Private Limited Partner's Interest in the Partnership. .........48

Section 5.17    Security Interest..........................................................................................50

ARTICLE 6  Adjustment of Capital Accounts ............................................................51

Section 6.01    Establishment of Capital Accounts. ...............................................................51

Section 6.02    Time of Adjustment of Capital Accounts. .......................................................51

Section 6.03    Adjustments to Capital Accounts...................................................................51

Section 6.04    Tax Matters. ...............................................................................................56

ARTICLE 7  Distributions ........................................................................................59

Section 7.01    Distributions to Partners. .............................................................................59

Section 7.02    Distributions of Noncash Assets in Kind........................................................60

Section 7.03    Apportionment of Distributions Among the General Partner and Private Limited Partners. ...................................................................................................61

Section 7.04    Distributions for Payment of Tax...................................................................61

Section 7.05    Distributions Violative of the Act Prohibited. ...................................... 62

ARTICLE 8  Dissolution, Liquidation, Winding Up and Withdrawal ........................... 63

Section 8.01    Dissolution. ........................................................................................ 63

Section 8.02    Winding Up. ........................................................................................ 64

Section 8.03    Withdrawal of the General Partner. ...................................................... 65

Section 8.04    Withdrawal of Private Limited Partners from the Partnership ..................... 66

Section 8.05    Amount Reserved and Pending Claims ................................................. 67

Section 8.06    Continuation of the Partnership After the Withdrawal of the General Partner 68

Section 8.07    Withdrawals of Capital. ....................................................................... 68

Section 8.08    Withdrawal by ERISA Regulated Pension Plans. ..................................... 68

Section 8.09    Withdrawal by Government Plans Complying with State and Local Law ....... 69

Section 8.10    Withdrawal by Government Plans Complying with ERISA. ......................... 69

Section 8.11    Withdrawal by Tax Exempt Private Limited Partners. ............................... 69

Section 8.12    Withdrawal by Registered Investment Companies. .................................. 70

Section 8.13    Distributions on Withdrawal. ................................................................ 70

ARTICLE 9  Accounts, Reports and Auditors ............................................................ 71

Section 9.01    Books of Account. ............................................................................... 71

Section 9.02    Audit and Report. ................................................................................ 71

Section 9.03    Fiscal Year. ......................................................................................... 72

ARTICLE 10  Miscellaneous ................................................................................... 73

Section 10.01    Assignability. ..................................................................................... 73

Section 10.02    Restrictions on Transfer ...................................................................... 74

Section 10.03    Binding Agreement. ............................................................................ 75

Section 10.04    Gender. .............................................................................................. 75

Section 10.05    Notices. .............................................................................................. 75

Section 10.06    Consents and Approvals.....................................................................76

Section 10.07    Counterparts.....................................................................................76

Section 10.08    Amendments.....................................................................................76

Section 10.09    Power of Attorney............................................................................77

Section 10.10    Applicable Law.................................................................................79

Section 10.11    Severability. ....................................................................................79

Section 10.12    Goodwill ..........................................................................................80

Section 10.13    Jurisdiction.......................................................................................80

Section 10.14    Waiver of Jury Trial.........................................................................80

Section 10.15    Agreement to Arbitrate ....................................................................80

Section 10.16    Entire Agreement.............................................................................80


Schedule A –      <u>Partners and Commitments</u>

Schedule A-1 –    <u>Instrument of Admission or Increase in Commitment for a Preferred
                  Limited Partner</u>


Exhibit I –       <u>Valuation Guidelines</u>

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF
COQUI CAPITAL PARTNERS, L.P.

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is dated and effective as of June 13, 2001 ("Effective Date"), by and among Coqui Capital Management, LLC, a Delaware limited liability company (the "General Partner"), and each of the Persons whose names are set forth under the heading "Limited Partners" on Schedule A attached hereto, as it may be amended from time to time in accordance with the terms hereof (the "Limited Partners"). Terms set forth herein with initial capital letters are used with the meanings specified for such terms below in Section 1.01, or as may be more specifically defined elsewhere herein.

WHEREAS, the General Partner and the Limited Partners have agreed to enter into a limited partnership on the terms and conditions hereinafter set forth;

WHEREAS, on October 6, 1999, the General Partner executed a Certificate of Limited Partnership forming Coqui Capital Partners, L.P. (the "Partnership"), as a limited partnership under the Delaware Revised Uniform Limited Partnership Act (6 Del. C. §§ 17-101 et seq.), as amended from time to time, and filed such certificate among the partnership records of the State of Delaware on October 7, 1999;

WHEREAS, the General Partner and each of the Limited Partners executed that certain Agreement of Limited Partnership dated as of March, 2000 (the "Original Agreement");

WHEREAS, the Partnership applied for and was granted a license by the U.S. Small Business Administration (the "SBA") to operate as a Small Business Investment Company ("SBIC") with Debenture Status on April 7, 2000;

WHEREAS, the General Partner, on behalf of the Partnership, has requested that the SBA grant the Partnership Participating Security status as an SBIC on September 19, 2000;

WHEREAS, the SBA granted the Partnership Participating Security status on May 15, 2001, on the condition that the Original Agreement be amended and restated to reflect the requirements of an Agreement of Limited Partnership for an SBIC with Participating Security Status; and

WHEREAS, the General Partner and Limited Partners desire to amend and restate the Original Agreement so that the Original Agreement conforms with the requirements of the SBA for an Agreement of Limited Partnership for a SBIC with Participating Security status.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree to continue the Partnership, upon the terms and conditions set forth herein.

# Article 1

## General Provisions

Section 1.01   Definitions.

The defined terms used in this Agreement shall, unless the context otherwise specifies, have the meanings specified in this Section 1.01. For the purposes of defining capitalized terms not herein defined, or defined by reference to the SBIC Act, this Agreement incorporates the definitions contained in the SBIC Act of all such terms, as if fully set forth herein. For the purposes of this Agreement, the following terms shall have the following meanings:

"Act" shall mean the Delaware Revised Uniform Limited Partnership Act (Title 6, Chapter 17 of the Delaware Code).

"Accumulated Prioritized Payments" has the meaning stated in the SBIC Act.

"Additional Private Limited Partners" has the meaning stated in Section 5.05.

"Adjusted Capital Account Deficit" means with respect to any Private Limited Partner, the deficit balance, if any, in such Private Limited Partner's Capital Account as of the end of the relevant fiscal period, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts that such Private Limited Partner is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Adjustments" has the meaning stated in the SBIC Act.

"Advisory Boards" shall mean those boards which may be authorized to perform the functions set forth in Section 3.13 herein.

"Affiliate" has the meaning stated in the SBIC Act.

"Agreement" means this amended and restated agreement of limited partnership, as amended from time to time. References to this Agreement will be deemed to include all provisions incorporated in this Agreement by reference.

"Annex GDP" shall mean the version of such Annex that is attached hereto and incorporated herein by reference as a part of this Agreement.

"Annex OP" shall mean the version of such Annex, that is attached hereto and incorporated herein by reference as a part of this Agreement.

"Assets" means common and preferred stock (including warrants, rights and other options relating to such stock), notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and other properties or interests commonly regarded as securities, and in addition, interests in real property, whether improved or unimproved, and interests in personal property of all kinds (tangible or intangible), chooses in action, and cash, bank deposits and so-called "money market instruments".

"Assets Under Management" means, as of any specified date, the value of all Assets owned by the Partnership (the value to be determined as provided in this Agreement), including contributions requested and due from Partners and uncalled amounts of Commitments that are included in the Partnership's Regulatory Capital, less the amount of any liabilities of the Partnership, determined in accordance with generally accepted accounting principles, consistently applied.

"Associate" has the meaning stated in the SBIC Act.

"Capital Account" means the account of each Partner that reflects its interest in the Partnership determined in accordance with Section 6.03.

"Certificate of Limited Partnership" means the certificate of limited partnership with respect to the Partnership filed for record in the office of the Secretary of State of the State of Delaware.

"Capital Contribution" shall mean, with respect to any Partner, the amount of money and the initial Gross Asset Value of any property (other than money contributed to the Partnership) with respect to the Partnership interest held by such Partner.

"Charge" has the meaning stated in the SBIC Act.

"Closing Capital Account" means, with respect to any fiscal period, the Opening Capital Account of each Partner for the fiscal period after allocations have been made to the Capital Account in accordance with Section 6.03.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder and interpretations thereof promulgated by the Internal Revenue Service, as in effect from time to time.

"Combined Capital" shall have the meaning set forth in the SBIC Act, including without limitation 13 C.F.R. § 107.50, namely, that "Combined Capital" means the sum of Regulatory Capital and outstanding Leverage.

3

"Commitments" means the capital contributions to the Partnership that the Preferred Limited Partners have made and the other Partners have made or are obligated to make to the Partnership. The amounts and terms of the Commitments of the General Partner, the Private Limited Partners, and the Preferred Limited Partners will be as stated in this Agreement and in Schedule A attached hereto.

"Control Person" has the meaning stated in the SBIC Act.

"Debentures" has the meaning stated in the SBIC Act.

"Depreciation" shall mean, for each fiscal year or other fiscal period ("fiscal period"), an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an Asset for such fiscal year or period, except that if the Gross Asset Value (as defined below) of an Asset differs from its adjusted basis for federal income tax purposes at the beginning of such fiscal year or period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such fiscal year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an Asset at the beginning of such fiscal year or period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

"Designated Party" means any of the General Partner, any Investment Adviser/Manager, and any partner, member, manager, stockholder, director, officer, employee or Affiliate of the General Partner and any Investment Adviser/Manager.

"Distributable Security" has the meaning stated in the SBIC Act.

"Distributive Share" shall mean the amount that a Partner would have received pursuant to Section 7.03 herein if the Partnership had been liquidated and all adjustments pursuant to Section 6.03 herein had been made at the date in question, and all Assets of the Partnership had been converted to cash in an amount equal to the value of all such Assets computed in accordance with Section 3.10 herein.

"Documents" shall have the meaning set forth in Section 1.08(b)(x).

"Earned Prioritized Payments" has the meaning stated in the SBIC Act.

"Earmarked Assets" has the meaning stated in the SBIC Act.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder and interpretations thereof promulgated by the Department of Labor, as in effect from time to time.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

"General Partner" means the general partner or general partners of the Partnership, as set forth in this Agreement.

"General Partner's Percentage" shall mean one percent (1%).

"Gross Asset Value" shall mean, with respect to any Asset, the Asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any Asset contributed by a Partner to the Partnership shall be the gross fair market value of such Asset, as reasonably determined by the General Partner;

(b)    The Gross Asset Values of all Assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as reasonably determined by the General Partner as of the following times: (i) the admission of any Additional Private Limited Partner or the date of the increase of the Commitment of any existing Private Limited Partner in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (iii) the liquidation of the Partnership within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that an adjustment described in clauses (i) and (ii) of this paragraph shall be made only if the General Partner reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Partners in the Partnership; and

(c)    The Gross Asset Value of any Asset distributed to any Partner shall be adjusted to equal the fair market value (taking Code Section 7701(g) into account) of such Asset on the date of distribution, as reasonably determined by the General Partner.

If the Gross Asset Value of an Asset has been determined or adjusted pursuant to subparagraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Asset, for purposes of computing Net Profits and Net Losses.

"Indemnifiable Costs" means all costs, expenses, damages, claims, liabilities, fines and judgments (including the reasonable cost of the defense, and any sums which may be paid with the consent of the Partnership in settlement), incurred in connection with or arising from a claim, action, suit, proceeding or investigation, by or before any court or administrative or legislative body or authority.

"Initial Public Offering" shall mean the agreement to sell substantially all of the Partners' ownership interests in the Partnership; the offering of securities representing the Partners' ownership interests in the Partnership or any portion thereof in either a private placement or public offering; or the conversion of the Partnership into another entity with the intention to offer to the public securities representing the ownership of that entity.

"Institutional Investor" shall have the meaning set forth in the SBIC Act, and in 13 C.F.R. § 107.50.

"Investment Advisers Act" means the Investment Advisers Act of 1940, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

"Investment Adviser/Manager" has the meaning stated in the SBIC Act.

"Investment Securities" shall mean Assets that do not constitute cash, bank deposits or so-called "money market" instruments.

"Legal Representative" shall mean any executor, administrator, committee, guardian, conservator or trustee.

"Leverage" has the meaning stated in the SBIC Act.

"Management Compensation" means the amounts payable by the Partnership to the General Partner or Investment Adviser/Manager, as provided in Section 3.07.

"Maximum Tax Liability" has the meaning stated in the SBIC Act.

"Minimum Allocation Percentage" shall mean:

6

(a) if the total Capital Contributions to the Partnership by all Private Limited Partners are not more than $50,000,000, then one percent (1%); or

(b) if the total Capital Contributions to the Partnership by all Private Limited Partners are more than $50,000,000, then one percent (1%) multiplied by $50,000,000 divided by the total Capital Contributions to the Partnership of all Private Limited Partners, or such greater percentage as may be expressly specified in the Agreement, but in either event set forth in this clause (b) not less than two tenths of one percent (0.2%).

"Net Losses" means, with respect to any fiscal period, the excess, if any, of:

    (i)    all expenses and losses incurred during the fiscal period by the Partnership from all sources over

    (ii)    the aggregate revenue, income and gains realized during the fiscal period by the Partnership from all sources.

For purposes of determining Net Losses:

    (A)    items will be taken into account to the extent that (1) they are includable as items of income, credit, loss or deduction for Federal income tax purposes (including items described in Section 705(a)(2)(B) of the Code, or treated as so described in Treasury Regulation § 1.704-1(b)(2)(iv)(i)) or, (2) in the case of items of income, they constitute income that is exempt from Federal income tax; and

    (B)    if any Noncash Asset is distributed in kind, it will be deemed sold at the value established at the most recent valuation of the Noncash Asset under this Agreement (or such other valuation date as is required under the SBIC Act) and any unrealized appreciation or depreciation with respect to the Noncash Asset will be deemed realized and included in the determination of Net Losses.

"Net Profits" means, with respect to any fiscal period, the excess, if any, of:

    (i)    the aggregate revenue, income and gains realized during the fiscal period by the Partnership from all sources over

    (ii)    all expenses and losses incurred during the fiscal period by the Partnership from all sources.

For purposes of determining Net Profits:

(A)    items will be taken into account to the extent that (1) they are includable as items of income, credit, loss or deduction for Federal income tax purposes (including items described in Section 705(a)(2)(B) of the Code, or treated as so described in Treasury Regulation § 1.704-1(b)(2)(iv)(i)) or, (2) in the case of items of income, constitute income that is exempt from Federal income tax; and

(B)    if any Noncash Asset is distributed in kind, it will be deemed sold at the value established at the most recent valuation of the Noncash Asset under this Agreement (or such other valuation date as is required under the SBIC Act) and any unrealized appreciation or depreciation with respect to the Noncash Asset will be deemed realized and included in the determination of Net Profits.

"Noncash Asset" means any Asset of the Partnership other than cash.

"Optionor" shall have the meaning set forth in Section 5.16.

"Optionees" shall have the meaning set forth in Section 5.16.

"Optioned Partnership Interest" shall have the meaning set forth in Section 5.16.

"Option Price" shall have the meaning set forth in Section 5.16.

"Opening Capital Account," with respect to any fiscal period, means:

(i)    with respect to any Partner admitted during the fiscal period, the Partner's initial capital contribution (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's initial capital contribution transferred to the transferee); and

(ii)    with respect to any Partner admitted during any prior fiscal period (other than a Partner who has withdrawn as of the last day of the preceding fiscal period), the Partner's Closing Capital Account for the preceding fiscal period (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's Closing Capital Account transferred to the transferee).

8

"Operating Expenses" shall mean, with respect to any fiscal period, Management Compensation, interest expenses and any other expenses of the Partnership, including amortization, if any, of Organization Expenses.

"Outstanding Leverage" means the total amount of outstanding securities (including, but not limited to, Debentures and Participating Securities) issued by the Partnership that qualify as Leverage and have not been redeemed or repaid as provided in the SBIC Act.

"Organization Expenses" shall mean all reasonable expenses incurred in the formation and marketing of the Partnership, the development of specialized credit approval and review systems for the Partnership, and the offering of limited partnership interests in the Partnership (including reimbursement of the General Partner, the Investment Adviser and the members, officers, managers, and employees of the General Partner and the Investment Adviser for such expenses).

"Participating Security" has the meaning stated in the SBIC Act.

"Partners" means the General Partner, the Private Limited Partners and the Preferred Limited Partners, if any.

"Partnership" means the limited partnership established by this Agreement.

"Partner's Percentage" shall mean the percentage determined for each Partner by dividing (i) the aggregate Capital Contributions credited to such Partner's Capital Account as provided in Section 6.03 herein at the time of any relevant calculation, by (ii) the aggregate Capital Contributions credited to all Partners' Capital Accounts at such time, taking into account any adjustment made pursuant to Section 5.16(h) herein. The sum of the respective Partners' Percentages shall at all times equal one hundred percent (100%).

"Person" shall mean any natural person, corporation, general partnership, limited partnership, proprietorship, other business organization, trust, association or other legal entity.

"Fifty-one percent (51%) in interest of the Private Limited Partners" means Private Limited Partners whose capital contributions represent such percentage of the capital contributions of all Private Limited Partners as of the time of determination.

"Portfolio Securities" shall mean Assets which do not constitute (a) securities in which a Licensee is permitted under 13 C.F.R. § 107.530, as in effect from time to time hereafter, to invest funds not invested in "Small Concerns" (as defined in the SBIC Act); or (b) cash or bank deposits.

"Preferred Limited Partner" means SBA, in its capacity as the holder of a Preferred Limited Partnership Interest, or any successor in interest to SBA in its capacity as a Preferred Limited Partner.

"Preferred Limited Partnership Interest" means a preferred limited partnership interest in the Partnership which qualifies as a Participating Security.

"Preferred Return" shall mean a sum equal to seven percent (7%) per annum, determined on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days occurring in the fiscal period for which the Preferred Return is being determined, of the average daily balance of the Private Limited Partners' Unreturned Capital from time to time during the fiscal period to which the Preferred Return relates, commencing on the date any Private Limited Partner first makes a Capital Contribution.

"Prioritized Payment" has the meaning stated in the SBIC Act.

"Private Capital" has the meaning stated in the SBIC Act.

"Private Limited Partners" means any limited partners of the Partnership other than any Preferred Limited Partner.

"Profit Participation" has the meaning stated in the SBIC Act.

"Publicly Traded Security" shall mean a Portfolio Security which is "Publicly Traded and Marketable" as such term is used in the SBIC Act, and in 13 C.F.R. § 107.50.

"Qualified Nonprivate Funds" has the meaning stated in the SBIC Act.

"Remaining Portion" shall have the meaning set forth in Section 5.16.

"Regulatory Capital" has the meaning stated in the SBIC Act.

"Retained Earnings Available for Distribution" has the meaning stated in the SBIC Act.

"SBA" means the United States Small Business Administration.

"SBA Agreements" has the meaning stated in Section 10.16.

"SBIC" means a small business investment company licensed under the SBIC Act.

"SBIC Act" means the Small Business Investment Act of 1958, as amended, and the rules and regulations thereunder and interpretations thereof promulgated by SBA, as in effect from time to time.

"SBIC Regulations" means all federal rules and regulations that may be applicable from time to time to an SBIC.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the regulations thereunder and interpretations thereof promulgated by the SEC, as in effect from time to time.

"Special Private Limited Partner" has the meaning stated in Section 4.10 and Article 8.3(c).

"Treasury Regulation" shall mean the Income Tax Regulations promulgated by the Internal Revenue Service and the Department of Treasury, as amended from time to time.

"Unreturned Capital" of any Partner on any date shall equal the excess, if any, of (a) the aggregate Capital Contributions of such Partner as of such date, over (b) the aggregate distributions to such Partner pursuant to Section 3.19(a)(ii) hereof as of such date.

"Voting Interest," as to any Partner, shall mean the Partner's Percentage for such Partner.

Section 1.02    [Annexes.

The provisions of Annex GDP and of Annex OP attached to this Agreement are incorporated in this Agreement with the same force and effect as if fully set forth herein.

Section 1.03    Conflicts.

(a)    The provisions of this Agreement shall be interpreted to the fullest extent possible in a manner consistent with the provisions of the SBIC Act, and the attached Annex GDP and Annex OP. In the event of any conflict between any provision of this Agreement, Annex GDP, or Annex OP and the provisions of the SBIC Act (including, without limitation, any conflict with respect to the rights of the SBA or the respective Partners under this Agreement), the provisions of the SBIC Act shall control.

(b)    In the event of any conflict between any provision of this Agreement and any provision of either Annex GDP or Annex OP, the provision of Annex GDP or Annex OP shall control.

(c)    In the event of any conflict between any provision of Annex GDP and any provision of Annex OP, the provision of Annex GDP shall control.]

[Use of 1.02 and 1.03 (relating to Annex GDP) in this Agreement will depend on what happens to the outstanding Debenture leverage; if it remains outstanding, keep provisions / if not, delete]

Section 1.04    <u>Name</u>.

    (a)    The name of the Partnership is "Coqui Capital Partners, L.P."

    (b)    Subject to the prior approval of SBA but without obtaining the approval of any of the Private Limited Partners, the General Partner has the power at any time to:

        (i)    change the name of the Partnership; and

        (ii)    qualify the Partnership to do business under any name when the Partnership's name is unavailable for use, or may not be used, in a particular jurisdiction.

    (c)    The General Partner will give prompt notice of any action taken under this Section to each Private Limited Partner and SBA.

Section 1.05    <u>Principal Office; Registered Office; and Qualification</u>.

    (a)    The principal office of the Partnership is at 1775 Broadway, New York, New York 10019, or such other place as may from time to time be designated by the General Partner, subject to the approval of SBA.

    (b)    The registered office of the Partnership in the State of Delaware will be located at 1013 Centre Road, Wilmington, Delaware 19805. The name of the registered agent for the Partnership will be The United States Corporation Company. The General Partner may from time to time change the registered agent and registered office of the Partnership.

    (c)    The General Partner will use its best efforts to qualify the Partnership to do business in each jurisdiction where the activities of the Partnership make such qualification necessary.

    (d)    The General Partner will give prompt notice of any action taken under this Section to each Partner and SBA.

Section 1.06    <u>Commencement and Duration</u>.

    (a)    The Partnership commenced upon the filing for record of the Certificate of Limited Partnership in the office of the Secretary of State of the State of Delaware.

(b)     The Partnership will be dissolved and wound up at the time and in the manner provided for in Article 8.

Section 1.07    Admission of Partners.

(a)     No person may be admitted as a General Partner or a Private Limited Partner without subscribing and delivering to the Partnership a counterpart of this Agreement, or other written instrument, which sets forth:

(i)     the name and address of the Partner,

(ii)    the Commitment of the Partner, and

(iii)   the agreement of the Partner to be bound by the terms of this Agreement.

(b)     Without the prior approval of SBA, no person may be admitted as:

(i)     a General Partner, or

(ii)    a Private Limited Partner with an ownership interest of ten percent (10%) or more of the Partnership's capital.

(c)     No one may be admitted as a Preferred Limited Partner without subscribing and delivering to the Partnership an executed Instrument of Admission substantially in the form of Schedule A-1 attached to this Agreement.

(d)     The General Partner will compile, and amend from time to time as necessary, Schedule A attached to this Agreement, which sets forth:

(i)     the name and address of the General and each Private Limited Partner, and

(ii)    the Commitment of the General Partner and each Private Limited Partner to the Partnership.

(e)     The addition to the Partnership at any time of one or more Partners will not be a cause for dissolution of the Partnership, and all the Partners will continue to be subject to the provisions of this Agreement in all respects.

Section 1.08    Representations of Partners.

(a)     This Agreement is made with the General Partner in reliance upon the General Partner's representation to the Partnership, each Preferred Limited Partner and SBA, that:

(i)   it is duly organized, validly existing and in good standing under the laws of the State of Delaware, and is qualified to do business under the laws of each state where such qualification is required to carry on the business of the Partnership;

(ii)  it has full power and authority to execute and deliver this Agreement and to act as General Partner under this Agreement;

(iii) this Agreement has been authorized by all necessary actions by it, has been duly executed and delivered by it, and is a legal, valid and binding obligation of it, enforceable according to its terms; and

(iv)  the execution and delivery of this Agreement and the performance of its obligations under this Agreement will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it.

(b)   This Agreement is made with each Private Limited Partner in reliance upon each Private Limited Partner's representation to the General Partner, the Partnership, each Preferred Limited Partner and SBA, that:

(i)   it has full power and authority to execute and deliver this Agreement and to act as a Private Limited Partner under this Agreement; this Agreement has been authorized by all necessary actions by it; this Agreement has been duly executed and delivered by it; and this Agreement is a legal, valid and binding obligation of it, enforceable against it according to its terms;

(ii)  the execution and delivery of this Agreement and the performance of its obligations under this Agreement do not require the consent of any third party not previously obtained, and will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it;

(iii) if the Private Limited Partner is a bank (as the term is used in the SBIC Act, at 15 U.S.C. § 682(b)), the total amount of such Private Limited Partner's investments in SBICs, including such Private Limited Partner's interest in the Partnership, does not exceed five percent (5%) of such Private Limited Partner's capital and surplus;

14

(iv)    unless otherwise disclosed to the Partnership in writing, it is a citizen or resident of the United States, an entity organized under the laws of the United States or a state within the United States or an entity engaged in a trade or business within the United States;

(v)    unless otherwise disclosed to the Partnership in writing, it is not subject to Title I of ERISA;

(vi)    it (i) is an Institutional Investor with respect to the Partnership; or (ii) has provided the Partnership with a separate written representation describing such Private Limited Partner's status under the definition of an Institutional Investor;

(vii)    it either (i) has provided a Commitment which qualifies as Private Capital, and none of its Commitment constitutes Qualified Nonprivate Funds whose source is Federal funds; or (ii) has provided the Partnership with a separate written representation stating the amount of its Commitment which qualifies as Private Capital and the amount of its Commitment which constitutes Qualified Nonprivate Funds whose source is Federal funds;

(viii)    either: (i) (A) its net worth or (in the case of any employee benefit plan, pension plan or government plan as defined under ERISA) net assets available for benefits is equal to or in excess of $10 million (exclusive, in the case of any individual, of the value of any equity in such individual's most valuable residence); and (B) its Commitment to the Partnership represents less than ten percent (10%) of such Private Limited Partner's net worth or (in the case of any employee benefit plan, pension plan or government plan as defined under ERISA) net assets available for benefits, and (C) if such Private Limited Partner is a natural person, such person is a permanent resident of the United States; or (ii) it has provided the Partnership with a separate written representation stating the amount of its net worth (exclusive, in the case of any individual, of the value of any equity in such individual's most valuable residence) or net assets available for benefits (in the case of any such employee benefit plan, pension plan or government plan), the percentage of such net worth or net assets available for benefits represented by such Private Limited Partner's Commitment to the Partnership and the country (if other than the United States) in which such Private Limited Partner is a permanent resident;

(ix)    in the case of each Private Limited Partner which directly or indirectly owns or controls a Private Limited Partner's interest

15

which constitutes ten percent (10%) or more of the Partnership capital (as such term is used in the SBIC Act) either (i) such Commitment to the Partnership does not: (A) constitute thirty-three percent (33%) or more of the Partnership capital, or (B) exceed five percent (5%) of such Private Limited Partner's net worth or net assets available for benefits (in the case of any employee benefit plan, pension plan or government plan); or (ii) the Private Limited Partner has provided the Partnership with a separate written representation stating the percentage of the Partnership capital which the Private Limited Partner's interest directly or indirectly owned or controlled by it constitutes, and the percentage of its net worth represented by such Private Limited Partner's interest;

(x)     it has received and carefully read the material documents and agreements relating to the Partnership, including the Agreement of Limited Partnership (the "Documents"), is familiar with and understands the Documents, has based its decision to invest on the information contained in the Documents and has not been furnished with any offering literature or prospectus other than such information;

(xi)     it is acquiring its interest as a limited partner of the Partnership (the "Interest") for its own account, as principal, for investment and not with a view toward resale or distribution;

(xii)     it (i) is an "accredited investor" as such term is defined in Rule 501(a) of Regulation D, promulgated under the Securities Act, and (ii) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment in the Interest;

(xiii)     it is able to bear the economic risk of losing its entire investment in the Interest;

(xiv)     its overall commitment to investments that are not readily marketable is not disproportionate to its net worth, and its investment in the Interest will not cause such overall commitment to become excessive;

(xv)     it, by reason of its business or financial experience, has the capacity to protect its own interests in connection with the purchase of the Interest;

(xvi) it maintains its domicile and principal residences (and is not a transient or temporary resident) at the address shown below and has no present intention of becoming a resident of any other state or jurisdiction; if a corporation, trust, partnership, joint venture or other organization, the Private Limited Partner has its domicile, principal place of business or principal office at the address shown below and has no present intention of relocating such domicile, principal place of business or principal office to any other state or jurisdiction;

(xvii) it understands that it is not entitled to cancel, terminate or revoke this Agreement or any part hereof, including the power of attorney granted hereby, and that it is unconditionally obligated to pay its Commitment regardless of any adverse change in the Partnership or the Partnership's properties, business, financial condition or prospects, subject only to the conditions of the SBIC Act and Annex GDP;

(xviii) it understands that (i) the Interest has not been registered under the Securities Act or any state securities or "Blue Sky" laws pursuant to exemptions therefrom, and the Partnership has not registered under the Investment Company Act pursuant to an exemption therefrom, (ii) the Partnership has no obligation to register the Interest for resale under any Federal or state securities laws, to register the Partnership under the Investment Company Act or to take any action (including the filing of reports or the publication of information required by Rule 144 under the Securities Act or the Investment Company Act) that would make available any exemption from the registration requirements of such laws, and (iii) it is likely that the Private Limited Partner, therefore, may be precluded from selling or otherwise transferring or disposing of the Interest or any portion thereof and may, therefore, have to bear the economic risk of investment in the Interest for an indefinite period;

(xix) it understands that no Federal or state agency has approved or disapproved the Interest, passed upon or endorsed the merits of the offering thereof, or made any finding or determination as to the fairness of the Interest for investment;

(xx) it acknowledges that all material documents, records and books pertaining to the Partnership have, on request, been made available to it, and that the Partnership has made available to it, the opportunity to ask questions of, and receive answers from, the Partnership concerning the terms and conditions of the offering and

to obtain any additional information, to the extent that the Partnership possesses such information, or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information given to it or otherwise to make an informed investment decision;

(xxi)  it understands that by executing this Agreement or a Counterpart Signature Page hereof, it is irrevocably appointing the General Partner (with power of substitution) (and any additional or successor general partners) to be its agent and attorney-in-fact for certain purposes;

(xxii)  it certifies, under penalties of perjury, that it has not been notified that it is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the Private Limited Partner that it is no longer subject to backup withholding;

(xxiii)  it does not own, directly or indirectly (within the meaning of the attribution rules set forth in Section 318 of the Code), own an interest in the General Partner or any member of its affiliated group (as that term is defined in Section 1504(a) of the Code);

(xxiv)  If the it is not a natural person, (i) the Private Limited Partner is duly organized and validly existing under the laws of the jurisdiction of its organization, and has full power and authority to enter into and perform this Agreement and the transactions contemplated hereby, (ii) the execution, delivery and performance by the Private Limited Partner of this Agreement and the transactions contemplated hereby have been duly authorized by all requisite action of it, and (iii) the Private Limited Partner was not organized or formed for the purpose of investing in the Interest. This Agreement is a valid and binding obligation of the Private Limited Partner, enforceable against the Private Limited Partner in accordance with its terms; and

(xxv)  it understands that the Interest is being offered and sold in reliance on specific exemptions from the registration requirements of Federal and state securities laws and that the Partnership, the General Partner and controlling persons thereof are relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgments and understandings set forth herein, in order to determine the applicability of such exemptions and the suitability of the Private Limited Partner to acquire the Interest, and

represents and warrants that the information set forth herein is true and correct.

(c)     Each Partner who has disclosed to the Partnership in writing that it is not a person described in Section 1.08(iv), agrees to provide the Partnership with any information or documentation necessary to permit the Partnership to fulfill any tax withholding or other obligation relating to the Partner, including but not limited to any documentation necessary to establish the Partner's eligibility for benefits under any applicable tax treaty.

Section 1.09    Notices With Respect to Representations by Private Limited Partners.

(a)     If any representation made by a Private Limited Partner in (b)(i), (ii) or (iii) ceases to be true, (including any separate written representation previously provided by such Limited Partner to the Partnership as provided in such subsections) then the Private Limited Partner will promptly provide the Partnership with a correct separate written representation as provided in each such Section.

(b)     The Partnership will give each Preferred Limited Partner and SBA prompt notice of any corrected representation received from any Private Limited Partner under Article 1.9(a).

Section 1.10    Liability of Partners.

(a)     Losses, liabilities and expenses incurred by the Partnership during any fiscal year will be allocated among the Partners in accordance with the procedures for allocating Net Losses as provided in Section 6.03(a)(iv)(B)(2).

(b)     The General Partner has the liability for the liabilities of the Partnership provided for in the Act and the SBIC Act.  The General Partner will not:

(i)     be obligated to restore by way of capital contribution or otherwise any deficits in the respective Capital Accounts of the Private Limited Partners or Preferred Limited Partners should such deficits occur, or

(ii)    have any greater obligation with respect to any Outstanding Leverage than is required by the SBIC Act or by SBA.

(c)     Except as otherwise provided under the Act and the SBIC Act, no Private Limited Partner nor any Preferred Limited Partner will be liable for any loss, liability or expense whatsoever of the Partnership.  Notwithstanding the preceding sentence, a Private Limited Partner will remain liable for any portion of such Private Limited Partner's Commitment not paid to the Partnership.

(d)     If a Private Limited Partner is required to return to the Partnership, for the benefit of creditors of the Partnership, amounts previously distributed to the Private Limited Partner, the obligation of the Private Limited Partner to return any such amount to the Partnership will be the obligation of the Private Limited Partner and not the obligation of the General Partner. No Private Limited Partner will be liable under this Agreement for the obligations under this Agreement of any other Partner.

(e)     Nothing in this Agreement limits any liability of any Partner under any agreement between the Partner and SBA.

# EXHIBIT B (Part 2)

## Article 2

### Purpose and Powers

Section 2.01   Purpose and Powers.

(a)   The Partnership is organized solely for the purpose of operating as a small business investment company under the SBIC Act and conducting the activities described under Title III of the SBIC Act. The Partnership has the powers and responsibilities, and is subject to the limitations, provided in the SBIC Act. The operations of the Partnership and the actions taken by the Partnership and the Partners will be conducted and taken in compliance with the SBIC Act.

(b)   Subject to Section 2.01(a), the Partnership may make, manage, own and supervise investments of every kind and character in conducting its business as a small business investment company.

(c)   Subject to the provisions of the SBIC Act, the Partnership has all powers necessary, suitable or convenient for the accomplishment of the purposes set forth in Section 2.01(a) and Section 2.01(b), alone or with others, as principal or agent, including without limitation the following:

(i)   to engage in any lawful act or activity for which limited partnerships may be organized under the Act;

(ii)   to buy, sell and invest in Assets, regardless of whether such Assets are readily marketable, and to reinvest the proceeds of any Assets in other Assets;

(iii)   to hold, receive, mortgage, pledge, lease, transfer, exchange, otherwise dispose of, grant options with respect to and otherwise deal in and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to all property owned or held by the Partnership;

(iv)   to borrow, raise money, issue promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable and non-negotiable instruments and evidences of indebtedness, to guarantee the obligations of others or incur lease obligations from time to time, to secure the payment of the principal of any such indebtedness and the interest thereon or any other such obligation by mortgage, pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the

21

time owned or thereafter acquired, and to buy, sell, pledge or otherwise dispose of any such instrument or evidence of indebtedness (subject to the limitations set forth below);

(v)    in such reasonable degree and manner as the General Partner may deem appropriate, to have and maintain one or more offices within or without the State of New York to rent or acquire office space, to engage personnel and compensate them and to do such other acts as the General Partner may deem appropriate in connection with the maintenance of such office or offices;

(vi)    to open, maintain and close accounts with brokers;

(vii)    to open, maintain and close bank accounts and draw checks and other orders for the payment of moneys;

(viii)    to engage accountants, custodians, Investment Advisers/ Managers (with the prior approval of the SBA), attorneys, consultants and any and all other agents and assistants, both professional and nonprofessional, and to compensate them in such reasonable degree and manner as may be necessary or advisable, subject to the limitations set forth in the SBIC Regulations;

(ix)    to enter into, make and perform all contracts, agreements and other undertakings as the General Partner may deem appropriate to carry out the purposes hereof;

(x)    to sue, prosecute, settle or compromise all claims against third parties, to compromise, settle or accept judgment with respect to claims against the Partnership and to execute all documents and make all representations, admissions and waivers in connection therewith;

(xi)    to take any actions that the General Partner may deem appropriate in order to obtain the approval of the SBA for any of the actions described in this section 2.01; and

(xii)    to engage in any other lawful act or activity for which limited partnerships may be organized under the Delaware Act and which conform with the SBIC Act and Regulations.

Section 2.02    <u>Unrelated Business Taxable Income</u>.

The Partnership will use its best efforts to ensure that no Partner (or any limited partner or member of a Partner) exempt from income taxation under Sections 501(a) or 501(c)(3) of the Code will be deemed to have "unrelated business taxable income" (as that term is defined in Section 512 of the Code) as a result of the activities of the Partnership.

Section 2.03    <u>Venture Capital Operating Company</u>.

At any time that a Private Limited Partner is subject to Title I of ERISA and 25% or more in interest of all Private Limited Partners (as measured by their aggregate Capital Accounts) are "benefit plan investors" (within the meaning of Department of Labor Regulation § 2510.3-101(f)(2), 51 Fed. Reg. 41,282 (November 13, 1986) or any amendment or successor regulation), the Partnership will use its best efforts to ensure that the Partnership qualifies as a "venture capital operating company" (within the meaning of Department of Labor Regulation § 2510.3-101(d), 51 Fed. Reg. 41,281 (November 13, 1986) or any amendment or successor regulation).

# Article 3

## Management

**Section 3.01     Authority of General Partner.**

(a)     The management and operation of the Partnership and the formulation of investment policy is vested exclusively in the General Partner.  The General Partner shall, in its sole discretion but subject to the approval of the Private Limited Partners to the extent specifically provided in this Agreement, exercise all powers on behalf and in the name of the Partnership that the General Partner deems appropriate for carrying out the lawful purposes of the Partnership.

(b)     The act of the General Partner in carrying on the business of the Partnership will bind the Partnership.

(c)     In the case of any General Partner other than a natural person, at any time that the Partnership is licensed as an SBIC,  the General Partner will not allow any person to serve as a general partner, director, officer or manager of the General Partner, unless such person has been approved by SBA.

(d)     So long as the General Partner remains the general partner of the Partnership:

    (i)     it will comply with the requirements of the SBIC Act, including, without limitation, 13 C.F.R. § 107.160(a) and (b), as in effect from time to time; and

    (ii)     in the case of any General Partner other than a natural person, except as set forth in Section 3.01(d)Article 3.1(d)(iii), it will devote all of its activities to the conduct of the business of the Partnership and will not engage actively in any other business, unless its engagement is related to and in furtherance of the affairs of the Partnership.

    (iii)     The General Partner may, however:

        (A)     act as the general partner or Investment Adviser/Manager for one or more other SBICs, and

        (B)     receive, hold, manage and sell Assets received by it from the Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager), or through the exercise or exchange of Assets received by it from the

Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager).

Section 3.02    Authority of the Private Limited Partners.

The Private Limited Partners will take no part in the control of the business of the Partnership, and the Private Limited Partners will not have any authority to act for or on behalf of the Partnership except as is specifically permitted by this Agreement.

Section 3.03    Authority of the Preferred Limited Partners.

The Preferred Limited Partners will take no part in the control of the business of the Partnership, and the Preferred Limited Partners will not have any authority to act for or on behalf of the Partnership except as is specifically permitted by this Agreement.

Section 3.04    Acknowledgement of SBA Authority.

(a)    The Partners acknowledge that, in addition to the rights of SBA under this Agreement in SBA's capacity as a Preferred Limited Partner, SBA also has regulatory authority over the Partnership as a licensed small business investment company under the provisions of the SBIC Act.  SBA exercises its regulatory authority over the Partnership under the SBIC Act independent of and separate from its rights and actions in its capacity as a Preferred Limited Partner, and actions taken by SBA under its regulatory authority will not be deemed to be actions taken in SBA's capacity as a Preferred Limited Partner of the Partnership.

(b)    The Partners acknowledge that in addition to the rights of SBA under this Agreement in SBA's capacity as a Preferred Limited Partner, SBA may also have additional rights with respect to the Partnership and any Partner or Partners under separate agreements between SBA and the Partnership or such Partner or Partners.  The exercise of rights by SBA under any such other agreement will not be deemed to be actions taken by SBA in its capacity as a Preferred Limited Partner of the Partnership unless the other agreement expressly so provides.

Section 3.05    The Investment Adviser/Manager.

(a)    Subject to the SBIC Act, the General Partner may delegate any part of its authority to an Investment Adviser/Manager.

(b)    Any agreement delegating any part of the authority of the General Partner to an Investment Adviser/Manager will:

(i)    be in writing, executed by the General Partner, the Partnership and the Investment Adviser/Manager,

    (ii)    specify the authority so delegated, and

    (iii)    expressly require that such delegated authority will be exercised by the Investment Adviser/Manager in conformity with the terms and conditions of such agreement, this Agreement and the SBIC Act.

(c)    Each agreement with an Investment Adviser/Manager under Article 3.5(a) will be binding upon the General Partner and any succeeding General Partner in accordance with its terms.

(d)    Each agreement with an Investment Adviser/Manager, and any material amendment to any such agreement, is subject to the prior approval of SBA.

(e)    No such delegation shall in any way limit the representations, fiduciary responsibility and obligations of the General Partner under the Agreement, and any compensation to be paid to any Investment Adviser/Manager shall be borne by the General Partner.

(f)    Coqui Capital Advisors, LLC is the initial Investment Adviser/Manager.

Section 3.06    Restrictions on Other Activities of the General Partner and its Affiliates.

(a)    Except as provided in the SBIC Act and as otherwise specifically provided in this Agreement, no provision of this Agreement will be construed to preclude any (i) Partner, (ii) Investment Adviser/Manager, or (iii) Affiliate, general partner, member, manager or stockholder of any Partner or Investment Adviser/Manager, from engaging in any activity whatsoever or from receiving compensation therefor or profit from any such activity. Such activities may include, without limitation, (A) receiving compensation from issuers of securities for investment banking services, (B) managing investments, (C) participating in investments, brokerage or consulting arrangements or (D) acting as an adviser to or participant in any corporation, partnership, limited liability company, trust or other business person.

(b)    Except as provided in the SBIC Act, and subject to any limitations in the SBIC Regulations, the General Partner may, in its sole discretion, offer all Private Limited Partners the opportunity to invest directly in particular investments in which the Partnership is also investing in situations where the General Partner decides that making such co-investment opportunities available to the Private Limited Partners would be in the best interests of the Partnership. Private Limited Partners shall not be obligated to invest in any such co-investment opportunities that may be presented to them, nor shall they be entitled to object if certain co-investment opportunities shall be offered only to other Private Limited Partners.

(c)    Upon the occurrence of any of the events specified in 13 C.F.R. §107.1810(d)(1) through (d)(6) or (f)(1) through (f)(3), as determined by SBA, SBA shall have the right, upon reasonable written notice, _inter alia_, to require the Partnership to remove the Person(s) responsible for such occurrence, and in such an event, the General Partner shall take all necessary actions to comply with the directives of the SBA.

Section 3.07   <u>Management Compensation</u>.

(a)    As compensation ("Management Compensation") for services rendered in the management of the Partnership, the Partnership will pay, with respect to each fiscal quarter, a management fee (payable monthly, in advance) equal to .0625% of the Partnership's Combined Capital as of the close of business on the last day of the preceding fiscal quarter.

(b)    The Management Compensation will be paid by the Partnership directly to the Investment Adviser.

(c)    The Partnership will not pay any Management Compensation with respect to any fiscal year in excess of the amount of Management Compensation approved by SBA.

(d)    If the Partnership fails to pay any Management Compensation provided, due to the SBIC Act or otherwise, the unpaid amount shall continue to be due and payable, or shall become due and payable at the earliest date on which the payment of such amount or any portion thereof could be made payable without violation of the SBIC Act.  Until paid, the unpaid amount shall accrue interest that shall be compounded on a monthly basis at the highest prime rate reported in <u>The Wall Street Journal</u>, from time to time, during the period of non-payment.

Section 3.08   <u>Payment of Management Compensation</u>.

(a)    Within forty-five (45) days after (i) the end of each fiscal year of the Partnership, (ii) the date of its dissolution and (iii) the date a person ceases to be Investment Adviser/Manager, appropriate adjustment (by way of payment or refund) will be made so that the Management Compensation paid with respect to the fiscal year then ended or the period from the end of the last fiscal year to the date set forth in clause (ii) or (iii) will be equal to the Management Compensation calculated on a daily basis under (a) for such period.

(b)    If the effective date of the Partnership's dissolution or the date that the General Partner ceases to be the general partner of the Partnership is not the last day of a fiscal quarter, the Management Compensation for the period between the effective date of such dissolution and the close of the preceding fiscal quarter,

or for the period between the date that the General Partner ceases to be the general partner and the close of the preceding fiscal quarter, shall be computed on a pro rata basis for such period pursuant to Section 3.07(a) herein. Any difference between the amount of Management Compensation paid by the Partnership pursuant to Section 3.07(a) herein with respect to such fiscal period and the amount due under this Section shall be repaid to the Partnership within forty-five (45) days after either the effective date of the Partnership's dissolution or the date that the General Partner ceases to be the general partner of the Partnership, as the case may be.

(c)    The Management Compensation payable with respect to the period commencing on the date of commencement of operations of the Partnership and ending on the last day of the first fiscal quarter of the Partnership after such date shall be computed on a pro rata basis for such portion of a fiscal quarter as such period shall comprise, and shall be due and payable in advance on the date of the commencement of operations of the Partnership.

(d)    Management Compensation payable with respect to the Commitment of any Person who becomes an Additional Limited Partner or who increases such Limited Partner's Commitment after the commencement of operations of the Partnership shall be computed with respect to the period between the commencement of operations of the Partnership and the date of such Commitment, and shall be payable on the first business day following the date of admission of any such Additional Limited Partner or following the date of the increase in such Limited Partner's Commitment.

(e)    Management Compensation payable with respect to the Commitment of any Additional Limited Partner or any increase in the Commitment of any Private Limited Partner for the period commencing on the date of admission of such Additional Limited Partner or the effective date for the increase of any Private Limited Partner's Commitment to the end of that fiscal quarter shall be computed with respect to such Commitment or increase in such Commitment as of the date of admission of such Additional Limited Partner or the effective date for the increase in such Private Limited Partner's Commitment, on a pro rata basis for such portion of that fiscal quarter as such Commitment or increased Commitment shall be operative.

(f)    Management Compensation shall be due and payable in advance on the first business day following the date of admission of any Additional Limited Partner or the effective date for any increase in any Private Limited Partner's Commitment; provided, however, that notwithstanding anything to the contrary contained herein, the initial payment of Management Compensation with respect to the admission of each Private Limited Partner and each Additional Private Limited Partner shall be equal to the sum of the pro rata payment for that fiscal quarter, as provided above.

Section 3.09    <u>Partnership Expenses.</u>

    (a)    The Investment Adviser will pay:

        (i)    the compensation of all professional and other employees of the Partnership and the Investment Adviser/Manager who provide services to the Partnership;

        (ii)    except as provided in Article 3.9(b), the cost of providing support and general services to the Partnership, including, without limitation:

            (A)    office expenses,

            (B)    travel,

            (C)    business development,

            (D)    office and equipment rental (provided, however, that the responsibility for the payment of such office rental expenses does not preclude the Partnership from being the lessee of any rental property dedicated to the Partnership's use now or in the future, such office rental expenses then being borne by the Partnership after being deducted from the Investment Adviser's Management Compensation),

            (E)    bookkeeping,

            (F)    the expenses related to development, investigation and monitoring of investments; and

        (iii)    all other expenses of the Partnership not authorized to be paid by the Partnership under Article 3.9(b).

    (b)    The Partnership will pay the following Partnership expenses:

        (i)    all interest and expenses payable by the Partnership on any indebtedness incurred by the Partnership;

        (ii)    all amounts payable to SBA under the SBIC Act, and all amounts payable in connection with any Leverage commitment and any Outstanding Leverage;

        (iii)    taxes payable by the Partnership to Federal, state, local and other governmental agencies;

(iv)    Management Compensation;

(v)    expenses incurred in the actual or proposed acquisition or disposition of Assets, including without limitation, accounting fees, brokerage fees, legal fees, transfer taxes and costs related to the registration or qualification for sale of Assets and/or Investment Securities;

(vi)    legal, insurance (including any insurance as contemplated in Article 3.12(l)), accounting and auditing expenses;

(vii)    all expenses incurred by the Partnership in connection with commitments for or issuance of Leverage;

(viii)    fees or dues in connection with the membership of the Partnership in any trade association for small business investment companies or related enterprises;

(ix)    expenses of any Member of the Advisory Boards for the Partnership;

(x)    all expenses of consultants for specialized or technical services related to the actual or proposed acquisition or disposition of Investment Securities;

(xi)    Expenses Incurred by the Investment Adviser in connection with meetings of and on behalf of the Partnership, including meetings of any Advisory Boards; and

(xii)    all Organizational expenses.

(c)    All Partnership expenses paid by the Partnership will be made against appropriate supporting documentation.  The payment by the Partnership of Partnership expenses will be due and payable as billed.

Section 3.10    <u>Valuation of Assets</u>.

(a)    The Partnership will adopt written guidelines for determining the value of its Assets.  Assets held by the Partnership will be valued by the General Partner in a manner consistent with the Partnership's written guidelines and the SBIC Act.  The Valuation Guidelines attached to this Agreement as Exhibit I are the Partnership's written guidelines for valuation.

(b)     To the extent that the SBIC Act requires any Asset held by the Partnership to be valued other than as provided in this Agreement, the General Partner will value the Asset in such manner as it determines to be consistent with the SBIC Act.

(c)     Assets held by the Partnership will be valued at least annually (or more often, as SBA may require), and will be valued at least semi-annually (or more often, as SBA may require) at any time that the Partnership has Outstanding Leverage.

Section 3.11   Standard of Care.

(a)     No Designated Party will be liable to the Partnership or any Partner for any action taken or omitted to be taken by it or any other Partner or other person in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Partnership, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.

(b)     Neither any Private Limited Partner, nor any member of any Partnership committee or board who is not an Affiliate of the General Partner, will be liable to the Partnership or any Partner as the result of any decision made in good faith by the Private Limited Partner or member, in its capacity as such.

(c)     Any Designated Party, any Private Limited Partner and any member of a Partnership committee or board, may consult with reputable legal counsel selected by it and will be fully protected, and will incur no liability to the Partnership or any Partner, in acting or refraining to act in good faith in reliance upon the opinion or advice of such counsel.

(d)     This Section does not constitute a modification, limitation or waiver of Section 314(b) of the SBIC Act, or a waiver by SBA of any of its rights under Section 314(b).

(e)     In addition to the standards of care stated in this Section, this Agreement may also provide for additional (but not alternative) standards of care that must also be met.

Section 3.12   Indemnification.

(a)     The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as a liability in the computation of Assets Under Management), any Designated Party, from any and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by reason of any action taken or omitted to be taken on behalf of the Partnership and in furtherance of its interests.

(b)     The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as

31

a liability in the computation of Assets Under Management), the Private Limited Partners, and members of any Partnership committee or board who are not Affiliates of the General Partner or any Investment Adviser/Manager from any and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by any third party on account of any matter or transaction of the Partnership, which matter or transaction occurred during the time that such person has been a Private Limited Partner or member of any Partnership committee or board.

(c)     The Partnership has power, in the discretion of the General Partner, to agree to indemnify on the same terms and conditions applicable to persons indemnified under Article 3.12(b), any person who is or was serving, under a prior written request from the Partnership, as a consultant to, agent for or representative of the Partnership as a director, manager, officer, employee, agent of or consultant to another corporation, partnership, limited liability company, joint venture, trust or other enterprise, against any liability asserted against such person and incurred by the person in any such capacity, or arising out of the person's status as such.

(d)     No person may be entitled to claim any indemnity or reimbursement under Article 3.12(a), (b) or (c) in respect of any Indemnifiable Cost that may be incurred by such person which results from the failure of the person to act in accordance with the provisions of this Agreement and the applicable standard of care stated in Section 3.11.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, preclude a determination that such person acted in accordance with the applicable standard of care stated in Section 3.11.

(e)     To the extent that a person claiming indemnification under Article 3.12(a), (b) or (c) has been successful on the merits in defense of any action, suit or proceeding referred to in Article 3.12(a), (b) or (c) or in defense of any claim, issue or matter in any such action, suit or proceeding, such person must be indemnified with respect to such matter as provided in such Section.  Except as provided in the foregoing sentence and as provided in Article 3.12(h) with respect to advance payments, any indemnification under this Section will be paid only upon determination that the person to be indemnified has met the applicable standard of conduct stated in (a) or (b).

(f)     A determination that a person to be indemnified under this Section has met the applicable standard stated in (a) or (b) may be made by (i) the General Partner, with respect to the indemnification of any person other than a person claiming indemnification under Article 3.12(a), (ii) a committee of the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager with respect to indemnification of any person indemnified under Article 3.12(a) or (iii) at the election of the General Partner, independent legal counsel selected by the General Partner, with respect to the indemnification of any person indemnified under this Section, in a written opinion.

(g)    In making any determination with respect to indemnification under (f), the General Partner, a committee of the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager or independent legal counsel, as the case may be, is authorized to make the determination on the basis of its evaluation of the records of the General Partner, the Partnership or any Investment Adviser/Manager to the Partnership and of the statements of the party seeking indemnification with respect to the matter in question and is not required to perform any independent investigation in connection with any determination. Any party making any such determination is authorized, however, in its sole discretion, to take such other actions (including engaging counsel) as it deems advisable in making the determination.

(h)    Expenses incurred by any person in respect of any Indemnifiable Cost may be paid by the Partnership before the final disposition of any such claim or action upon receipt of an undertaking by or on behalf of such person to repay such amount unless it is ultimately determined as provided in Article 3.12(e) or (f) that the person is entitled to be indemnified by the Partnership as authorized in this Section.

(i)    The rights provided by this Section will inure to the benefit of the heirs, executors, administrators, successors, and assigns of each person eligible for indemnification under this Agreement.

(j)    The rights to indemnification provided in this Section are the exclusive rights of all Partners to indemnification by the Partnership. No Partner may have any other rights to indemnification from the Partnership or enter into, or make any claim under, any other agreement with the Partnership (whether direct or indirect) providing for indemnification.

(k)    The Partnership may not enter into any agreement with any person (including, without limitation, any Investment Advisor/Manager, Partner or any person that is an employee, officer, director, partner or shareholder, or an Affiliate, Associate or Control Person of any Partner) providing for indemnification of any such person (i) except as provided for under this Section, and (ii) unless such agreement provides for a determination with respect to the indemnification as provided under Article 3.12(f).

(l)    The provisions of this Section do not apply to indemnification of any person that is not at the expense (whether in whole or in part) of the Partnership.

(m)    The Partnership may purchase and maintain insurance on its own behalf, or on behalf of any person or entity, with respect to liabilities of the types described in this Section. The Partnership may purchase such insurance regardless of whether the person is acting in a capacity described in this Section or whether the Partnership would have the power to indemnify the person against such liability under the provisions of this Section.

33

Section 3.13     Partnership Committees.

(a)     The members of any Advisory Boards shall consist of business persons, scientists and other persons generally recognized for their standing and reputation, all of whom shall be designated by the General Partner. Members of the Advisory Boards may receive a reasonable fee from the Partnership for their service as consultants on an Advisory Board, as determined by the General Partner, plus reasonable out-of-pocket expenses. The Advisory Boards shall hold periodic meetings, as determined by the General Partner. The Advisory Boards shall serve as an adviser to the General Partner on behalf of the Partnership, and shall consult with the General Partner concerning the Partnership's activities and operations as to business, scientific and technical matters; provided, however, that the Advisory Board(s) shall take no part in the control or management of the Partnership nor shall the Advisory Board(s) or any member thereof have any authority to act for or on behalf of the Partnership.

Section 3.14     Investment Company Act; Investment Advisers Act.

The Partnership has been formed in such fashion as to be exempt from the Investment Company Act. The relationship between the Partnership, on the one hand, and the General Partner, on the other hand, has been structured in such manner as to exempt each of the General Partner, Affiliates of the General Partner, and the members, officers and directors of the General Partner and Affiliates of the General Partner from the requirements of the Investment Advisers Act. Existing laws, regulations and interpretations or changes thereto may make it necessary or advisable to register the Partnership under the Investment Company Act or to register the General Partner, any Affiliates thereof or the members, officers or directors of either the General Partner or any Affiliates thereof under the Investment Advisers Act. The General Partner shall have the power to take such action as it may deem advisable in light of existing or changing regulatory conditions, in order to permit the Partnership to continue in existence.  The General Partner shall also have the power to register the Partnership under the Investment Company Act, and to take any and all action necessary to secure such registration and to secure appropriate exemptions under the Investment Advisers Act for the General Partner, any Affiliates thereof and the members, officers and directors of either the General Partner or any Affiliates thereof (including an exemption from the provisions of Section 205(a) thereof). In addition, subject to the approval in writing by seventy-five percent (75%) of the Voting Interest of the Private Limited Partners (or as may be otherwise required for an amendment by Section 10.08 hereof), the General Partner shall have the power to modify the present fee structure in Section 3.07 herein if the General Partner, any Affiliates thereof, or the members, officers or directors of either the General Partner or any Affiliate thereof is required to register under the Investment Advisers Act. This Section shall not give the General Partner any power to amend this Agreement other than as provided pursuant to Section 10.08 herein.

\\\DC - 69963/1 - #1251576 v2

**Article 4**

<u>Small Business Investment Company Matters</u>

Section 4.01    <u>SBIC Act</u>.

The provisions of this Agreement must be interpreted to the fullest extent possible in a manner consistent with the SBIC Act.  If any provision of this Agreement conflicts with any provision of the SBIC Act (including, without limitation, any conflict with respect to the rights of SBA or the respective Partners under this Agreement), the provisions of the SBIC Act will control.

Section 4.02    <u>Consent or Approval of, and Notice to, SBA</u>.

(a)    The requirements of the prior consent or approval of, and notice to, SBA in this Agreement will be in effect at any time that the Partnership is licensed as an SBIC, has Outstanding Leverage or owns Earmarked Assets.  These requirements will not be in effect if the Partnership is not licensed as an SBIC, does not have any Outstanding Leverage, and does not own any Earmarked Assets.

(b)    Except as provided in the SBIC Act, a consent or approval required to be given by SBA under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is:

(i)    given by SBA in writing, and

(ii)    delivered by SBA to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.05.

Section 4.03    <u>Provisions Required by the SBIC Act for Issuers of Participating Securities</u>.

(a)    The provisions of 13 C.F.R. § 107.1820 are incorporated by reference in this Agreement as if fully stated in this Agreement.

(b)    The Partnership and the Partners consent to the exercise by SBA of all of the rights of SBA under 13 C.F.R. § 107.1820, and agree to take all actions that SBA may require in accordance with 13 C.F.R. § 107.1820.

(c)    This Section will be in effect at any time that the Partnership has outstanding Participating Securities or owns Earmarked Assets, and will not be in effect at any time that the Partnership neither has outstanding Participating Securities nor owns Earmarked Assets.

36

(d)    Nothing in this Section may be construed to limit the ability or authority of SBA to exercise its regulatory authority over the Partnership as a licensed small business investment company under the SBIC Act.

**Section 4.04**    <u>Effective Date of Incorporated SBIC Act Provisions</u>.

(a)    Any section of this Agreement which relates to Participating Securities or Debentures issued by the Partnership and incorporates or refers to the SBIC Act or any provision of the SBIC Act (including, without limitation, 13 C.F.R. §§ 107.1810(i), 107.1820, and 107.1830 – 107.1850)) will, with respect to each Participating Security or Debenture, be deemed to refer to the SBIC Act or such SBIC Act provision as in effect on the date on which the capital contribution with respect to the Participating Security was made to the Partnership or the Debenture was purchased from the Partnership, as the case may be.

(b)    Article 4.4(a) will not be construed to apply to:

    (i)    the provisions of the SBIC Act which relate to the regulatory authority of SBA under the SBIC Act over the Partnership as a licensed small business investment company; or

    (ii)    the rights of SBA under any other agreement between the Partnership and SBA.

(c)    The parties acknowledge that references in this Agreement to the provisions of the SBIC Act relating to SBA's regulatory authority refer to the provisions as in effect from time to time.

**Section 4.05**    <u>Admission of Preferred Limited Partners and Increased Commitments</u>.

The Partnership may, from time to time after the date of this Agreement, admit one or more Preferred Limited Partners under the following terms and conditions:

(a)    Each Preferred Limited Partner must execute and deliver to the Partnership an instrument substantially in the form attached to this Agreement as Schedule A-1, or other form satisfactory to the Partnership and the Preferred Limited Partner, evidencing the Preferred Limited Partner's agreement to be bound by and comply with the terms and provisions of this Agreement as if the Preferred Limited Partner were an original signatory to this Agreement, and setting forth the Preferred Limited Partner's name and Commitment.

(b)    Each Preferred Limited Partner will be admitted to the Partnership as of the date that the first such instrument is executed by the Preferred Limited Partner and the General Partner. Each Preferred Limited Partner must pay, on the date of its admission to the Partnership, a capital contribution equal to 100% of the amount of its Commitment as of such date.

37

(c)    At the time that any Preferred Limited Partner increases its Commitment, it must execute an instrument as provided in Article 4.5(a) setting forth the amount of such increase in its Commitment. Each Preferred Limited Partner must pay, on the date it increases its Commitment, a capital contribution equal to 100% of the amount of such increase in its Commitment.

(d)    The amount of any user, commitment or other fees deducted by SBA from the proceeds of any Preferred Limited Partnership interest issued by the Partnership will be deemed a capital contribution to the Partnership by such Preferred Limited Partner.

Section 4.06   <u>Redemption and Withdrawal of Preferred Limited Partners</u>.

(a)    The redemption of the Preferred Limited Partnership Interest under the SBIC Act will not cause the withdrawal of the Preferred Limited Partner from the Partnership, and any Preferred Limited Partner whose Preferred Limited Partnership Interest is redeemed under the SBIC Act will remain a Preferred Limited Partner of the Partnership notwithstanding the redemption, until such time as the Preferred Limited Partner is deemed to have withdrawn under Article 4.6(d).

(b)    If before the redemption date of a Preferred Limited Partnership Interest under the SBIC Act the Preferred Limited Partner has not received on a cumulative basis the amount provided under the SBIC Act with respect to such Preferred Limited Partnership Interest, then on the redemption date the Partnership will distribute to the Preferred Limited Partner such amount as is required so that as of the redemption date the Preferred Limited Partner has received on a cumulative basis the amount provided under the SBIC Act with respect to the Preferred Limited Partnership Interest.

(c)    If at the time any Preferred Limited Partner's Preferred Limited Partnership Interest has been redeemed under the SBIC Act the Partnership has not (i) paid all Earned Prioritized Payments, earned Adjustments and earned Charges in full, and (ii) sold or otherwise disposed of all assets which are Earmarked Assets, then the Partnership's obligation to pay Earned Prioritized Payments, earned Adjustments and earned Charges will continue and payment will be made as provided in the SBIC Act. The Partnership's obligation to pay Profit Participation with respect to Earmarked Assets will continue until such time as all Earmarked Assets are disposed of. If on disposition of all Earmarked Assets there remain any Accumulated Prioritized Payments, unearned Adjustments and unearned Charges, the obligation to make such payments will be extinguished.

(d)    A Preferred Limited Partner will be deemed to have withdrawn from the Partnership at such time as the Preferred Limited Partnership Interest of the Preferred Limited Partner has been redeemed under the SBIC Act, the Partnership no longer owns any assets which are Earmarked Assets, and all amounts due from the Partnership to the Preferred Limited Partner with respect to its Preferred Limited Partnership Interest (including, without limitation, all allocated Profit Participation) have been paid to the Preferred

Limited Partner or the obligation to pay such amounts has been extinguished as provided in Article 4.6(c) or the SBIC Act.

Section 4.07    Assignment of Right to Distributions by a Preferred Limited Partner.

A Preferred Limited Partner may assign to a designee all or part of its right to receive any distribution or payment from the Partnership with respect to its Preferred Limited Partnership Interest. Upon receipt of written notice from the Preferred Limited Partner as to such an assignment, the Partnership will pay any such assigned distribution or payment directly to the designee. Any assignment made solely under this Section will not be deemed an assignment of a partnership interest or the substitution of a designee as a Partner, and will not be deemed to give the designee any rights or interest in the Partnership as a Partner in the Partnership.

Section 4.08    Priority of Preferred Limited Partnership Interests on Liquidation.

If the Partnership is liquidated under the SBIC Act, the Preferred Limited Partnership Interests will be senior in priority for all purposes to all other partnership interests (or other equity interests) in the Partnership to the extent of the amount determined, with respect to each Preferred Limited Partnership Interest, as provided in the SBIC Act.

Section 4.09    SBA as Third Party Beneficiary.

SBA will be deemed an express third party beneficiary of the provisions of this Agreement to the extent of the rights of the Preferred Limited Partners and SBA under this Agreement and under the Act. SBA will be entitled to enforce the provisions (including, without limitation, the obligations of each Partner to make capital contributions to the Partnership) for the benefit of the Preferred Limited Partners and for its benefit, as if SBA were a party to this Agreement.

Section 4.10    Interest of the General Partner After Withdrawal.

If the General Partner withdraws as a general partner of the Partnership by notice from SBA as provided in the SBIC Act or otherwise, then the entire interest of the General Partner in the Partnership will be converted into an interest as a Special Private Limited Partner on the terms provided in Article 8.3(e).

## Article 5

### Partners' Capital Contributions

Section 5.01    <u>Capital Commitments</u>.

(a)    The Private Limited Partners and the General Partner commit to make capital contributions to the Partnership in the amounts set forth opposite their respective names in <u>Schedule A</u> attached hereto and by their respective names on the signature pages of this Agreement (and its counterparts) executed by each such Partner.

(b)    The Commitment of a Preferred Limited Partner includes only the amount the Preferred Limited Partner has actually contributed to the Partnership, and does not include any amount under any agreement by the Preferred Limited Partner or SBA to provide Leverage to the Partnership that has not been contributed to the Partnership. The amount of the actual contribution by a Preferred Limited Partner to the Partnership will be set forth on Schedule A-1 attached to this Agreement.

Section 5.02    <u>Capital Contributions by Private Limited Partners</u>.

(a)    All capital contributions to the Partnership by Private Limited Partners must be in cash, except as provided in this Agreement and approved by SBA.

(b)    Each Private Limited Partner will pay as its initial capital contribution to the Partnership, an amount equal to twenty-five percent (25%) of the Private Limited Partner's Commitment. The initial capital contribution will be made on the date commencement of operations of the Partnership or on such other date as determined by the General Partner in its sole discretion.

(c)    [Upon not less than [10] [15] days prior notice from the General Partner, each Private Limited Partner (including each Additional Private Limited Partner) that has not yet contributed to the Partnership the entire amount of such Private Limited Partner's Commitment, shall pay such percentage of its Commitment (in 5% increments) as is demanded by the General Partner in cash, at such times as shall be determined by the General Partner, and each such notice from the General Partner shall specify the date such payment shall be due and the percentage of the Private Limited Partner's Commitment then due.]

[PPM states 15 days notice; Original Agreement states 10 days]

(d)    Any Limited Partner may elect to contribute all or any portion of its Commitment prior to the date such portion would be due, pursuant to this

Section 5.02(d). Any such advance contribution with respect to a Commitment will be applied to the amount due from such Private Limited Partner with respect to the next required contribution (or contributions) and shall be credited to such Private Limited Partner's Capital Account when and to the extent so applied, as provided in Sections 6.02 and 6.03.

Section 5.03    <u>Capital Contributions by Preferred Limited Partners</u>.

Each Preferred Limited Partner will contribute the entire amount of its initial Commitment to the Partnership on the date of its admission to the Partnership as a Preferred Limited Partner. On the date that any Preferred Limited Partner increases its Commitment, it will pay a capital contribution equal to 100% of the amount of the increase in its Commitment. Any capital contribution by a Preferred Limited Partner with respect to its initial Commitment or increase in its Commitment will be deemed to include any portion of any such Commitment contributed as provided in Article 4.5(d).

Section 5.04    <u>Capital Contributions by the General Partner</u>.

(a)    All capital contributions to the Partnership by the General Partner must be in cash, except as provided in this Agreement and approved by SBA.

(b)    The General Partner shall contribute an amount equal to the Minimum Allocation Percentage of the total Commitments of the Private Limited Partners. Except as otherwise provided in Section 5.04(c) herein, the General Partner acknowledges its Commitment and may pay its Commitment in cash upon demand by the Partnership, including a payment of interest at the minimum rate necessary to avoid the imputation of interest or the creation of original issue discount under the Code. All such interest and the principal shall be payable to the Partnership in full upon the termination or dissolution of the Partnership. The amount of such Commitment shall be amended from time to time to account for the Commitments of any Additional Private Limited Partners and any increase in the Commitments of any Private Limited Partners, and to account for any distributions to the General Partner.

(c)    If at the time any distribution in cash is to be made to the General Partner under Section 7.03 herein, the aggregate percentage of the Commitment of the General Partner which has been paid is lower than the aggregate percentage of the Commitments of the Private Limited Partners which have become due or with respect to which a notice requiring a contribution has been given pursuant to Section 5.02(e) herein as of such date, then a portion of such distribution (up to the maximum amount provided below) shall be contributed to the Partnership as a Capital Contribution with respect to the General Partner's Commitment. The portion of any such distribution which shall be so contributed shall be the lesser of (i) the amount required to cause the aggregate percentage of the Commitment of the General Partner which has been paid or set off to be equal to the aggregate percentage of the Commitments of the

41

Private Limited Partners which have become due or with respect to which a notice requiring a contribution has been given pursuant to Section 5.02(e) herein; or (ii) the amount of such distribution less a percentage of such distribution equal to the combined highest marginal Federal and applicable state income tax rates for individual taxpayers. Capital Contributions pursuant to this Section shall be applied first against interest and then to principal. The date any contribution is made pursuant to this Section shall be the date such contribution is received for purposes of Section 6.03(a)(iv)(B)(1)(a) herein.

(d)     If the Commitment of the General Partner is increased as a result of an increase in the Commitment of the Private Limited Partners or the admission of any Additional Private Limited Partner, the amount of the increased Commitment will be payable by the General Partner in installments, the first of which will be due upon the effectiveness of the increased Commitment and each subsequent installment will be due at the same times and in the same percentage amounts as the Private Limited Partners.

(e)     When the partnership is liquidated, the General Partner will contribute to the Partnership within the time period provided in Treasury Regulation § 1.704-(1)(b)(2)(ii)(b)(3) an amount equal to any deficit balance in its Capital Account after giving effect to its contribution of its Commitment as provided in Article 5.4(a) and (b).

Section 5.05    Additional Private Limited Partners and Increased Commitments.

From time to time after the date of this Agreement and on or before the last date for admission of additional Private Limited Partners, the General Partner may admit one or more new Private Limited Partners (the "Additional Private Limited Partners") or permit any Private Limited Partner to increase its Commitment, up to a maximum aggregate Commitment for the Partnership of $30 million, under the following terms and conditions:

(a)     Each Additional Private Limited Partner (and Private Limited Partner increasing its Commitment) must execute and deliver to the Partnership a counterpart of this Agreement, or other written instrument, which sets forth:

(i)     the name and address of the Partner,

(ii)    the Commitment of the Partner, and

(iii)   in the case of an Additional Private Limited Partner, the agreement of the Partner to be bound by the terms of this Agreement, as if such Additional Private Limited Partner were an original signatory to this Agreement.

# EXHIBIT B (Part 3)

<u>Schedule A</u> attached to this Agreement will be amended by the General Partner to reflect such Additional Private Limited Partner's name, address and Commitment (or the increase in the Private Limited Partner's Commitment, as the case may be).

(b)    An Additional Private Limited Partner may be admitted or an existing Private Limited Partner may increase its Commitment only with the consent of the General Partner.

(c)    Each Additional Private Limited Partner shall be admitted to the Partnership as of the date that (i) an executed counterpart of this Agreement has been delivered to and accepted by the General Partner, and (ii) such Additional Private Limited Partner has paid, by way of contribution to the Partnership, cash in an amount equal to that percentage of its Commitment that is equal to the percentage of the Commitments previously contributed by the other Private Limited Partners.

(d)    In the case of each Private Limited Partner whose Commitment has been increased, such increased Commitment shall be effective as of the date that (i) an executed counterpart of this Agreement reflecting such increased Commitment has been delivered to and accepted by the General Partner, and (ii) such Private Limited Partner has paid, by way of contribution to the Partnership, cash in an amount equal to that percentage of the increased amount of its Commitment that is equal to the percentage of the Commitments previously contributed by the other Private Limited Partners.

(e)    The General Partner shall determine the price for each Partner's Percentage to be issued to each Additional Private Limited Partner or each Private Limited Partner whose Commitment is to be increased, which price shall be known as the "Offering Price." In determining the Offering Price, the General Partner shall not set the price at less than the Gross Asset Value of the percentage of the Partnership's Assets Under Management reflected in the Partner's Percentage to be issued; however, the General Partner, in its sole discretion, may set an Offering Price in excess of the Gross Asset Value of the percentage of the Partnership's Assets Under Management to be issued to the Additional Private Limited Partner or to the Private Limited Partner increasing its Commitment.

Section 5.06  <u>Conditions to the Commitments of the General Partner and the Private Limited Partners.</u>

(a)    Notwithstanding any provision in this Agreement to the contrary, on the earlier of (i) the completion of the liquidation of the Partnership or (ii) one year from the commencement of the liquidation, the General Partner and the Private Limited Partners will be obligated to contribute any amount of their respective Commitments, not previously contributed to the Partnership, if and

43

to the extent that the other Assets of the Partnership have not been sufficient to permit at that time the redemption of all Outstanding Leverage, the payment of all amounts due with respect to the Outstanding Leverage as provided in the SBIC Act, and the payment of all other amounts owed by the Partnership to SBA.

(b)     Notwithstanding any provision in this Agreement to the contrary, if the Partnership is subject to restricted operations (as that term is used in the SBIC Act) and before the liquidation of the Partnership SBA requires the General Partner and the Private Limited Partners to contribute any amount of their respective Commitments not previously contributed to the Partnership, the obligation to make such contributions will not be subject to any conditions stated in this Agreement other than limitations on the amount of capital which a Partner is obligated to contribute (i) within any specified time period or (ii) before any specified date.

(c)     The provisions of this Section do not apply to the Commitment of any Private Limited Partner whose obligation to make capital contributions has been terminated or who has withdrawn from the Partnership, with the consent of SBA, under a provision of this Article 5 or Article 8 or any agreement, release, settlement or action under any provision of this Agreement.  No Private Limited Partner or General Partner has any right to delay, reduce or offset any obligation to contribute capital to the Partnership called under this Section by reason of any counterclaim or right to offset by the Partner or the Partnership against SBA or any Preferred Limited Partner.

Section 5.07     Termination of the Obligation to Contribute Capital.

(a)     Any Private Limited Partner may elect to terminate its obligation in whole or in part to make a capital contribution required under this Agreement, or upon demand by the General Partner, will no longer be entitled to make such capital contribution, if the Private Limited Partner or the General Partner obtains an opinion of counsel as provided under Section 5.08 to the effect that making such contribution would require the Private Limited Partner to withdraw from the Partnership under Section 8.08 through Section 8.12.

(b)     Upon receipt by the General Partner of a notice and opinion as provided under Section 5.08, unless cured within the period provided under Section 5.09, the Commitment of the Private Limited Partner delivering the opinion will be deemed to be reduced by the amount of such unfunded capital contribution and this Agreement will be deemed amended to reflect a corresponding reduction of aggregate Commitments to the Partnership.

Section 5.08     Notice and Opinion of Counsel.

(a)     A copy of any opinion of counsel issued as described in Section 5.07 or Section 8.08 through Section 8.12 must be sent by the General Partner to SBA, together with (i) the written notice of the election of the Private Limited Partner or (ii) the written demand of the General Partner, to which the opinion relates.

44

(b)     An opinion rendered to the Partnership as provided in Section 5.07 or Section 8.08 through Section 8.12 will be deemed sufficient for the purposes of those Sections only if the General Partner and SBA each approve (i) the counsel rendering the opinion, and (ii) the form and substance of the opinion.

Section 5.09     Cure, Termination of Capital Contributions and Withdrawal.

(a)     Unless within ninety (90) days after the giving of written notice and opinion of counsel, as provided in Section 5.08, the Private Limited Partner or the Partnership eliminates the necessity for termination of the obligation of the Private Limited Partner to make further capital contributions or for the withdrawal of the Private Limited Partner from the Partnership in whole or in part to the reasonable satisfaction of the Private Limited Partner and the General Partner, the Private Limited Partner will withdraw from the Partnership in whole or in part to the extent required, effective as of the end of the ninety (90) day period.

(b)     Subject to the provisions of Section 5.111, in its discretion the General Partner may waive all or any part of the ninety (90) day cure period and cause such termination of capital contributions or withdrawal to be effective at an earlier date as stated in the waiver.

(c)     Any distributions made to a Private Limited Partner with respect to such Partner's withdrawal under this Section will be subject to and made as provided in Section 8.13.

Section 5.10     Failure to Make Required Capital Contributions.

(a)     The Partnership is entitled to enforce the obligations of each Partner to make the contributions to capital specified in this Agreement.  The Partnership has all rights and remedies available at law or equity if any such contribution is not so made.

Section 5.11     Notice and Consent of SBA with respect to Capital Contribution Defaults.

(a)     The Partnership must give SBA prompt written notice of any failure by a Private Limited Partner to make any capital contribution to the Partnership required under this Agreement when due, which failure continues beyond any applicable grace period specified in this Agreement.

(b)     Unless SBA has given its prior consent or the provisions of subsection (c) of this Section have become applicable, the Partnership will not (i) take any action (including entering into any agreement (whether oral or written), release or settlement with any Partner) which defers, reduces, or terminates the obligations of the Partner to make contributions to the capital of the Partnership, or (ii) commence any legal proceeding or arbitration, which seeks any such deferral, reduction or termination of such obligation.  Without the consent of SBA (including SBA's deemed consent under subsection (c)

45

of this Section) no such agreement, release, settlement or action taken will be effective with respect to the Partnership or any Partner.

(c)    If the Partnership has given SBA thirty (30) days prior written notice of any proposed legal proceeding, arbitration or other action described under subsection (b) of this Section with respect to any default by a Private Limited Partner in making any capital contribution to the Partnership, and the Partnership has not received written notice from SBA that it objects to the proposed action within the thirty (30) day period, then SBA will be deemed to have consented to the proposed Partnership action.

(d)    Any notice given by the Partnership to SBA under this Section must:

(i)    be given by separate copies directed to each of the Investment Division and the Office of the General Counsel of SBA;

(ii)    explicitly state in its caption or first sentence that the notice is being given with respect to a specified default by a Private Limited Partner in making a capital contribution to the Partnership and a proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default; and

(iii)    state the nature of the default, the identity of the defaulting Private Limited Partner, and the nature and terms of the proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default.

(e)    Section 5.11(b) shall be in effect at any time that the Partnership has Outstanding Leverage and shall not be in effect at any time the Partnership has no Outstanding Leverage.

Section 5.12    Interest on Overdue Contributions.

(a)    In the event that any Private Limited Partner fails to make a contribution required under this Agreement within ten (10) days after the date such contribution is due, then the General Partner may, in its sole discretion, elect to charge such Private Limited Partner interest at an annual rate equal to the lesser of (i) the highest prime rate reported in The Wall Street Journal, from time to time, plus two percent (2%) or (ii) the highest rate of interest such Private Limited Partner is legally permitted to pay in such circumstance, on the amount due from the date such amount became due until the earlier of (x) the date on which such payment is received by the Partnership from such Private Limited Partner or (y) the date of any notice given to such Private Limited Partner by the General Partner pursuant to Section 5.13 or Section 5.14. Any interest deducted from such Private Limited Partner's Capital Account shall be credited to the Capital Accounts of the other Partners in the manner provided in Section 5.16(h) herein.

Section 5.13    <u>Termination of a Private Limited Partner's Right to Make Further Capital Contributions.</u>

(a)    In the event that any Private Limited Partner fails to make a contribution required under Section 5.02 herein within 20 days after the date such contribution is due, unless the General Partner has acted pursuant to Section 5.14 herein, the General Partner may, in its sole discretion (and with the consent of the SBA given as provided in Section 5.11(b) herein) elect to declare, by notice to such Private Limited Partner, that such Private Limited Partner's Commitment shall be deemed to be reduced to the amount of any contributions of capital timely made pursuant to Section 5.01 or 5.05 herein. Upon such notice, such Private Limited Partner shall have no right to make any contribution thereafter (including the contribution as to which the nonpayment occurred and any contribution otherwise required to be made thereafter pursuant to the terms of Section 5.01 or 5.05 herein). Upon such notice, the General Partner shall amend <u>Schedule A</u> to this Agreement to reflect such reduced Commitment.

Section 5.14    <u>Forfeiture of a Private Limited Partner's Interest in the Partnership.</u>

(a)    In the event that any Private Limited Partner fails to make a contribution required under Section 5.02 herein within 30 days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution was due, the General Partner may in its sole discretion (and with the consent of the SBA given as provided in Section 5.11 herein) declare, by notice of forfeiture to such Private Limited Partner, that one hundred percent (100%) of the interest of such Private Limited Partner in the Partnership (including amounts in its Capital Account as well as any interest in future profits, losses or distributions of the Partnership) is forfeited, effective as of the date of such Private Limited Partner's failure to make such required contribution, in which event, as of the date of such notice of forfeiture (i) the Private Limited Partner shall cease to be a Partner with respect to such forfeited interest; <u>provided</u>, <u>however</u>, that such forfeited Private Limited Partner shall cease to have any liability for the payment of the forfeited percentage of any Capital Contributions due at such time or in the future and (ii) the forfeited percentage of such Private Limited Partner's Capital Account shall be held by the Partnership and reallocated among the Capital Accounts of the Partners to be apportioned among such Private Limited Partners (other than such forfeited Private Limited Partner) in accordance with their respective aggregate Capital Contributions.

Section 5.15    <u>Withholding and Application of a Private Limited Partner's Distributions.</u>

(a)    No part of any distribution shall be paid to any Private Limited Partner from which there is then due and owing to the Partnership, at the time of such

47

distribution, any amount required to be paid to the Partnership. At the election of the General Partner, which it may make in its sole discretion, the Partnership may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Partnership from such Private Limited Partner or (ii) withhold such distribution until all amounts then due are paid to the Partnership by such Private Limited Partner. Upon payment of all amounts due to the Partnership (by application of withheld distributions or otherwise), the General Partner shall distribute any unapplied balance of any such withheld distribution to such Private Limited Partner. No interest shall be payable on the amount of any distribution withheld by the Partnership pursuant to this Section.

Section 5.16    <u>Required Sale of a Private Limited Partner's Interest in the Partnership</u>.

In the event that any Private Limited Partner fails to make a contribution required under this Agreement within thirty (30) days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution is due, unless the General Partner has acted pursuant to Section 5.13 or Section 5.14, the General Partner may, in its sole discretion, (and with the consent of SBA given as provided in Section 5.11) elect to declare such Private Limited Partner in default. If the General Partner so elects to declare such Private Limited Partner in default (such Private Limited Partner being hereinafter referred to as the "Optionor"), then the other Private Limited Partners of the Partnership which are not in default (the "Optionees") and the General Partner shall have the right and option to acquire one-hundred percent (100%) of the Partnership interest, which shall include one-hundred percent (100%) of the Capital Account (the "Optioned Partnership Interest") of the Optionor on the following terms:

(a)     The General Partner shall give the Partners notice promptly after declaration of any such default. Such notice shall advise each Optionee of the portion of the Optioned Partnership Interest available to it and the price therefor. The portion available to each Optionee shall be that portion of the Optioned Partnership Interest that bears the same ratio to the Optioned Partnership Interest as each Optionee's capital contributions to the Partnership bears to the aggregate capital contributions to the Partnership, exclusive of the capital contributions to the Partnership of the Optionor. The aggregate price for the Optioned Partnership Interest shall be the assumption of the unpaid Commitment obligation (both that portion then due and amounts due in the future) of the Optionor (the "Option Price"). The Option Price for each Optionee shall be prorated according to the portion of the Optioned Partnership Interest purchased by each such Optionee so that the percentage of the unpaid Commitment assumed by each Optionee is the same as the percentage of the Optioned Partnership Interest purchased by such Optionee. The option granted hereunder shall be exercisable by each Optionee in whole only at any time within thirty (30) days of the date of the notice from the General Partner by the delivery to the General Partner of (i) a notice of

48

exercise of option, and (ii) the capital contribution due in accordance with clause (e)(i). The General Partner shall forward the above notices of exercise of option received to the Optionor.

(b)    Should any Optionee not exercise its option within the period provided in subsection on period, shall notify the other Optionees who have previously exercised their options in full, which Optionees shall have the right and option ratably among them to acquire the portion of the Optioned Partnership Interest not so acquired (the "Remaining Portion") within ten (10) days of the date of the notice specified in this subsection on the same terms as provided in subsection (a).

(c)    The amount of the Remaining Portion not acquired by the Optionees pursuant to subsection (b) may be acquired by the General Partner within ten (10) days of the expiration of the period specified in subsection (b) on the same terms as set forth in subsection (a).

(d)    The amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to subsection (c) may, if the General Partner deems it in the best interest of the Partnership, be sold to any other corporations, partnerships, individuals or other entities on terms not more favorable to such purchaser than the Optionees' option (and the General Partner may admit any such third party purchaser as a Private Limited Partner, subject to the approval of SBA, if required under the SBIC Act). Any consideration received by the Partnership for such amount of the Optionor's interest in the Partnership in excess of the Option Price therefor shall be retained by the Partnership and allocated among the Partners' Capital Accounts in proportion to the respective Partners' capital contributions.

(e)    Upon exercise of any option hereunder, such Optionee (or the General Partner, if it has exercised its rights pursuant to subsection (c)) shall be deemed to have assumed that portion of the Optionor's unpaid Commitment representing the Option Price of the purchased portion of the Optioned Partnership Interest and shall be obligated (i) to contribute to the Partnership the portion of the capital contribution then due from the Optionor equal to the percentage of the Optioned Partnership Interest purchased by such Optionee and (ii) to pay the same percentage of any further contributions which would have otherwise been due from such Optionor.

(f)    Upon the purchase by the General Partner of any portion of the Optioned Partnership Interest in the Partnership pursuant to subsection (c), the General Partner shall also become a Private Limited Partner to the extent of such interest.

\\\DC - 69963/1 - #1251576 v2

(g)    Upon the purchase of any portion of any Optioned Partnership Interest by an Optionee, the General Partner or other person pursuant to this Section, the Optionor shall have no further rights or obligations under this Agreement with respect to such portion.

(h)    Upon the purchase of any portion of the Optioned Partnership Interest, for purposes of computing such purchaser's aggregate capital contributions, such purchaser shall be deemed to have aggregate capital contributions (or the aggregate capital contributions of any Optionee, shall be increased by an amount) equal to the percentage of the defaulting Private Limited Partner's aggregate capital contribution which the purchased portion of the Optioned Partnership Interest represents of the defaulting Private Limited Partner's entire Partnership interest, and the aggregate capital contributions of such defaulting Private Limited Partner shall be reduced by a corresponding amount.

Section 5.17    Security Interest.

(a)    Each Private Limited Partner hereby grants to the Partnership a security interest in such Private Limited Partner's interest to secure the full and prompt payment to the Partnership of such Private Limited Partner's Commitment.

**Article 6**

<u>Adjustment of Capital Accounts</u>

Section 6.01  <u>Establishment of Capital Accounts</u>.

There will be established on the books of the Partnership an Opening Capital Account for each Partner in accordance with the definitions and methods of allocation prescribed in this Agreement.

Section 6.02  <u>Time of Adjustment of Capital Accounts</u>.

Allocations will be made to the Opening Capital Account of each Partner in accordance with Section 6.03, as of the following dates:

(i)  the close of each fiscal year of the Partnership;

(ii)  the day before the date of the admission of an Additional Private Limited Partner, increase in any Private Limited Partner's Commitment, admission of any Preferred Limited Partner or increase in the Commitment of any Preferred Limited Partner;

(iii)  the day before the dissolution of the Partnership;

(iv)  the date of a distribution; and

(v)  such other dates as this Agreement may provide.

Section 6.03  <u>Adjustments to Capital Accounts</u>.

(a)  As of the times stated in Section 6.02, allocations will be made to the Opening Capital Accounts of the Partners to arrive at each Partner's Closing Capital Account for the period in the following order and amounts:

(i)  The amount of any capital contributions paid by each Partner during such period will be credited to the Partner's Opening Capital Account (other than capital contributions referred to in clause (i) of the definition of "Opening Capital Account" in Section 1.01); provided, however, that any such capital contribution will be credited to the Partner's Opening Capital Account on the later of the date the capital contribution was due or the date on which the capital contribution was actually received by the Partnership;

(ii)    The amount of any distributions made to each Partner during the period will be debited against the Partner's Opening Capital Account;

(iii)   Net Profits will be credited and Net Losses will be debited to the Opening Capital Accounts of the Preferred Limited Partners in such amount and in such manner as is required to allocate to the Preferred Limited Partners the amount of the Earned Prioritized Payments and earned Adjustments and earned Charges to which the Preferred Limited Partners are then entitled (determined as provided in the SBIC Act), to be apportioned among them as required under the SBIC Act;

(iv)    The balance of any Net Profits will be credited, and the balance of any Net Losses will be debited, to the Opening Capital Accounts of the Partners as follows:

    (A)    to the Preferred Limited Partners in such amount as is required to allocate to the Preferred Limited Partners the amount of the Profit Participation to which the Preferred Limited Partners are then entitled (determined as provided in the SBIC Act), to be apportioned among them as required under the SBIC Act; and

    (B)    the balance to the General Partner and the Private Limited Partners to be apportioned among the General Partner and the Private Limited Partners as follows:

        (1)    After giving effect to the special allocations set forth in Section 6.04(j)(i) hereof, Net Profits will be credited to the Opening Capital Accounts of the General Partner and the Private Limited Partners as follows:

            (a)    First, one-hundred percent (100%) to the General Partner in an amount equal to the excess, if any, of the cumulative Net Losses allocated to the General Partner pursuant to Section 6.03(a)(iv)(B)(2)(e) hereof for all prior periods, over the cumulative Net Profits allocated to the General Partner pursuant to this Section 6.03(a)(iv)(B)(1)(a) for all prior periods;

            (b)    Second, to the Private Limited Partners according to their respective Preferred Returns until each Private Limited Partner

has received cumulative allocations of Net Profit under this Section 6.03(a)(iv)(B)(1)(b) equal to the sum of its aggregate Preferred Return and the aggregate amount of Net Losses previously allocated pursuant to Section 6.03(a)(iv)(B)(2)(d) below;

(c)     Third, one percent (1%) to the General Partner and ninety-nine percent (99%) to the Private Limited Partners in an amount equal to the excess, if any, of the cumulative Net Losses allocated to the Partners pursuant to Section 6.03(a)(iv)(B)(2)(c) hereof for all prior periods, over the cumulative Net Profits allocated to the Partners pursuant to this Section 6.03(a)(iv)(B)(1)(c) for all prior periods;

(d)     Fourth, to the General Partner until cumulative allocations to the General Partner pursuant to this Section 6.03(a)(iv)(B)(1)(d), less the aggregate amount of Net Losses allocated to the General Partner under Section 6.03(a)(iv)(B)(2)(b) below, equal twenty-five percent (25%) of the total cumulative allocations pursuant to Section 6.03(a)(iv)(B)(1)(b); and

(e)     Thereafter, any remaining Net Profits shall be allocated twenty percent (20%) to the General Partner and eighty percent (80%) to the Private Limited Partners.

(2)     After giving effect to the special allocations set forth in Section 6.04(j)(i) hereof, Net Losses will be debited to the Opening Capital Accounts of the General Partner and the Private Limited Partners as follows:

(a)     First, twenty percent (20%) to the General Partner and eighty percent (80%) to the Limited Partners in an amount equal to the excess, if any, of the cumulative Net Profits allocated to the Partners pursuant to Section

53

6.03(a)(iv)(B)(1)(e) hereof for all prior periods, over the aggregate Net Losses allocated pursuant to this Section 6.03(a)(iv)(B)(2)(a) for all prior periods;

(b)    Second, one-hundred percent (100%) to the General Partner but only to the extent that Net Profits previously have been allocated to the General Partner pursuant to Section 6.03(a)(iv)(B)(1)(d) above and not offset by allocations of Net Losses under this Section 6.03(a)(iv)(B)(2)(b);

(c)    Third, one percent (1%) to the General Partner and ninety-nine percent (99%) to the Private Limited Partners in an amount equal to the excess, if any, of the cumulative Net Profits allocated to the Private Limited Partners pursuant to Section 6.03(a)(iv)(B)(1)(b) hereof for all prior periods over the cumulative Net Losses allocated to the Private Limited Partners pursuant to this Section 6.03(a)(iv)(B)(2)(c) for all prior periods, provided that Net Losses shall not be allocated pursuant to this Section 6.03(a)(iv)(B)(2)(c) to the extent such allocations would cause the Private Limited Partners to have Adjusted Capital Account Deficits at the end of any period;

(d)    Fourth, one-hundred percent (100%) to the Private Limited Partners but only to the extent that Net Profits previously have been allocated to the Private Limited Partners pursuant to Section 6.03(a)(iv)(B)(1)(b) hereof and not offset by allocations of Net Losses under this Section 6.03(a)(iv)(B)(2)(d); and

(e)    Thereafter, any remaining Net Losses shall be allocated to the General Partner.

(b)    Notwithstanding the provisions of Article 6.3(a)(iv):

\\\DC - 69963/1 - #1251576 v2

(i) at such time as the Capital Account of the General Partner or any Private Limited Partner is reduced to an amount equal to the aggregate capital contributions of such Partner (less all distributions to such Partner), the balance of all Net Losses will be allocated:

 (A) first, to the remaining Capital Accounts of the General Partner and Private Limited Partners which have not been reduced to zero (to be apportioned among them in accordance with their respective positive Capital Accounts);

 (B) second, after the Capital Accounts of the General Partner and all Private Limited Partners have been reduced to zero, then to the remaining Capital Accounts of the Preferred Limited Partners which have not been reduced to zero (to be apportioned among them according to their respective Capital Accounts); and

 (C) third, after the Capital Accounts of all Private Limited Partners and Preferred Limited Partners have been reduced to zero, then the balance to the General Partner.

(ii) If Net Losses are allocated in accordance with the foregoing clause (i), any Net Profits that are required to be allocated after such special allocation of Net Losses as provided in the foregoing clause will be allocated:

 (A) first, to the General Partner until the effect of the special allocation of Net Losses under clause (C) is reversed and eliminated;

 (B) second, to all of the Preferred Limited Partners to whom the allocation of such Net Losses has been made under clause (B) until the effect of such special allocation of Net Losses has been reversed and eliminated; and

 (C) third, to the General Partner and Private Limited Partners to whom the allocation of such Net Losses has been made under clause (A) until the effect of such special allocation of Net Losses has been reversed and eliminated.

(c) To the extent not otherwise accomplished by the provisions of Article 6.3(a) and Article 6.3(b) , the Opening Capital Accounts of the Partners will be adjusted to effect any allocation of any item of income, gain, loss, deduction or credit to a Partner required by the Code.

\\\DC - 69963/1 - #1251576 v2

Section 6.04     Tax Matters.

(a)    If at the end of a fiscal year of the Partnership, a Private Limited Partner or any Preferred Limited Partner unexpectedly receives an adjustment, allocation, or distribution described in clauses (4), (5) and (6) of Treasury Regulation § 1.704 - 1(b)(2)(ii) and that adjustment, allocation, or distribution reduces that Private Limited Partner's or Preferred Limited Partner's Opening Capital Account below zero (0), then the Private Limited Partner or Preferred Limited Partner will be allocated all items of income and gain of the Partnership for that year and for all subsequent fiscal years until the deficit balance has been eliminated as provided in Treasury Regulation § 1.704 - 1(b)(2)(ii)(d), as quickly as possible.  If any such unexpected adjustment, allocation or distribution creates a deficit balance in the Opening Capital Accounts of more than one Private Limited Partner or Preferred Limited Partner in any fiscal year, all items of income and gain of the Partnership for the fiscal year and all subsequent fiscal years will be allocated among all such Private Limited Partners and Preferred Limited Partners in proportion to their respective deficit balances until such balances have been eliminated.  If any allocation is made pursuant to this paragraph, subsequent allocations shall be made (in a manner consistent with this paragraph) to offset the effects of such prior allocation.  This provision is intended to qualify as a "qualified income offset" within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(d).

(b)    For Federal, state and local income tax purposes, each item of Partnership income, credit, gain or loss will be allocated among the Partners as provided in Section 6.03.

(c)    The General Partner has the power, limited as provided in the following sentence, to make such allocations and to take such actions necessary under the Code or other applicable law to effect and to maintain the substantial economic effect of allocations made to the Partners under Section 704(b) of the Code.  The preceding sentence does not give the General Partner any power to make any allocation or take any other action that affects the rights or preferences of, or allocations or distributions to, any Preferred Limited Partner.  All allocations made and other actions taken by the General Partner under this paragraph will be consistent to the maximum extent possible with the provisions of this Agreement.

(d)    The General Partner is the "tax matters partner," as the term is used in the Code.

(e)    The General Partner is expressly authorized to (i) elect that the Partnership be classified as a partnership for federal tax purposes, and (i) to make any election or other action on behalf of the Partnership permitted under the Code with respect to the election of that tax classification.

(f)    The General Partner must keep the Partners informed of all administrative and judicial proceedings with respect to Partnership tax returns or the adjustment of Partnership items. Any Partner who enters into a settlement agreement with respect to Partnership items must promptly give the General Partner notice of the settlement agreement and terms that relate to Partnership items.

(g)    In the event of any admission of any Additional Private Limited Partner or Preferred Limited Partner or transfer by any Private Limited Partner of its Partnership interest, the General Partner will allocate items of income, credit, gain or loss in accordance with the Code and may make such elections under the Code as the General Partner determines to be necessary or appropriate.

(h)    Anything contained in this Agreement to the contrary notwithstanding, if the Partnership is deemed liquidated within the meaning of Treasury Regulation § 1.704-1(b) (2)(ii)(g) but has not dissolved under Article 8.1(a), then the assets of the Partnership will, after provision for payment to creditors, be deemed distributed to the Partners in accordance with Treasury Regulation § 1.704-1(b)(2)(ii)(b)(2) and immediately recontributed to the Partnership and the General Partner must make the contributions contemplated by (e).

(i)    Notwithstanding any other provision of this Agreement, the interests of the General Partner in each material item of Partnership income, gain, loss, deduction or credit shall be equal to at least the Minimum Allocation Percentage of each such item at all times during the existence of the Partnership.

(j)    The provisions of Section 704(b) of the Code and the Regulations issued thereunder relating to qualified income offsets, minimum gain chargeback requirements and allocations of deductions attributable to nonrecourse debt and partner nonrecourse debt are hereby incorporated by reference. If any allocation is required by this Section 6.04(j)(i), special offsetting allocations of other items of income, gain, loss and deduction shall be made as rapidly as possible so that, after such offsetting allocations are made, each Partner's Capital Account is, to the extent possible, equal to the Capital Account such Partner would have had if the allocations made under this Section 6.04(j)(i) had not been made. Any allocations made under this Section 6.04(j)(i) shall be made prior to allocations made under Section 6.03.

(k)    In accordance with Code Section 704(c) and the regulations thereunder, income, gain, loss and deduction with respect to any Assets contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such Asset to the Partnership for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value).

(l)     In the event the Gross Asset Value of any Partnership Asset is adjusted pursuant to subparagraph (b) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such Asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(m)     Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement; provided, that the Partnership, upon the election of a majority in Voting Interest of the Limited Partners, may make, or not make, "curative" or "remedial" allocations (within the meaning of the regulations under Code Section 704(c)), including but not limited to "curative" allocations which offset the effect of the "ceiling rule" for a prior fiscal year (within the meaning of Regulation Section 1.704-3(c)(3)(ii), and "curative" allocations from disposition of contributed property within the meaning of Regulation Section 1.704-3(c)(3)(iii)(B).  Allocations pursuant to Sections 6.04(j)(ii), 6.04(j)(iii) and 6.04(j)(iv) are solely for purposes of federal, state, and local taxes, and shall not affect or in any way be taken into account in computing any Partner's Capital Account or share of Net Profits, Net Losses, other items or distributions (other than distributions required by Section 7.04(b)) pursuant to any provision of this Agreement.

## Article 7

## Distributions

Section 7.01  Distributions to Partners.

(a)  The Partnership must make distributions of cash and/or property, if any, at such times as the SBIC Act requires and may make distributions of cash and/or property at such other times as the SBIC Act permits and as are determined under this Agreement.

(b)  All distributions must be made in the following order and amounts:

(i)  to the Preferred Limited Partners in an amount up to any unpaid Earned Prioritized Payments, earned Adjustments and earned Charges to which any Preferred Limited Partners are entitled (as determined under the SBIC Act), to be apportioned among them as required by the SBIC Act;

(ii)  if all amounts required to be distributed under clause (i) have been distributed, then at the election of the General Partner, to the Partners (whether or not each Partner is a taxpayer or is a tax exempt entity) in an amount up to the Maximum Tax Liability of the Partners, to be apportioned between the Preferred Limited Partners on the one hand and the General Partner and the Private Limited Partners on the other hand, as required by the SBIC Act;

(iii)  if all amounts required to be distributed under clause (i) and clause (ii) (if the General Partner has elected to make a distribution under clause (ii)) have been distributed, then to the Partners in an amount up to the amount of the Retained Earnings Available for Distribution of the Partnership, to be apportioned among them in the following ratios:

(A)  if as of the date of the distribution there is Outstanding Leverage, then in the ratios stated in the SBIC Act; and

(B)  if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under this clause (iii) will be apportioned to the Preferred Limited Partners up to the amount of any Profit Participation payable to the Preferred Limited Partners following the redemption of their Preferred Limited Partnership Interests under the SBIC Act, if any, and the balance will be apportioned to the General Partner and the Private Limited Partners;

(iv) if all amounts required to be distributed under clauses (i) , (ii) (if the General Partner has elected to make a distribution under clause (ii)), and (iii) have been distributed, then any additional amount will be distributed and apportioned among the Partners in the following ratios:

(A) if as of the date of the distribution there is Outstanding Leverage then in the ratios stated in the SBIC Act; and

(B) if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under this clause (iv) will be distributed one hundred percent (100%) to the General Partner and the Private Limited Partners.

Section 7.02    Distributions of Noncash Assets in Kind.

(a) Subject to the provisions of the SBIC Act (including, without limitation, 13 C.F.R. § 107.1580), the prior approval of SBA and the provisions of this Section, the Partnership at any time may distribute Noncash Assets in kind.

(b) Except as provided in the next sentence, any distribution of Noncash Assets will be made pro rata between the Preferred Limited Partners on the one hand and the General Partner and Private Limited Partners on the other hand (based upon the respective amounts which each of the two groups would be entitled to receive if the distribution were made in cash) with respect to the distribution of each Noncash Asset. With the prior approval of SBA, the Partnership may distribute cash to the Preferred Limited Partners in lieu of all or part of any Noncash Assets that they would otherwise receive in such distribution.

(c) Distributions of Noncash Assets in kind before the redemption of all Preferred Limited Partnership Interests will only be made if the Noncash Assets are Distributable Securities. Distributions in kind of Noncash Assets which are Earmarked Assets after the redemption of all Preferred Limited Partnership Interests will be made only (i) if the Noncash Assets are Distributable Securities or (ii) if the Noncash Assets are not Distributable Securities, then with the prior approval of SBA (which must include the approval of the valuation of the Noncash Assets).

(d) At any time that any amount due to a Preferred Limited Partner whose Preferred Limited Partnership Interest has been redeemed for purposes of the SBIC Act has not been paid in full, the Partnership will not make any distribution of Noncash Assets in kind unless the Partnership distributes to the Preferred Limited Partner such amount, up to the amount of the unrealized appreciation on the Noncash Assets to be distributed, as may be necessary to pay in full the amounts due to the Preferred Limited Partner under (c).

(e) Subject to the SBIC Act, Noncash Assets distributed in kind under this Section 7.02 will be subject to such conditions and restrictions as are legally

60

required, including, without limitation, such conditions and restrictions required to assure compliance by the Partners and/or the Partnership with the aggregation rules and volume limitations under Rule 144 promulgated under the Securities Act.

(f)     The valuation of any in-kind distributions shall be made pursuant to the valuation guidelines adopted by the Partnership pursuant to Section 3.10(a).

Section 7.03    Apportionment of Distributions Among the General Partner and Private Limited Partners.

All amounts to be distributed to the General Partner and the Private Limited Partners will be apportioned among the General Partner and the Private Limited Partners as follows:

(a)     First, to the General Partner and the Private Limited Partners, pro rata and in proportion to the their Voting Interest, in an amount equal to the excess, if any, of (i) the cumulative Preferred Return of each such Partner from the inception of the Partnership to the time of such distribution, over (ii) the sum of all prior distributions to such Partners pursuant to this Section 7.03(a);

(b)     Second, to the General Partner and Private Limited Partners in proportion to and to the extent of the Unreturned Capital of each such Partner;

(c)     Third, to the General Partner in an amount equal to the excess, if any, of twenty-five percent (25%) of the sum of all concurrent and prior distributions to the Private Limited Partners pursuant to section 7.03(a) hereof, over the sum of all prior distributions to the General Partner pursuant to this Section 7.01(c); and

(d)     The balance, if any, twenty percent (20%) to the General Partner and eighty percent (80%) to the Partners pro rata in proportion to the their Voting Interest.

Section 7.04    Distributions for Payment of Tax.

The General Partner shall use commercially reasonable efforts to distribute in accordance with Section 7.03 herein (i) within 90 days after the receipt thereof, the cash proceeds from any sale of any Investment Securities, net of any expenses related to such sale, revenues or amounts required in the good faith judgment of the General Partner to be retained to meet future expenses or liabilities of the Partnership and any amounts the General Partner elects to retain for the purchase of Investment Securities; (ii) within 90 days of the end of each fiscal year, to the extent not distributed pursuant to clause (i) hereof, a portion of the net realized gain (including items of ordinary income) for the preceding fiscal year that is equal to the maximum U.S. Federal rate applicable to individuals, net of any expenses related to such gain required in the good faith judgment of the General Partner to be retained to meet future expenses or liabilities of the

Partnership and any amounts the General Partner elects to retain for the purchase of Investment Securities; and (iii) within 90 days after the receipt thereof, proceeds received upon the maturity of any Investment Securities, net of any expenses related to such maturity required in the good faith judgment of the General Partner to be retained to meet future expenses or liabilities of the Partnership and any amounts the General Partner elects to retain for the purchase of Investment Securities.

Section 7.05    <u>Distributions Violative of the Act Prohibited</u>.

Anything contained in this Agreement to the contrary notwithstanding, no distribution may be made by the Partnership if and to the extent that such distribution would violate § 17-607 of the Act.

62

# EXHIBIT B (Part 4)

# Article 8

## Dissolution, Liquidation, Winding Up and Withdrawal

**Section 8.01   Dissolution.**

(a)   The Partnership will be dissolved upon the first to occur of the following:

 (i)   subject to Section 8.04 of this Agreement, an event of withdrawal (as defined in Section 17-402 of the Act) of the General Partner;

 (ii)   the later of:

  (A)   the close of business on September 30, 2009 ; or

  (B)   ten (10) years from the date of formation of the Partnership; or

  (C)   two years after all Preferred Limited Partners have withdrawn from the Partnership and all Outstanding Leverage has matured; or

 (iii)   the determination of the Partners to dissolve and terminate the Partnership as provided in Article 8.1(c) below.

(b)   The Partnership will not dissolve upon the withdrawal, dissolution, bankruptcy, death or adjudication of incompetence or insanity of any Private Limited Partner or Preferred Limited Partner.

(c)   Seventy-five percent (75%) in interest of the Private Limited Partners and the General Partner may elect to dissolve the Partnership by giving notice to each Partner and SBA of the election.  Any notice of an election to dissolve the Partnership may only be given:

 (i)   on or after the later to occur of:  (A) September 29, 2009 or (B) ten (10) years from the formation of the Partnership;

 (ii)   if all Outstanding Leverage has been repaid or redeemed; and

 (iii)   if all amounts due the Preferred Limited Partners, SBA, its agent or trustee have been paid.

Any election to dissolve the Partnership given under this Article 8.1(c) will not be effective until the later of:  (A) thirty (30) days from the date the

notice is given to all parties or (B) the effective date of dissolution stated in the notice.

(d)    [Fifty-one percent (51%) in interest of the Private Limited Partners and the General Partner may elect to extend the date set forth in Article 8.1(a)(ii)(A) and Article 8.1(c)(i) at any time within [sixty (60)] days prior to such date. Such date can be extended by any such election for an additional period of up to one (1) year, but may not be extended by this clause beyond three (3) years.]

[PPM says GP can do this (d) alone—not mentioned in Original Agreement]

Section 8.02    Winding Up.

(a)    Subject to the SBIC Act and Section 8.03, when the Partnership is dissolved, the property and business of the Partnership will be liquidated by the General Partner or if there is no General Partner or the General Partner is unable to act, a person designated by the holders of fifty-one percent (51%) in interest of the Private Limited Partners.

(b)    Within sixty (60) days (and subject to the requirements of Treasury Regulation §§ 1.704-1(b)(ii)(g) and 1.704-1(b)(2)(ii)(b)(2)) after the effective date of dissolution of the Partnership, the affairs of the Partnership will be wound up and the Partnership's assets will be distributed in the following manner and order:

(i)    the claims of the SBA shall be paid and discharged, and the claims of all creditors of the Partnership who are not Partners shall be paid and discharged or reasonable provision shall be made therefor;

(ii)    the claims of all creditors of the Partnership who are Private Limited Partners shall be paid and discharged or reasonable provision shall be made therefor;

(iii)    the claims of all creditors of the Partnership who are General Partners (including any claims for unpaid Management Compensation) shall be paid and discharged or reasonable provision shall be made therefor;

(iv)    any amounts contributed by Private Limited Partners prior to the time such Capital Contributions were due and not credited to such Private Limited Partners' Capital Accounts pursuant to Section 6.03, shall be paid to such Limited Partners; and

(v)    the remainder shall be distributed to the Partners in accordance with the distributional requirements of Section 7.03.

Section 8.03   <u>Withdrawal of the General Partner</u>.

(a)    Except as provided in Section 4.03 and 4.04, the General Partner may not withdraw as the general partner of the Partnership without the approval of seventy-five percent (75%) in interest of the Private Limited Partners.

(b)    To the extent required by the SBIC Act, no transfer of the interest of the General Partner, or any portion of such interest, will be effective without the consent of SBA.

(c)    Except as provided in Article 8.3(b), Article 10.1(b), Article 10.1(d), or Article 10.1(f), any person who acquires the interest of the General Partner, or any portion of such interest, in the Partnership, will not be a General Partner but will become a special private limited partner (a "Special Private Limited Partner") upon his written acceptance and adoption of all the terms and provisions of this Agreement. Such person will acquire no more than the interest of the General Partner in the Partnership as it existed on the date of the transfer, but will not be entitled to any priority given to the Private Limited Partners, their successors and assigns, in respect of the interest. No such person will have any right to participate in the management of the affairs of the Partnership or to vote with the Private Limited Partners, and the interest acquired by such person will be disregarded in determining whether any action has been taken by any percentage of the limited partnership interests.

(d)    If the General partner withdraws as a general partner of the Partnership by notice from the SBA as provided in the SBIC Act or otherwise, then the entire interest of the General Partner in the Partnership shall be converted into an interest as a Special Limited Partner on the terms provided in subsection (c) above.

(e)    Upon an event of withdrawal of the General Partner without continuation of the Partnership as provided in 8.06, the affairs of the Partnership will be wound up in accordance with the provisions of Section 8.02.

(f)    Notwithstanding any other provisions of this Agreement, the General Partner and any successor general partner that may be approved by the SBA shall not be removed or replaced by the Private Limited Partners without the prior written approval of the SBA.

Section 8.04   <u>Withdrawal of Private Limited Partners from the Partnership</u>.

Withdrawal of any Private Limited Partner from the Partnership (as opposed to an assignment as contemplated by Section 10.01) shall be subject to the following conditions

and, except as otherwise provided in this Section 10.01, no Private Limited Partner may withdraw from the Partnership before its dissolution or termination pursuant to Section 8.01 hereof:

(a)    Any Private Limited Partner may request a full or partial withdrawal of its interest from the Partnership at any time. Upon the receipt of such a request, the General Partner shall determine whether such a withdrawal would be in accordance with the provisions hereof and the SBIC Act and whether it is desirable for withdrawal and, if so, the total funds available for withdrawal by all Private Limited Partners under this Section 8.04 (the "Available Funds"). If the General Partner decides to permit a withdrawal hereunder and the SBA consents in writing to such a withdrawal, the Partnership shall send to each Private Limited Partner notice of a voluntary withdrawal (a "Withdrawal Notice"). Any Private Limited Partner desiring to withdraw all or a part of its limited partnership interest in the Partnership shall provide the Partnership with notice of that portion of its interest that it desires to withdraw (up to the entire interest) in terms of U.S. Dollars (the "Acceptance Notice"), which Acceptance Notice, in order to be effective, must be received by the Partnership within 30 days from the latest date on which the Withdrawal Notice was sent to any Private Limited Partner. The Partnership shall then allocate the full amount of the Available Funds among the Private Limited Partners proportionately in accordance with their Capital Contributions, but no Private Limited Partner shall be allocated an amount that is greater than the amount that it specified for withdrawal in its Acceptance Notice.

(b)    If the General Partner permits a withdrawal hereunder, such withdrawal shall be effective at the end of the first fiscal quarter that occurs within 90 days from the date on which the Withdrawal Notice shall have been sent to the Private Limited Partners. However, the General Partner shall have the authority to change the effective date of a withdrawal in order to account for any factors pertinent to the Partnership that the General Partner deems appropriate at that time.

(c)    Within 90 days after the latest date on which the Partnership shall have sent a Withdrawal Notice, subject to the other provisions hereof and the SBIC Act, the Partnership shall purchase from any Private Limited Partner sending an effective Acceptance Notice, and any such Private Limited Partner shall sell to the Partnership, that portion of such Private Limited Partner's interest in the Partnership (which is represented by such Private Limited Partner's Capital Account) that is commensurate with the portion of the Available Funds that was allocated to such Private Limited Partner.

(d)    All payments made to a withdrawing Private Limited Partner by the Partnership pursuant to this Section 8.04 prior to the dissolution of the Partnership may be made in whole or in part in cash or Investment Securities,

\\\DC - 69963/1 - #1251576 v2

in the discretion of the General Partner as it determines to be in the best interests of the Partnership; provided, however, that (i) the percentage of any particular issue of such Investment Securities so distributed shall not exceed the retiring Private Limited Partner's percentage interest in the Closing Capital Accounts of the Partnership and (ii) such Investment Securities shall be valued for such purpose at the value determined by the General Partner, in accordance with Section 3.10(a) hereof, for purposes of adjusting Capital Accounts in connection with such distribution, pursuant to Section 6.03.

(e)     Subject to the provisions of Section 8.04(f) below, a withdrawing Private Limited Partner whose entire interest is being withdrawn under this Section 8.04 (a "Terminating Partner") shall have the rights to distributions provided in the Delaware Act with respect to distributions to be made to limited partners upon withdrawal from a limited partnership.  As of the effective date of withdrawal for a Terminating Partner (or if later, the date on which the Partnership pays the amount to be paid to the Terminating Partner hereunder), (i) the Terminating Partner shall cease to be a Private Limited Partner and the Terminating Partner, or its Legal Representative, shall become a creditor of the Partnership, (ii) all of the Terminating Partner's rights in specific Partnership property shall immediately pass to and become vested in the remaining Partners, (iii) the Terminating Partner, or its Legal Representative, shall thereafter have only the right to receive the distribution provided for in this Section 8.04 and any interest in any amounts reserved pursuant to Section 8.05.  Neither a Terminating Partner nor its Legal Representative shall have any right to vote in the affairs of the Partnership after the effective date of withdrawal.

(f)     The Partnership will not make any distribution to any Partner in connection with its withdrawal under any provision of this Agreement or the Delaware Act unless the distribution is permitted by the SBIC Act and the SBA has given its consent to such distribution before the distribution is made.

Section 8.05    Amount Reserved and Pending Claims.

(a)     If there are any assets that, in the judgment of the General Partner, cannot be sold, or be properly distributed in kind in the case of dissolution without sacrificing a significant portion of the value thereof, then the value of a Partner's interest in such separate group of assets, including such Partner's pro rata interest in any gains, losses or distributions, in such assets, shall not be paid or distributed until such time as the General Partner shall determine.

(b)     If there is any pending transaction or claim by or against the Partnership as to which the interest or obligation of any Partner therein cannot, in the judgment of the General Partner, be then ascertained, then the value thereof or probable loss therefrom may be excluded from the valuation of assets for purposes of computing any Partner's Distributive Share.  No amount shall be paid or

charged to any such Partner or his Legal Representative on account of any such transaction or claim until its final settlement or such earlier time as the General Partner shall determine; the Partnership may meanwhile retain from other sums due such Partner or his Legal Representative an amount that the General Partner estimates to be sufficient to cover the share of such Partner in any probable loss or liability on account of such transaction or claim.

(c)     Upon determination by the General Partner that circumstances no longer require the exclusion of assets or retention of sums as provided in Sections 8.05(a) and (b) herein, the General Partner shall, at the earliest practicable time, consistent with the SBIC Act, pay such sums or distribute such assets or the proceeds realized from the sale of such assets to each Partner from whom such sums or assets have been withheld.

(d)     Any assets excluded or retained pursuant to this Section 8.05 herein at the time of the dissolution of the Partnership shall be held by the General Partner after the dissolution of the Partnership in trust for the benefit of the Partners on the same terms as provided in this Agreement and distributed to the Partners pursuant to Section 8.05(c) herein.

Section 8.06     Continuation of the Partnership After the Withdrawal of the General Partner.

Upon the occurrence of an event of withdrawal (as defined in the Act) of the General Partner, the Partnership will not be dissolved, if, within ninety (90) days after the event of withdrawal, seventy-five percent (75%) in interest of the Private Limited Partners agree in writing to continue the business of the Partnership and to the appointment of one or more additional general partners (subject to the approval of SBA), effective as of the date of withdrawal of the General Partner.

Section 8.07     Withdrawals of Capital.

Except as specifically provided in this Agreement, withdrawals by a Partner of any amount of its Capital Account are not permitted.

Section 8.08     Withdrawal by ERISA Regulated Pension Plans.

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the Private Limited Partner to avoid a violation of, or breach of the fiduciary duties of any person under ERISA  (other than a breach of the fiduciary duties of any such person based upon the investment strategy or

68

performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership (as opposed to the Private Limited Partner's partnership interest) constitute assets of the Private Limited Partner for purposes of ERISA and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the Private Limited Partner.

Section 8.09    <u>Withdrawal by Government Plans Complying with State and Local Law.</u>

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that as a result of state statutes, regulations, case law, administrative interpretations or similar authority applicable to the "government plan", the withdrawal of such Private Limited Partner from the Partnership to such extent is required to enable the Private Limited Partner or the Partnership to avoid a violation (other than a violation based upon the investment performance of the Partnership) of the applicable state law.

Section 8.10    <u>Withdrawal by Government Plans Complying with ERISA.</u>

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, if the "government plan" obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the "government plan" from the Partnership to such extent would be required if it were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, to enable the "government plan" to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership would constitute assets of the "government plan" for the purposes of ERISA, if the "government plan" were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA and would be subject to the provisions of ERISA to substantially the same extent as if owned directly by the "government plan."

Section 8.11    <u>Withdrawal by Tax Exempt Private Limited Partners.</u>

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is exempt from taxation under Section 501(a) or 501(c)(3) of the Code may elect to withdraw from the Partnership in whole or in part, if the Private Limited Partner obtains an opinion of counsel to the effect that as a result of applicable statutes, regulations, case law, administrative interpretations or similar authority, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the tax exempt Private Limited Partner to avoid loss of its tax exempt status under Section 501(a) or 501(c)(3) of the Code.

Section 8.12    <u>Withdrawal by Registered Investment Companies</u>.

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is an "investment company" subject to registration under the Investment Company Act, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of the Investment Company Act, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable such Private Limited Partner or the Partnership to avoid a violation of applicable provisions of the Investment Company Act or the requirement that the Partnership register as an investment company under the Investment Company Act.

Section 8.13    <u>Distributions on Withdrawal</u>.

(a)    Subject to the provisions of Article 8.13(b), upon withdrawal under any provision of this Agreement, a Private Limited Partner will have the rights to distributions provided in the Act with respect to distributions to be made to limited partners upon withdrawal from a limited partnership.

(b)    The Partnership will not make any distribution to any Partner in connection with its withdrawal under any provision of this Agreement or the Act, unless the distribution is permitted by the SBIC Act and SBA has given its consent to such distribution before the distribution is made.

(c)    Except in the case of distributions made as permitted under subsection (b), the right of the General Partner or any Private Limited Partner to receive any distribution from the Partnership as a result of such Partner's withdrawal, including any right any such Partner may have as a creditor of the Partnership with respect to the amount of any such distribution, is subordinate to any amount due to a Preferred Limited Partner or SBA by the Partnership.

70

## Article 9

## Accounts, Reports and Auditors

Section 9.01   Books of Account.

    (a)    The Partnership must maintain books and records in accordance with the provisions of the SBIC Act regarding financial accounts and reporting and, except as otherwise provided in this Agreement, generally accepted accounting principles.

    (b)    The books and records of the Partnership must be kept at the principal place of business of the Partnership. Each Partner will have access to all books and records of the Partnership and the right to receive copies thereof;

    (c)    The Partnership will not be required to disclose, however, any confidential or proprietary information received by the Partnership in connection with its investment operations, except for any disclosure to SBA required by the SBIC Act.

Section 9.02   Audit and Report.

    (a)    The financial statements of the Partnership must be audited and certified as of the end of each fiscal year by a firm of independent certified public accountants selected by the Partnership.

    (b)    Within one-hundred twenty (120) days of the end of each fiscal year, the Partnership must prepare and mail to each Partner a report prepared in accordance with the provisions of the SBIC Act regarding financial reporting, setting forth as at the end of the fiscal year:

        (i)    a balance sheet of the Partnership;

        (ii)    a statement of the Net profits, if any, for the year and such Partner's share of such Net Profits;

        (iii)    a statement of cash flows;

        (iv)    such Partner's Closing Capital Account;

        (v)    the amount of such Partner's share in the Partnership's taxable income or loss for the year, in sufficient detail to enable it to prepare its Federal, state and other tax returns;

71

(vi)    a statement of the value of the Assets Under Management, valued as provided under this Agreement;

(vii)    any other information the General Partner, after consultation with any Private Limited Partner requesting the same, deems necessary or appropriate;

(viii)    upon request by any Partner, such other information as is needed by such Partner in order to enable it to file any of its tax returns; and

(ix)    such other information as any Partner may reasonably request for the purpose of enabling it to comply with any reporting or filing requirements imposed by any statute, rule, regulation or otherwise by any governmental agency or authority.

The items set forth in clauses (i), (ii), (iii), (iv) and (v) will be certified by the firm of independent certified public accountants selected by the Partnership

(c)    Within ninety (90) days of the end of each fiscal year, the Partnership will prepare and mail to each Partner a report of the General Partner prepared in accordance with the provisions of the SBIC Act regarding financial reporting setting forth the information described in Article 9.2(b), including the amount of such Partner's share in the Partnership's taxable income or loss for such year, in sufficient detail to enable it to prepare its federal, state and other tax returns, and also identifying the securities held by the Partnership and stating the amount of each security held and the cost and value thereof as determined under Section 3.10. The Partnership shall also comply with such provisions of the SBIC act as govern its duty to submit periodic financial statements and supplementary information to the SBA and to have an annual audit by an independent public accountant acceptable to the SBA.

Section 9.03    <u>Fiscal Year</u>.

The fiscal year of the Partnership will be a twelve-month year (except for the first and last partial years, if any) ending on December 31.

**Article 10**

<u>Miscellaneous</u>

Section 10.01  <u>Assignability</u>.

(a)    No Private Limited Partner may assign, pledge or otherwise grant a security interest in its or his interest in the Partnership or in this Agreement, except:

    (i)    by operation of law;

    (ii)    to a receiver or trustee in bankruptcy for that Partner;

    (iii)    as a whole, to a corporation, partnership or other entity which has one hundred percent (100%) common ownership with the Partner (i.e. an entity wholly owned by the Partner, that is the sole owner of the Partner or that is wholly owned by the sole owner of the Partner); or

    (iv)    with the prior written consent of the General Partner (which consent may be withheld in the reasonable discretion of the General Partner).

(b)    No General Partner or Private Limited Partner may transfer any interest of ten percent (10%) or more in the capital of the Partnership without the prior approval of SBA.

(c)    The General Partner may not assign, pledge or otherwise grant a security interest in its interest in the Partnership or in this Agreement, except with the prior consent of SBA and the prior approval of seventy-five percent (75%) in interest of the Private Limited Partners.

(d)    No transfer of any interest in the Partnership will be allowed if such transfer or the actions to be taken in connection with that transfer would:

    (i)    result in any violation of the SBIC Act;

    (ii)    result in a violation of any law, rule or regulation by the Partnership;

    (iii)    cause the termination or dissolution of the Partnership;

# EXHIBIT B (Part 5)

(iv)    cause the Partnership to be classified other than as a partnership for Federal income tax purposes;

(v)    result in the transfer of a limited partnership interest with a cost of less than $20,000 or cause the Partnership to be classified as a "publicly traded partnership" within the meaning of Section 469(k)(2) of the Code or for the purposes of Section 512(c)(2) of the Code;

(vi)    result in a violation of the Securities Act;

(vii)    require the Partnership to register as an investment company under the Investment Company Act;

(viii)    require the Partnership, the General Partner or the Investment Adviser/Manager to register as an investment adviser under the Investment Advisers Act; or

(ix)    result in a termination of the Partnership for Federal or state income tax purposes.

(e)    If a natural person Private Limited Partner dies or become incapacitated, his or her legal representative will, upon execution of a counterpart of this Agreement, be substituted as a Private Limited Partner, subject to all the terms and conditions of this Agreement.

(f)    Any transferee of any interest in the Partnership by a transfer in compliance with this Section will become a substituted Partner under this Agreement upon delivery and execution of a counterpart of this Agreement, will have the same rights and responsibilities under this Agreement as its assignor and will succeed to the Capital Account and balances thereof.

Section 10.02  Restrictions on Transfer.

No Private Limited Partner will sell, transfer, assign or otherwise dispose of its interest in the Partnership or any rights therein unless and until such Private Limited Partner (i) obtains any consent required under this Agreement, (ii) complies with all applicable requirements of Federal and state securities laws as well as the SBIC Act; and (iii) provides the Partnership with an opinion of counsel which is satisfactory to the General Partner (both as to the issuer of the opinion and the form and substance thereof) that its interest in the Partnership may be sold, transferred, assigned or disposed of without registration of the Interest under the Securities Act, and without violation of any applicable state securities laws (including any investor suitability standards) and the transfer will not cause the Partnership to be required to register under the Investment

Company Act or to lose the "safe harbor" exemption from registration under the Investment Company Act that relates to the number of beneficial owners of the securities issued by the Partnership.

Section 10.03  Binding Agreement.

Subject to the provisions of Section 10.01, this Agreement is binding upon, and inures to the benefit of, the heir, successor, assign, executor, administrator, committee, guardian, conservator or trustee of any Partner.

Section 10.04  Gender.

As used in this Agreement, masculine, feminine and neuter pronouns include the masculine, feminine and neuter; and the singular includes the plural.

Section 10.05  Notices.

[Original Agreement used slightly different Notice requirements (below); we encourage you to adopt this new Notices language in order to expedite SBA's approval of this Agreement]

(a)     All notices under this Agreement must be in writing and may be given by personal delivery, telex, telegram, private courier service or registered or certified mail.

(b)     A notice is deemed to have been given:

(i)     by personal delivery, telex, telegram, or private courier service, as of the day of delivery of the notice to the addressee; and

(ii)    by mail, as of the fifth (5th) day after the notice is mailed.

(c)     Notices must be sent to:

(i)     the Partnership, at the address of the General Partner in the Certificate of Limited Partnership, or such other address or addresses as to which the Partners have been given notice;

(ii)    the Private Limited Partners, at the addresses in Schedule A attached to this Agreement (as Schedule A may be amended from time to time) or such other addresses as to which the Partnership has been given notice;

(iii)   the Preferred Limited Partner, at the address of the Investment Division of SBA or such other addresses as to which the Partnership has been given notice; and

75

(iv)    SBA, at the address of the Investment Division of SBA and, if so required under any Section of this Agreement, in duplicate at the address of the Office of the General Counsel of SBA.

Section 10.06  <u>Consents and Approvals</u>.

A consent or approval required to be given by any party under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is:

(i)    given by such party in writing, and

(ii)    delivered by such party to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.05.

Section 10.07  <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts and by any combination of the parties hereto in separate counterparts, each of which counterparts shall be an original and all of which taken together shall constitute one and the same agreement.

Section 10.08  <u>Amendments</u>.

(a)    This Agreement may not be amended except by an instrument in writing executed by the holders of fifty percent (50%) in interest of the Private Limited Partners who have not withdrawn as of the effective date of that amendment and the General Partner, and approved by SBA.

(b)    In addition to the requirements in Section 10.07 and Article 10.8(a), any amendment that:

(i)    increases the amount of a Private Limited Partner's Commitment requires that Partner's consent;

(ii)    may cause a Private Limited Partner or Preferred Limited Partner to become liable as a general partner of the Partnership requires the written consent of all Partners; or

(iii)    amends this Section requires the consent of all Partners.

(c)    Each Private Limited Partner consents to:

   (i)    the admission of Additional Private Limited Partners and the increase in any Private Limited Partner's Commitment in accordance with Section 5.05 herein;

   (ii)    the admission of any Preferred Limited Partner and the increase in any Preferred Limited Partner's Commitment in accordance with (b);

   (iii)    the transfer of a Partner's interest in accordance with Section 10.01 and the admission of a substituted Partner under such transfer;

   (iv)    any amendment of this Agreement or the Certificate of Limited Partnership necessary to effect such transfer or admission; and

   (v)    any amendment of this Agreement or the Certificate of Limited Partnership to comply with or conform to any amendments of applicable laws governing the Partnership.

(d)    The General Partner must distribute to each Private Limited Partner, Preferred Limited Partner and SBA a copy of:

   (i)    any Certificate of Amendment to the Certificate of Limited Partnership, and

   (ii)    any amendment to this Agreement.

(e)    Copies of any Certificate of Amendment to the Certificate of Limited Partnership, and any amendment to this Agreement must be distributed in the same manner as provided for notices in Section 10.05.

Section 10.09  Power of Attorney.

(a)    Each Private Limited Partner, by executing this Agreement or a Counterpart Signature Page hereof, hereby constitutes and appoints the General Partner (and any additional or successor general partner), each officer of the General Partner and each of their respective successors, its true and lawful attorney-in-fact with full power of substitution, with such attorney having full power and authority for such Private Limited Partner and in its name, place and stead to execute, acknowledge, deliver, swear to, certify, verify, publish, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including the following:

   (i)    any amendments of this Agreement necessary to reflect:

\\\DC - 69963/1 - #1251576 v2

(A)   the transfer of a Partner's interest in accordance with Section 10.01;

(B)   the admission of a substituted Private Limited Partner under Section 10.01;

(C)   the admission of an Additional Private Limited Partner under Section 5.05;

(D)   an amendment of this Agreement adopted by the Partners under Section 10.08; and

(ii)   all instruments, documents and certificates which, from time to time, may be required by the law of the United States of America, the State of Delaware or any other state in which the Partnership determines to do business, or any political subdivision or agency thereof, to execute, implement and continue the valid and subsisting existence of the Partnership and in conformance to the provisions of this Agreement.

(iii)   all certificates and other instruments, including counterparts of this Agreement, the Partnership's Certificate of Limited Partnership, and amendments to the Partnership's Certificate of Limited Partnership necessary or appropriate to reflect the admission of additional or substitute Limited Partners or any other change in the Partnership or Partnership Agreement, and fictitious name certificates, and any amendment of any thereof, and all certificates and instruments that the General Partner deems appropriate to qualify or continue the Partnership as a limited partnership, or as a partnership in which the Private Limited Partners have limited liability in the jurisdictions in which the Partnership may conduct business;

(iv)   all instruments necessary to effect a dissolution, termination and liquidation of the Partnership and cancellation of the Certificate of Limited Partnership as provided in the Delaware Act or this Agreement;

(v)   all instruments necessary to perfect the security interest in the Interest granted hereunder by the Private Limited Partner to the Partnership, the General Partner and their respective assignees, including financing statements pursuant to the Uniform Commercial Code as adopted by the applicable jurisdictions; and

\\\DC - 69963/1 - #1251576 v2

(vi)    any other document or instrument that the General Partner deems necessary or desirable to carry out the provisions and purposes of this Agreement, including in connection with an offer and sale of the Interest of a Private Limited Partner that is in default of its obligations hereunder

(b)    Each Private Limited Partner hereby (i) authorizes such attorney-in-fact to take any further action that such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, (ii) gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully and to the same extent as such Private Limited Partner might or could do if personally present, and (iii) ratifies and confirms all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof; provided, that in no event may the General Partner utilize this power of attorney to cast any vote or consent of a Private Limited Partner as to the matters with respect to which the Private Limited Partners are entitled to vote under the terms of this Agreement.

(c)    Each Private Limited Partner shall execute any and all additional forms, documents or instruments as may be reasonably necessary or required by the General Partner to evidence the power of attorney granted in this Section 10.09

(d)    The General Partner and its partners, as representatives and attorneys-in-fact, do not have any rights, powers or authority to amend or modify this Agreement when acting in such capacity, except as expressly provided in this Agreement. This power of attorney is coupled with an interest, will be irrevocable and will continue in full force and effect notwithstanding the subsequent death, disability, dissolution, incapacity, merger or other termination of such party.

Section 10.10  Applicable Law.

This Agreement is governed by, and construed in accordance with, applicable Federal laws and the laws of the State of Delaware.

Section 10.11  Severability.

If any one or more of the provisions contained in this Agreement, or any application of any such provision, is invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and all other applications of any such provision will not in any way be affected or impaired.

Section 10.12  Goodwill.

The Partnership's name and goodwill shall belong to the General Partner or any successor thereof, and no Private Limited Partner shall have any right or claim individually to the use thereof.

Section 10.13  Jurisdiction.

In any suit, action or proceeding arising out of or in connection with the Private Limited Partner's investment in the Partnership, the Private Limited Partner consents to the in personam jurisdiction of any court of competent jurisdiction and proper venue within the state in which the Partnership has its principal place of business at the time of any suit, action or proceeding.

Section 10.14  Waiver of Jury Trial.

Each Partner hereby covenants and agrees not to elect a trial by jury of any issue triable of right by a jury and waives trial by jury in any action or proceeding to which any such Partner may be a party arising out of, in connection with or in any way pertaining to this Agreement and/or any transactions, occurrences, communications or understandings (or lack of any of the foregoing) relating in any way to this Agreement.  It is understood and agreed that this waiver constitutes a waiver of trial by jury of all claims against all parties to such actions or proceedings, including claims against parties who are not parties to this Agreement.

Section 10.15  Agreement to Arbitrate.

Notwithstanding Sections 10.13 and 10.14 hereof, the parties to this Agreement agree that any dispute or disagreement concerning, pertaining or relating to this Agreement and/or any transactions, occurrences, communications or understandings (or lack of any of the foregoing) relating in any way to this Agreement shall be submitted to arbitration under the laws of the American Arbitration Association by an impartial arbitrator selected by the parties.

Section 10.16  Entire Agreement.

This Agreement, and all other written agreements executed by or on behalf of the General Partner and/or the Private Limited Partners and  executed or approved by SBA, up to and including the date of this Agreement (such other written agreements, collectively,  the "SBA Agreements"), state the entire understanding among the parties relating to the subject matter of this Agreement and the SBA Agreements.  Any and all prior conversations, correspondence, memoranda or other writings are merged in, and replaced by this Agreement and the SBA Agreements, and are without further effect on this Agreement and the SBA Agreements.  No promises, covenants, representations or warranties of any character or nature other than those expressly stated in this

Agreement and the SBA Agreements have been made to induce any party to enter into this Agreement or any SBA Agreement.

\\\DC - 69963/1 - #1251576 v2

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement as of June 13, 2001.

**General Partner**:

COQUI CAPITAL MANAGEMENT, LLC

By: _____
     General Partner

Commitment Amount:

$ _____

**Private Limited Partners**:

Represented by Coqui Capital Mgt. LLC

By: _____
    Name: *ISAAC KIER*
    Title: *GENERAL PARTNER*

Commitment Amount:

$14,235,750.00

EXHIBIT I

Valuation Guidelines

**General**

The General Partner has sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

Loans and Investments shall be valued individually and in the aggregate at least semi-annually - as of the end of the second quarter of the fiscal year-end and as of the end of the fiscal year.  [...at least annually - as of the end of the fiscal year.]  Fiscal year-end valuations are audited as set forth in SBA's Accounting Standards and Financial Reporting Requirements for Small Business Investment Companies.

This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio.  The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

**Interest-Bearing Securities**

Loans shall be valued in an amount not greater than cost with Unrealized Depreciation being recognized when value is impaired.  The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business.  In those instances where a loan valuation is based on an analysis of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses.  Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful.  Collection is presumed to be in doubt when one or both of the following conditions occur:  (i) interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

The carrying value of interest bearing securities shall not be adjusted for changes in interest rates.

Valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

## Equity Securities - Private Companies

Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of the prior securities.

If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or if of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

Warrants should be valued at the excess of the value of the underlying security over the exercise price.

**Equity Securities – Public Companies**

Public securities should be valued as follows:  (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded.  Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

# EXHIBIT B (Part 6)

## SBA ANNEX OP

## ARTICLE I

### General Provisions

**1.1. Definitions.**    For the purposes of this Annex, the following terms shall have the following meanings:

"Affiliate" shall have the meaning set forth in the SBIC Act.

"Agreement" shall mean the agreement of limited partnership of the Partnership to which this Annex is attached and incorporated as a provision thereof. References to the Agreement shall be deemed to include all provisions incorporated in the Agreement by reference.

"Assets shall mean and include common and preferred stock (including warrants, rights and other options relating thereto or any combination thereof), notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and other properties or interests commonly regarded as securities, and in addition, interests in real property, whether improved or unimproved, and interests in personal property of all kinds, tangible or intangible, choses in action, and cash, bank deposits and so-called "money market instruments".

"Assets Under Management" shall mean, as of any specified date, the value of all Assets owned by the Partnership (such value to be determined as provided in the Agreement), including contributions requested and due from Partners and uncalled amounts of Commitments less the amount of any liabilities of the Partnership determined in accordance with generally accepted accounting principles.

"Associate" shall have the meaning set forth in the SBIC Act.

"Capital Account" shall mean the account of each Partner that reflects its interest in the Partnership determined in accordance with Article V of SBA Annex PS (if such Annex is incorporated as part of the Agreement) or as otherwise set forth in the Agreement.

"Commitments" shall mean the capital contributions to the Partnership which the Preferred Limited Partners have made and the other Partners have made or are obligated to make to the Partnership. The terms of the Commitments of the Preferred Limited Partners shall be as set forth in SBA Annex PS (if SBA Annex PS is incorporated in the Agreement, or if not then as otherwise set forth in the Agreement); provided, that any Commitment by a Preferred Limited Partner shall include only the amount such Preferred Limited Partner has actually contributed to the Partnership, and shall not include any amount under any agreement by any such Partner or SBA to provide Leverage to the Partnership which has not been contributed to the Partnership. The amounts and terms of the Commitments of the General Partner and the Private Limited Partners shall be as defined in the Agreement.

"Control Person" shall have the meaning set forth in the SBIC Act.

-1-

"General Partner" shall mean the general partner or general partners of the Partnership.

"Investment Advisor/Manager" shall have the meaning set forth in the SBIC Act.

"Leverage" shall have the meaning set forth in the SBIC Act.

"Optionor" shall have the meaning set forth in Section 2.5.

"Optionees" shall have the meaning set forth in Section 2.5.

"Optioned Partnership Interest" shall have the meaning set forth in Section 2.5.

"Option Price" shall have the meaning set forth in Section 2.5.

"Participating Security" shall have the meaning set forth in the SBIC Act.

"Partnership" shall mean the limited partnership established by the Agreement.

"Partners" shall mean the General Partner, the Private Limited Partners and the Preferred Limited Partners, if any, of the Partnership.

"Preferred Limited Partner" shall mean the SBA, in its capacity as a Preferred Limited Partner, or any other person holding one or more Preferred Limited Partnership Interests in the Partnership.

"Preferred Limited Partnership Interest" shall mean a preferred limited partnership interest in the Partnership which qualifies as a Participating Security.

"Private Limited Partners" shall mean any limited partners of the Partnership, other than any Preferred Limited Partner.

"Remaining Portion" shall have the meaning set forth in Section 2.5.

"SBA" shall mean the United States Small Business Administration.

"SBA Annex GDP" shall mean the version of such Annex, if any, which is attached to and incorporated as a part of the Agreement.

"SBA Annex PS" shall mean the version of such Annex, if any, which is attached to and incorporated as a part of the Agreement.

"SBA Annex OP" shall mean the version of this Annex which is attached to and incorporated as a part of the Agreement.

"SBIC Act" shall mean the Small Business Investment Act of 1958, as amended, and the rules and regulations promulgated thereunder by the SBA, as in effect from time to time.

SBA Annex OP Version 1.1 March 1, 1996

**1.2.  Conflict with SBIC Act.**  The provisions of this Annex and the Agreement shall be interpreted to the fullest extent possible in a manner consistent with the SBIC Act.  In the event of any conflict between any provision of the Agreement or this Annex and the provisions of the SBIC Act (including, without limitation, any conflict with respect to the rights of the SBA or the respective Partners hereunder), the provisions of the SBIC Act shall control.

**1.3.  Conflict With Other Provisions of the Agreement.**  The provisions of the Agreement shall be interpreted to the fullest extent possible in a manner consistent with the provisions of this Annex.  In the event of any conflict between any provision of this Annex and any other provision of the Agreement (other than the provisions of SBA Annex PS and SBA Annex GDP, if either of such Annexes is incorporated as part of the Agreement), the provisions of this Annex shall control.  In the event of any conflict between any provision of this Annex and any provision of SBA Annex PS or SBA Annex GDP, the provisions of SBA Annex PS or SBA Annex GDP (if such Annex is incorporated as part of the Agreement) shall control.

**1.4.  Deletion of Certain Provisions.**  (a)  The specific sections of this Annex identified in clauses (c) and (d) of this Section may be deleted at the option of the Partnership from the form of the Annex that is attached to and incorporated in the Agreement.  Blank spaces for periods, interest rates or percentages appearing in any section of this Annex may be filled in by the Partnership or left blank.  In the case of any such blank space in a section which is not filled in by the Partnership, the space must be lined through and the period, interest rate or percentage which appears in bold face type immediately before such blank space will apply.  References in this Annex to the provisions or sections of this Annex shall refer only to those provisions which have not been so deleted, giving effect to any periods, interest rates or percentages filled in by the Partnership in such sections.  The footnote numbers which appear in certain sections and the notes which appear in certain sections and the notes which appear at the end of this Annex are for convenience only and shall neither be considered part of this Annex nor be given any legal effect.

(b)  The deletion of any section of this Annex shall be indicated by striking through that Section (note that subsections of an included section may not be deleted).

(c)  In Article II, the Partnership may elect to delete any of the Sections.

(d)  In Article IV, the Partnership may elect to delete either all sections or Section 4.2; if Section 4.2 is included, Section 4.1 may not be deleted.

**1.5.  Incorporation of this Annex into the Agreement.**  The Agreement shall contain the following provision evidencing the incorporation of this Annex:

"The provisions of SBA Annex OP attached to this Agreement are incorporated in this Agreement with the same force and effect as if fully set forth herein."

## ARTICLE II

### Remedies for Failure of a Private Limited Partner
### to Make a Contribution to Capital

    **2.1. Interest on Overdue Contributions.** In the event that any Private Limited Partner fails to make a contribution required under the Agreement within thirty (30) days (unless another period is specified here: _____ ( ) days) [1] after the date such contribution is due, then the General Partner may, in its sole discretion, elect to charge such Private Limited Partner interest at an annual rate equal to ten percent (10%) (unless another rate is specified here: _____) [2] on the amount due from the date such amount became due until the earlier of (i) the date on which such payment is received by the Partnership or (ii) the date of any notice given to such Private Limited Partner by the General Partner pursuant to Sections 2.3, 2.4 or 2.5. Any distributions to which such Private Limited Partner is entitled shall be reduced by the amount of such interest, and such interest shall be deemed to be income to the Partnership. The amount of interest charged as provided in this Section 2.1 shall not exceed the amount of such Private Limited Partner's Capital Account. [3]

    **2.2. Termination of Right to Make Further Capital Contributions.** In the event that any Private Limited Partner fails to make a contribution required under the Agreement within thirty (30) (unless another period is specified here: _____ ( )) days after the date such contribution is due, the General Partner may, in its sole discretion (and with the consent of SBA given as provided in Section 7.2 of SBA Annex PS or Section 5.2 of SBA Annex GDP, if SBA Annex PS or SBA Annex GDP is incorporated in the Agreement), elect to declare, by notice to such Private Limited Partner, that:

        (a) Such Private Limited Partner's Commitment shall be deemed to be reduced to the amount of any contributions of capital timely made pursuant to the Agreement; and

        (b) Upon such notice (i) such Private Limited Partner shall have no right to make any capital contribution thereafter (including the contribution as to which the default occurred and any contribution otherwise required to be made thereafter pursuant to the terms of the Agreement) and (ii) to this Agreement shall be deemed amended to reflect such reduced Commitment.

    **2.3. Forfeiture of Interest in the Partnership.** In the event that any Private Limited Partner fails to make a contribution required under the Agreement, within thirty (30) (unless another period is specified here: _____ ( )) days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution was due, the General Partner may in its sole discretion (and with the consent of SBA given as provided in Section 7.2 of SBA Annex PS or Section 5.2 of SBA Annex GDP, if SBA Annex PS or SBA Annex GDP is incorporated in the Agreement) declare, by notice of forfeiture to such Private Limited Partner, that one hundred percent (100%) (unless another percentage is specified here: _____ percent ( %)) of the interest of such Private Limited Partner in the Partnership (including amounts in its Capital Account as well as any interest in future profits, losses or distributions of the Partnership) is forfeited, effective as of the date of such Private Limited Partner's failure to make such required contribution, in which event, as of the date of such notice of forfeiture (i) the Private Limited Partner shall cease to be a Partner with respect to such forfeited interest; provided, however, that such forfeited Private Limited Partner shall cease to have any liability for the payment of the forfeited percentage of any capital contributions due at such time or in the future and (ii) the forfeited percentage of such Private Limited Partner's Capital Account shall be held by the Partnership and reallocated among the Capital Accounts of the Partners one

-4-

percent (1%) (unless another percentage is specified here: _____ percent (__%)) to the General Partner and ninety-nine percent (99%) (unless another percentage is specified here: _____percent (__%)) to the Private Limited Partners (other than such forfeited Private Limited Partner) to be apportioned among such Private Limited Partners in accordance with their respective aggregate capital contributions. [4]

    **2.4. Withholding and Application of Distributions.** No part of any distribution shall be paid to any Private Limited Partner from which there is then due and owing to the Partnership, at the time of such distribution, any amount required to be paid to the Partnership. At the election of the General Partner, which it may make in its sole discretion, the Partnership may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Partnership from such Private Limited Partner or (ii) withhold such distribution until all amounts then due are paid to the Partnership by such Private Limited Partner. Upon payment of all amounts due to the Partnership (by application of withheld distributions or otherwise), the General Partner shall distribute any unapplied balance of any such withheld distribution to such Private Limited Partner. No interest shall be payable on the amount of any distribution withheld by the Partnership pursuant to this Section.

    **2.5. Required Sale of Interest in the Partnership.** In the event that any Private Limited Partner fails to make a contribution required under the Agreement within thirty (30) (unless another period is specified here: _____ (__)) days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution is due, unless the General Partner has acted pursuant to Sections 2.2 or 2.3 (if either of such Sections are included in the version of this Annex incorporated in the Agreement) the General Partner may, in its sole discretion, (and with the consent of SBA given as provided in Section 7.2 of SBA Annex PS or Section 5.2 of SBA Annex GDP, if SBA Annex PS or SBA Annex GDP is incorporated in the Agreement) elect to declare such Private Limited Partner in default. If the General Partner so elects to declare such Private Limited Partner in default (such Private Limited Partner being hereinafter referred to as the "Optionor"), then the other Private Limited Partners of the Partnership which are not in default (the "Optionees") and the General Partner shall have the right and option to acquire one hundred percent (100%) (unless another percentage is specified here: _____ percent (__%)) of the Partnership interest, which shall include **one hundred percent (100%)** (unless another percentage is specified here: _____ percent (__%)) of the Capital Account (the "Optioned Partnership Interest") [5] of the Optionor on the following terms:

    (i) The General Partner shall give the Partners notice promptly after declaration of any such default. Such notice shall advise each Optionee of the portion of the Optioned Partnership Interest available to it and the price therefor. The portion available to each Optionee shall be that portion of the Optioned Partnership Interest that bears the same ratio to the Optioned Partnership Interest as each Optionee's capital contributions to the Partnership bears to the aggregate capital contributions to the Partnership, exclusive of the capital contributions to the Partnership of the Optionor. The aggregate price for the Optioned Partnership Interest shall be the assumption of the unpaid Commitment obligation (both that portion then due and amounts due in the future) of the Optionor (the "Option Price"). [5] The Option Price for each Optionee shall be prorated according to the portion of the Optioned Partnership Interest purchased by each such Optionee so that the percentage of the unpaid Commitment assumed by each Optionee is the same as the percentage of the Optioned Partnership Interest purchased by such Optionee. The option granted hereunder shall be exercisable by each Optionee in whole only at any time within thirty (30) days of the date of the notice from the General Partner by the delivery to the General

-5-

# EXHIBIT C



# COQUI CAPITAL PARTNERS, L.P.
## A Delaware Limited Partnership

### Subscription Agreement

### *General Partner*

### COQUI CAPITAL MANAGEMENT, LLC

## COQUI CAPITAL PARTNERS, L.P.
### A Delaware Limited Partnership

## SUBSCRIPTION AGREEMENT

THE LIMITED PARTNERSHIP INTERESTS (THE "INTERESTS") REFERRED TO IN THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"). SUCH INTERESTS ARE BEING OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE 1933 ACT AND PURSUANT TO RULE 506 THEREUNDER.

A PURCHASER OF ANY INTERESTS SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE 1933 ACT OR STATE SECURITIES LAWS, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE INTERESTS UNDER THE 1933 ACT OR ANY STATE SECURITIES LAWS.

THE SECURITIES LAWS REQUIRE THAT THE PARTNERSHIP AND GENERAL PARTNER ASK EACH SUBSCRIBER FOR CERTAIN FINANCIAL AND OTHER INFORMATION. THE QUESTIONS INCLUDED IN THIS SUBSCRIPTION AGREEMENT ARE INTENDED TO PROVIDE THIS INFORMATION. THE GENERAL PARTNER AND THE PARTNERSHIP WILL RELY ON THE INFORMATION CONTAINED IN THIS SUBSCRIPTION AGREEMENT AND ANY FURTHER INFORMATION FURNISHED BY THE SUBSCRIBER IN DETERMINING COMPLIANCE WITH EXEMPTIONS FROM REGISTRATION UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

COQUI CAPITAL PARTNERS, L.P.,
A Delaware Limited Partnership

SUBSCRIPTION AGREEMENT

(Capitalized terms used herein and not otherwise defined shall have the same meanings assigned to them in the Partnership Agreement referred to in Section 1.)

1.    *Subscription.*  The undersigned (the "Subscriber") hereby subscribes for the amount of Limited Partnership Interests (the "Interests") set forth below in Coqui Capital Partners, L.P., a Delaware Limited Partnership (the "Partnership"), whose sole General Partner is Coqui Capital Management, LLC, a Delaware limited liability company (the "General Partner"). Subscriber understands that if this application is accepted by the General Partner and upon payment of the first installment of the subscription amount, as set forth in Section 2, Subscriber will be admitted to the Partnership as a Limited Partner and will be bound by the terms of the Limited Partnership Agreement relating to the Partnership (the "Partnership Agreement"). Subject to the acceptance of this Subscription Agreement by the General Partner, this Subscription Agreement shall be irrevocable.

2.    *Payment.*  Subscriber agrees that on or before the Closing Date established by the General Partner, Subscriber will pay by wire transfer of immediately available funds or by other means acceptable to the General Partner a percentage equal to at least 25% of the total subscription amount, in such exact amount, on such date and to such account as shall be specified by the General Partner upon at least 10 days' notice to Subscriber. Subscriber agrees to make additional payments, each in an amount equal to a percentage of the total subscription amount, on the dates designated by the General Partner upon at least 10 days' notice, as required by the Partnership Agreement. The General Partner may not call for any such additional payments later than 5 years after the Closing Date. If the Partnership has not been formed within 180 days of the date hereof, this Subscription Agreement shall terminate and Subscriber shall not be obligated to make any future payments of the subscription amounts set forth above.

3.    *Subscriber hereby represents and warrants as follows:*

(a)    The Interests to be acquired hereunder are being acquired for Subscriber's own account and not as a nominee or agent for the benefit of any other person, and Subscriber has no present intention of distributing, reselling or hypothecating the Interests.

(b)    Subscriber understands that the Interests have not been registered under the Securities Act of 1933, as amended (the "1933 Act"), or under the laws of any other jurisdiction, and that the Partnership does not contemplate and is under no obligation to so

WDC - 69963/1 - #965665 v1

register the Interests. Subscriber understands and agrees that the Interests must be held indefinitely unless they are subsequently registered under the 1933 Act and/or other applicable securities laws or an exemption from registration is available. Even if an exemption is available, the assignability and transferability of the Interests will be governed by the Partnership Agreement, which imposes substantial restrictions on transfer. Subscriber understands that legends stating that the Interests have not been registered under the 1933 Act and setting forth or referring to the restrictions on transferability and sale of the Interests will be placed on all documents evidencing the Interests, and agrees that stop-order instructions prohibiting transfer of the Interests may be issued and filed by the Partnership on the Partnership's records as a means of preventing the sale or disposition of the Interests otherwise than in accordance with the Partnership Agreement. Subscriber agrees that, as a condition to any disposition of the Interests, the General Partner may require that the proposed transferee furnish the General Partner with written representations substantially the same as those made by Subscriber in this Subscription Agreement and that the proposed transferee will agree to comply with the provisions of Section 6.1 and 7.5 of the Partnership Agreement.

(c)     Subscriber has been furnished and has carefully read the Private Offering Memorandum dated October __, 1999, relating to the Partnership (the "Offering Memorandum") and the Partnership Agreement. Subscriber acknowledges that:

(i)     the Partnership has not yet been organized and therefore has no operating history;

(ii)     the General Partner will receive substantial compensation in connection with its management of the Partnership;

(iii)     no Federal or State agency has passed upon the Interests or made any finding or determination as to the fairness of this investment, and no tax ruling has been sought regarding the tax benefits described in the Offering Memorandum;

(iv)     Subscriber will be making representations and warranties to the General Partner, the Partnership and each other Limited Partner as provided in Article 7 of the Partnership Agreement;

(v)     Subscriber is not entitled to cancel, terminate or revoke this Subscription Agreement or any of the powers conferred herein, and this Subscription Agreement shall survive Subscriber's death, incapacity, bankruptcy, dissolution or termination; and

(vi)     if Subscriber fails to make a capital contribution required hereunder, under the terms of the Partnership Agreement, Subscriber may be required to

-2-

forfeit a portion of the Interests previously issued to Subscriber and/or sell such Interests at the lower of cost or market value.

(d)    Subscriber represents and warrants to the Partnership and General Partner that:

(i)    Subscriber is an "accredited investor" within the meaning of Rule 501 of Regulation D under the 1933 Act and has such knowledge and experience in financial and business matters that Subscriber is capable of evaluating the merits and risks of the proposed investment in the Partnership and is able to bear the economic risk of such investment;

(ii)    Subscriber has carefully reviewed and understands the risks of, and other considerations relating to, a purchase of Interests, including, but not limited to, the risks set forth under "Risk Factors" and "Tax and Regulatory Matters" in the Offering Memorandum;

(iii)    in connection with Subscriber's investment in the Partnership, Subscriber has had available to Subscriber, and will continue to have available so long as Subscriber is an investor in the Partnership, the advice of Subscriber's own investment advisers, counsel and/or accountants ("investment advisers") and has discussed with such investment advisers the suitability of such investment;

(iv)    Subscriber and Subscriber's investment advisers have been furnished any materials relating to the Partnership, the offering of Interests or anything set forth in the Offering Memorandum which Subscriber and Subscriber's investment advisers have requested and have been afforded the opportunity to ask questions of representatives of the General Partner concerning the terms and conditions of the offering and an investment in the Partnership and to obtain any additional information necessary to verify the accuracy of any representations or information set forth in the Offering Memorandum;

(v)    the General Partner has answered all inquiries that Subscriber has put to it concerning the Partnership, the General Partner or any other matters relating to the creation of the Partnership, and the terms and conditions of the offering and sale of the Interests;

(vi)    Subscriber has not been furnished any offering literature other than the Offering Memorandum, and Subscriber has relied only on such Offering Memorandum, and such other written information furnished or made available to Subscriber by the Partnership or the General Partner, as described in subparagraphs 3(d)(iv) and (v) above, and Subscriber has not relied on any other information, written or oral, whether used in evaluating the suitability of an investment in the Partnership or otherwise;

-3-

(vii)    Subscriber has no need for liquidity in this investment; and

(viii)    all the information which Subscriber has supplied to the Partnership concerning Subscriber's financial and business experience and with respect to Subscriber's net worth and current income is true and accurate.

(e)    Subscriber represents and warrants that the address listed in the caption "Supplemental Information on Limited Partner" below is Subscriber's domicile, and the only jurisdiction in which an offer to sell the Interests was made to Subscriber.

(f)    If Subscriber, after giving effect to the subscription, owns ten percent (10%) or more of the Interests, Subscriber represents and warrants that the Partnership will not be required to count or include holders of the Subscriber's outstanding securities as beneficial owners of the Interests pursuant to Section 3(c) of the Investment Company Act of 1940, as amended.

(g)    Subscriber represents and warrants that it is a citizen, resident or national of, or institution organized, chartered or resident in, the United States including territories or possessions of the United States), or is purchasing on behalf of or in trust for a U. S. citizen, resident or national or any other such parties.

Subscriber covenants to advise the General Partner by telephone and in writing if any representation or warranty contained in this Section 3 becomes untrue prior to the date Subscriber is required to make its initial capital contribution pursuant to Section 2 hereof.

4.    *Acceptance.*  Subscriber hereby confirms Subscriber's understanding that the General Partner has full right to accept or reject this application in its sole and absolute discretion, provided that the General Partner must accept or reject Subscriber's application no later than 180 days after the date hereof, and that if Subscriber's application is not accepted on or prior to such date it will be deemed to have been rejected by the General Partner and Subscriber will not be admitted as a Limited Partner. Upon acceptance of this application by the General Partner, Subscriber will receive a confirmation of such acceptance executed by the General Partner for the Partnership.

5.    *Interest.*  The Interests subscribed for herein shall not be deemed issued to or owned by Subscriber until the Partnership's Certificate of Limited Partnership is filed with the office of the Secretary of State of the State of Delaware, which filing will take place no later than 180 days after the date hereof, and Subscriber will make the required Capital Contribution with respect to such Interests.

\\\DC - 69963/1 - #965663 v1

6.    *Power of Attorney*.    Subscriber hereby constitutes and appoints the General Partner with full power and authority Subscriber's true and lawful attorney-in-fact, with full power and authority in Subscriber's name, place and stead to:

(a)    Execute on its behalf the Partnership Agreement;

(b)    File and record the Partnership Agreement and all amendments thereto;

(c)    Prepare, execute on its behalf, verify, file and record amendments to the Partnership Agreement reflecting a change of the name or location of the principal place of business of the Partnership, a change of the name or address of any Limited Partner, the addition of Limited Partners, the disposal by a Limited Partner of its interest as Limited Partner in the Partnership in any manner (subject to any restrictions on transfer in the Partnership Agreement), a Person becoming or ceasing to be a General Partner or Limited Partner of the Partnership (subject to any restrictions in the Partnership Agreement), the exercise by any Person of any or all rights under the Partnership Agreement, the correction of typographical or similar errors, any distributions that may constitute a return of capital and any amendments that do not require the consent of the Limited Partners under Section 6.7 of the Partnership Agreement;

(d)    Prepare, execute on its behalf and record a Certificate of Limited Partnership and all amendments that the General Partner may deem advisable, including amendments to reflect the changes identified in clause (c) above;

(e)    Prepare, execute on its behalf, file and record any other agreements, certificates, instruments and other documents required to continue the Partnership, to admit Substituted Limited Partners, to liquidate and dissolve the Partnership, to comply with applicable law, and to carry out the purposes of clauses (a), (b) and (c) above, to the extent consistent with the Partnership Agreement; and

(f)    Take any further action that the General Partner shall consider advisable in connection with the exercise of the authority in this Section 6.

The foregoing grant of authority:

(a)    is a Special Power of Attorney coupled with an interest, and is irrevocable;

(b)    may be exercised by such attorney-in-fact by executing any agreement, certificate, instrument or document with a single signature as attorney-in-fact for Subscriber, and Subscriber's name shall be listed in the agreement, certificate, instrument or document as a Limited Partner; and

-5-

(c)    shall survive Subscriber's delivery of an assignment of all or any part of the Interests except that where the assignment is of Subscriber's entire interest in the Partnership and the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner as provided for in Section 6.1 of the Partnership Agreement, the Power of Attorney shall survive the delivery of such assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any instrument necessary to effect such substitution.

Subscriber hereby agrees to be bound by all the representations of Subscriber's attorney-in fact and waives any and all defenses which may be available to Subscriber to contest, negate or disaffirm the actions of such attorney-in-fact under this Power of Attorney, and hereby ratifies and confirms all acts which said attorney-in-fact may take as attorney-in-fact hereunder in all respects as though performed by Subscriber to the extent not specifically prohibited by the Partnership Agreement.

In the event of any conflict between the provisions of the Partnership Agreement and any document executed or filed by the attorney in fact pursuant to this Power of Attorney, the Partnership Agreement shall govern.

7.    *Partnership Agreement*.  Subscriber acknowledges receipt of the Partnership Agreement, and hereby specifically accepts and adopts each and every provision of such Partnership Agreement, including, without limitation, the power of attorney contained in Section 7.6 thereof.

8.    *Agreement with Respect to Resale*.  Subscriber agrees that no Interests will be resold without registration under the 1933 Act and applicable state securities laws or availability of exemption therefrom.

9.    *Agreement with Respect to Transfer*.  Subscriber hereby agrees that Subscriber will make no transfer or suffer any transfer, voluntarily or by operation of law, including any resale that is subject to Section 8 hereof), of the Interests in the Partnership which Subscriber beneficially owns, or any interest in such Interests, if such transfer would subject the Partnership to registration under the Investment Company Act, or would subject the Partnership or its General Partner to registration as an investment adviser under the Investment Advisers Act a 1940, as amended (the "Advisers Act"), or if such transfer would violate any provisions of the Partnership Agreement.

10.    *Status of Subscriber as "Accredited Investor"*.  Subscriber represents and warrants to the Partnership and the General Partner that one or more of the following categories (as indicated on the appropriate lines below) applies to Subscriber:

(a)    Subscriber is a bank as defined in Section 3(a)(2) of the 1933 Act, acting either in its individual or in a fiduciary capacity:

_____Yes            _____No

(b)    Subscriber is an insurance company as defined in Section 2(13) of the 1933 Act:

_____Yes            _____No

(c)    Subscriber is an investment company registered under the Investment Company Act:

_____Yes            _____No

(d)    Subscriber is a business development company as defined in Section 2(a)(48) of the Investment Company Act:

_____Yes            _____No

(e)    Subscriber is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958:

_____Yes            _____No

(f)    Subscriber is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA") and (i) the investment decision regarding the Interests is being made by a plan fiduciary (as defined in Section 3(21) of ERISA) which is either a bank, insurance company or registered investment adviser or (ii) Subscriber has total assets in excess of $5,000,000:

_____Yes            _____No

(g)    Subscriber is a private business development company as defined in Section 202(a)(22) of the Advisers Act:

-7-

_____Yes                    _____No

(h)    Subscriber is an organization described in Section 501 (c)(3) of the Internal Revenue Code of 1986 (the "Code"), with total assets in excess of $5,000,000:

_____Yes                    _____No

(i)    Subscriber is a natural person whose individual net worth* or joint net worth* with Subscriber's spouse exceeds, and will exceed at the time of purchase, $1,000,000:

_____Yes                    _____No

(j)    Subscriber is a natural person who had an individual income (not jointly with Subscriber's spouse) in excess of $200,000 in each of the two most recent years and who reasonably expects an individual income in excess of $200,000 in the current year:

_____Yes                    _____No

(k)    Subscriber is a natural person who had a joint income (with Subscriber's spouse) in excess of $300,000 in each of the two most recent years and who reasonably expects an individual income in excess of $300,000 in the current year:

_____Yes                    _____No

(l)    Subscriber is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring an interest in the Partnership, whose purchase of the Partnership interest is directed by a bank acting in a fiduciary capacity or by a sophisticated person (a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of this investment):

_____Yes                    _____No

(m)    Subscriber is a corporation, partnership or other entity in which all the equity owners are entities or natural persons described in paragraphs (a) through (l) above. Beneficiaries of a trust typically would not be deemed "equity owners" unless significant powers are retained by the grantor or granted to the beneficiaries of such trust, which means

-8-

that a conventional irrevocable trust would not qualify under this section. The grantor of a revocable trust or the beneficiary of a trust for an individual retirement account may qualify as the "equity owners" of the trust.



_____Yes          ✓__No

* In any computation of net worth above, there shall be excluded from total assets the price of Subscriber's investment in the Interests. In the case of sales to fiduciary accounts, the conditions as to net worth must be met by the fiduciary account or by the person who directly or indirectly supplied the funds for the purchase of the Interests.

11.    *Status of Subscriber as "Institutional Investor"*.    Subscriber represents and warrants to the Partnership and the General Partner that one or more of the following categories (as indicated on the appropriate lines below) applies to Subscriber:

(a)    Subscriber is a State or National bank, trust company, savings bank, or savings and loan association:

_____Yes          ✓__No

(b)    Subscriber is an insurance company:

_____Yes          ✓__No

(c)    Subscriber is an "investment company" as defined in the Investment Company Act of 1940, as amended (15 U. S. C. §80a-3):

_____Yes          ✓__No

(d)    Subscriber is a "business development company" as defined in the Investment Company Act of 1940, as amended (15 U. S. C. §80a-2(a)(48)):

_____Yes          ✓__No

(e)    Subscriber is a holding company of any entity described in subsections (a), (b), (c) or (d) above:

_____Yes          ✓__No

(f)    Subscriber is an employee benefit or pension plan established for the benefit of employees of the Federal government, any State or political subdivision of a State, or any agency or instrumentality of such governmental unit.

_____ Yes                    ✓ No

(g)    Subscriber is an employee benefit plan or pension plan as defined in the Employee Retirement Income Security Act of 1974, as amended (Pub. L. 93-406, 88 Stat. 829), excluding plans established under section 401(k) of the Internal Revenue Code of 1986 (26 U. S. C. § 401(k)):

_____ Yes                    ✓ No

(h)    Subscriber is a trust, foundation or endowment exempt from Federal income taxation under the Internal Revenue Code of 1986, as amended:

_____ Yes                    ✓ No

(i)    Subscriber is a corporation, partnership or other entity with a net worth (exclusive of unfunded commitments from investors) of more than $10 million:

_____ Yes                    ✓ No

(j)    Subscriber is a State, a political subdivision of a State, or an agency or instrumentality of a State or its political subdivision.

_____ Yes                    ✓ No

(k)    Subscriber is an entity whose primary purpose is to manage and invest non-Federal funds on behalf of at least three Institutional Investors described in subsections (a) through (j) above, each of whom must have at least a ten percent ownership interest in the entity.

_____ Yes                    ✓ No

-10-

least one of the representations and warranties in Section 11 above.  The capital contribution to the Partnership of such Subscriber does not include: (i) funds borrowed from any source, (ii) funds obtained through the issuance of "Leverage" (as defined in 13 CFR §107.50), (iii) funds obtained directly or indirectly from any Federal, State or local government, or any government agency or instrumentality, except for funds invested by a public pension fund and "Qualified Non-private Funds", as defined in an addendum to this Subscription Agreement; or (iv) in the case of a Subscriber that answered "Yes" to at least one of the representations and warranties in Section 11 above and that has a net worth of less than $10,000,000, any portion of a commitment that exceeds ten percent of such Subscriber's net worth and is not backed by a letter of credit from a State or National bank;

(c)    Any portion of the Subscriber's capital contribution which constitutes "Qualified Non-private Funds", as defined in an addendum to this Subscription Agreement, has been disclosed in writing to the Partnership and to the General Partner;

(d)    If such Subscriber is not a permanent resident of the United States, that fact has been disclosed in writing to the Partnership and to the General Partner; and

(e)    If the Subscriber shall own or control, directly or indirectly, ten percent or more but less than thirty-three percent of the Partnership's capital, the capital contribution of such Subscriber does not exceed five percent of such Subscriber's net worth, except as otherwise specified in a written disclosure to the Partnership and to the General Partner.

13.    *Further Information.*    Subscriber agrees that the Partnership and General Partner may rely on the responses to the questions in Section 10 in determining whether Subscriber is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act. Subscriber further agrees that Subscriber will furnish to the Partnership or the General Partner such further information related to the foregoing responses as the Partnership or General Partner may deem relevant to determining whether Subscriber is an "accredited investor" within the meaning of Rule 501(a), and Subscriber authorizes the General Partner and its agents to confirm, as necessary, with Subscriber's tax advisor, investment counselor, lawyer, accountant, banker or other financial representative named below, such information as the General Partner may deem relevant to making such determination. The financial representative to whom inquiries should be directed is (please print):

Name of Firm:    _____

Client Representative:    _____

Address:    _____

Telephone Number    (    )    _____

-12-

14.    *Additional Representations by Subscribers other than Natural Persons*.  Any Subscriber who is not a natural person should answer the following questions. Subscriber represents and warrants to the Partnership and the General Partner that the information set forth below is true and correct.

(a)    Subscriber was organized for the specific purpose of acquiring the Interests:



_____ Yes                _____ No

(b)    The beneficial owners of Subscriber will be required to make additional capital contributions to Subscriber in connection with Subscriber's acquisition of the Interests:



_____ Yes                _____ No

(c)    The beneficial owners of Subscriber will make or participate in Subscriber's investment decision with respect to the Interests:



_____ Yes                _____ No

(d)    The individual executing this Subscription Agreement has full power and authority to execute all documents in connection with the acquisition of Interests on behalf of Subscriber:



_____ Yes                _____ No

15.    *Beneficial Ownership*.  Each Subscriber must beneficially own, for his own account and not for the account of any other person or firm, his Interests. As more fully set forth in the Offering Memorandum, it is essential that the number of beneficial owners of securities of the Partnership not exceed one hundred (100) in order that the Partnership remain exempt from the burdensome and extensive provisions of the Investment Company Act. Subscriber represents and warrants that the following information is true and correct:

(a)    The name in which Subscriber's Interests will be registered and the aggregate amount of such Interests is as follows:

-13-

# EXHIBIT D

Williamson

**VIA FACSIMILE AND REGISTERED MAIL**

**APR 1 2 2005**

License No.  02/72-0599

Mr. Ike Kier
General Partner
Coqui Capital Partners, L.P.
1775 Broadway, Suite 604
New York, NY 10019

Dear Mr. Kier:

Upon reviewing the Licensee's Form 468 for the year ended December 31, 2004, the
Office of SBIC Operations ("Operations") has identified the following issue:

The Licensee's Capital Impairment Percentage ("CIP") increased to 106.7% for the
period ended December 31, 2004 due to realized portfolio losses and increased unrealized
losses.  After reviewing the applicable sections in 13 CFR 107, Operations has
determined that the maximum permissible CIP for the Licensee is 85%.  You are hereby
directed to cure this impairment within 15 days of the date on this letter.  To cure the
impairment, the Licensee will need to increase its Regulatory Capital by an amount not
less than $3,612,175, plus any additional amounts of unrealized depreciation and
operating expenses incurred subsequent to December 31, 2004.

Otherwise, pursuant to §107.1820(f), upon expiration of the time to cure, Operations will
place the Licensee in Restricted Operations until the condition of Capital Impairment is
cured.  Under Restricted Operations, SBA has the right to take any or all of the following
actions:

1. SBA may require you to call the remaining unfunded Private Partners' capital.

2. Reduce the Licensee's management fee to an amount to be determined by
   Operations based on the Licensee's available sources of cash (excluding access to
   additional SBA leverage) and provide Operations a proposed budget for the
   Licensee for the next 24 months.  The determined amount may be sufficient only
   to provide for minimum operations of the Licensee.  In addition, you will also be
   required to minimize other expenses including professional service fees and other
   miscellaneous expenses.  Please provide Operations with a detailed budget by
   April 25, 2005.

3.  In accordance with §107.1820(f)(2) and until all leverage is redeemed and amounts due are paid, you are prohibited from making Distributions to any party other than SBA, its agent, or Trustee.

4.  Seek SBA prior written approval for any follow-on investments to current portfolio concerns other than pursuant to existing binding commitments previously disclosed to SBA. The request should include the amount, terms and current financials on the company as well as what you expect to realize on the follow-on investment and how this further investment would affect the likelihood of creating an exit for the fund. No new portfolio investments are to be made except for investments under legally binding commitments you entered into before such notice.

In addition, SBA requests that the Licensee provide the following information to SBA on a monthly basis:

a.  Status of each portfolio investment, including progress toward exit. Please also include any change in your assessment of the environment or market conditions regarding the industries that portfolio concerns are in and that may affect the value or exit strategy.

b.  A cash report to include demand deposit and time deposits.

c.  Additional liquidity requirements needed to meet follow-on investments or to meet current operating expenses.

Your primary focus should be on maturing the portfolio with an emphasis placed on generating liquidity for the fund while at the same time maximizing the sales proceeds for each investment. Every effort should be made to minimize the risk of additional financial losses.

SBA expects that you will minimize any expenses needed to run the operations of the Licensee in excess of those approved in item 2 above including payments to outside parties such as attorneys, valuation experts, and other consultants.

Finally, SBA strongly suggests that the Licensee contact its counsel regarding any duty it may have to notify its LPs.

The foregoing restrictions are made without prejudice to any other rights of SBA and SBA specifically reserves the right to seek and impose further remedies upon the Licensee as warranted.

If you have questions you may contact the undersigned, as Licensee's Acting Area Chief, at (202) 205-6980 or Financial Analyst, Jerry Williamson, at 202-205-6880.  Please acknowledge receipt of this letter by signing below and faxing to Mr. Williamson at (202) 481-0690.

Sincerely,

Marja Maddie

Marja Maddrie
Director of Operations
Office of SBIC Operations

**Receipt Acknowledged for Coqui Capital Partners, L.P.:**

By _____

Title _____

Date _____

OI: 4/7/05: DRAFT:final:mjg:4/11/05        Williamson_____
cc:Area IV
Williamson                                Messinger/OGC_____
Maddrie
OE- New York                              Haskins_____
Inv. 6-7
Code: D-24                                Guzman-Fournier_____
S/Area IV/Williamson/Coqui/Rest Ops 15-Day cure ltr 040705

# EXHIBIT E

**SBA**

*Championing America's Entrepreneurs*

**U.S. SMALL BUSINESS ADMINISTRATION**
409 Third St., S.W., Sixth Floor
Investment Division, Office of SBIC Liquidation
Washington, D.C. 20416
202-205-6503 • 202-481-4909 (FAX)

June 7, 2005

**VIA CERTIFIED MAIL- RETURN RECEIPT AND FACSIMILE**

Mr. Ike Kier
General Partner
Coqui Capital Partners, L.P.
1775 Broadway, Suite 604
New York, NY 10019

Re: Notice of Transfer to Office of Liquidation
    License No. 02/72-0599

Dear Mr. Kier:

Pursuant to the Small Business Investment Act of 1958, as amended ("the Act"), the Small Business Administration ("SBA") licensed and provided financing to Coqui Capital Partners, L.P., ("Coqui"), through the guarantee of $19,920,000 of Participating Securities and Debenture Leverage ("Leverage").

You are hereby notified that Coqui has been transferred from operating status to liquidation status at SBA.

Coqui's financial statements of December 31, 2004 indicated a condition of capital impairment of 106.7%.

By letter dated April 12, 2005, Coqui was directed to cure its condition of capital impairment within 15 days. If Coqui failed to cure the capital impairment within the time frame set by SBA, they would be placed in restricted operations.

To date, Coqui has failed to cure its capital impairment and therefore, SBA has determined that pursuant to Section 107.1830(b) of the Regulations, you have a condition of capital impairment and are not in compliance with the terms of your Leverage.

In accordance with Section 107.1820(f) of the Regulations, you are hereby notified that you must continue to comply with the following restricted operations conditions:

   1. You are prohibited from making any additional investments except for investments under legally binding commitments you entered into before such

notice, and, subject to SBA's prior written approval, investments that are necessary to protect your investment;

2. Until all leverage is redeemed and amounts due are paid, you are prohibited from making any distributions to any party other than SBA, its agents or Trustee;

3. All your commitments from all investors, if any remain, are required to be funded at the earliest time permitted in accordance with your Articles of Limited Partnership. You are directed to provide to SBA copies of your correspondence calling down your remaining unfunded commitments from Partners' capital and to provide SBA with a bank letter verifying the deposits of those commitments; and

In addition, SBA retains the right to review and re-determine your approved Management Expenses.

Coqui is expected to cooperate so as to maximize net recoveries while in liquidation within the shortest reasonable time, while recognizing the interests of other parties affected, such as other limited partners. SBA is continuing its review of this matter and may provide notice of other violations of the Act and/or Regulations as the circumstances warrant.

The foregoing is made without prejudice to any other rights of SBA, and SBA specifically reserves the right to seek and impose further remedies upon the SBIC as warranted.

Please do not hesitate to contact me at (202) 205-6880 with any questions.

Sincerely,

Jerry W. Williamson
Financial Analyst
Account Resolution Branch

cc: Arlene Messinger, Assistant General Counsel

# EXHIBIT F



U. S. Small Business Administration

**U. S. SMALL BUSINESS ADMINISTRATION**
409 Third St., S.W., Sixth Floor
Investment Division, Office of SBIC Liquidation
Washington, D.C. 20416

October 4, 2005                                 License No.:  02/72-0599

<u>VIA MAIL AND FACSIMILE</u>

Mr. Ike Kier
General Partner
Coqui Capital Partners, L.P.
1775 Broadway, Suite 604
New York, NY 10019

Dear Mr. Kier:

The U. S. Small Business Administration Investment Division, Office of SBIC Liquidation
("SBA"), has reviewed the information presented by Coqui Capital Partners, L.P. ("Coqui"
or "Licensee") in our meeting of August 17, 2005 and has decided to request the
appointment of a Receiver to liquidate the Licensee's assets.

Pursuant to §107.1820(f) of the SBIC Regulations, SBA has also reviewed the Licensee's
management fees and is reducing the fees to $370,000 annually – to be drawn monthly at
approximately $30, 833 per month – for the last quarter of 2005 and thereafter until further
notice.  This is the same amount of management fees projected by the Licensee for 2006 in
the information presented on August 17.

The Licensee's remaining unfunded Private Capital will be called by the appointed
Receiver if not called sooner by the fund's management.

The restrictions cited in SBA's letter dated June 7, 2005 remain in effect.

The foregoing is made without prejudice to any other rights of SBA, and SBA specifically
reserves the right to impose or change the remedies to which the Licensee is subjected as
warranted.

Please contact me at (202) 205-6880 or by e-mail at jerrywilliamson@sba.gov with any
questions you may have.

Sincerely,

Jerry W. Williamson
Financial Analyst
Account Resolution Branch

TRANSMISSION RESULT REPORT          (OCT 04 '05  09:58AM)

IN   MENT DEPT

(AUTO)

THE FOLLOWING FILE(S) ERASED

| FILE | FILE TYPE | OPTION | TEL NO. | PAGE | RESULT |
|------|-----------|--------|---------|------|--------|
| 065  | MEMORY TX |        | 912122474801 | 01/01 | OK |

ERRORS
1) HANG UP OR LINE FAIL     2) BUSY     3) NO ANSWER     4) NO FACSIMILE CONNECTION



U.S. Small Business Administration

# U. S. SMALL BUSINESS ADMINISTRATION
409 Third St., S.W., Sixth Floor
Investment Division, Office of SBIC Liquidation
Washington, D.C. 20416

Championing America's Entrepreneurs

October 4, 2005                                    License No. 02/72-0599

## VIA MAIL AND FACSIMILE

Mr. Ike Kier
General Partner
Coqui Capital Partners, L.P.
1775 Broadway, Suite 604
New York, NY 10019

Dear Mr. Kier:

The U. S. Small Business Administration Investment Division, Office of SBIC Liquidation ("SBA"), has reviewed the information presented by Coqui Capital Partners, L.P. ("Coqui" or "Licensee") in our meeting of August 17, 2005 and has decided to request the appointment of a Receiver to liquidate the Licensee's assets.

# EXHIBIT G

## CAPITAL CERTIFICATE

NAME OF APPLICANT:                     Coqui Capital Partners, L.P.

APPLICANT'S "LEVERAGEABLE CAPITAL":    $7,766,591     5/16/02   7,723,862
                                                                  $42,729

APPLICANT'S "REGULATORY CAPITAL":      $13,968,576

DATE OF THIS CERTIFICATE:              October 31, 2002

THE APPLICANT HEREBY REPRESENTS AND WARRANTS TO AND COVENANTS AND AGREES WITH THE U.S. SMALL BUSINESS ADMINISTRATION ("SBA") AS FOLLOWS:

1.    The table attached hereto as Exhibit A (the "Table") states the name of each general and limited partner of Applicant (other than SBA or its agent, trustee or representative), states the amount of such partner's total capital commitment to Applicant (the "Capital Contribution"), the amount of each partner's Capital Contribution which has been paid to Applicant ("Paid-In Capital"), and the unfunded balance of each partner's Capital Contribution ("Unfunded Commitment"). The Table specifies whether each partner is an "Entity Institutional Investor" as defined under Section (1) of the definition of Institutional Investor set forth in 13 CFR 107.50 (the "Definition"), a person who is an Institutional Investor as defined in Section (2) of the Definition, or is not claimed by Applicant to be an Institutional Investor. The Table sets forth the number of the subsection of Section (1) or (2) of the Definition and in the case of entities, the type of entity, pursuant to which Applicant believes such partner qualifies as an Institutional Investor.

2.    Applicant has obtained the representation, warranty and agreement from each partner listed in the Table as being an Institutional Investor that with respect to such partner:

(a)    Such partner is the kind of entity or person described in the subsection of the Definition set opposite such partner's name in the Table.

(b)    The Unfunded Commitment specified in the Table for such partner does not exceed ten percent (10%) of such partner's net worth if such partner has a net worth of less than $10 million or such partner is listed on Exhibit D and Applicant has obtained a Letter of Credit as defined in Section 3 of this Certificate; it being understood that in the case of entities described in subsections (1)(v) or (vi) of the Definition, references to "net worth" mean "net assets available for benefits."

(c)    So long as any portion of his (its) Unfunded Commitment has not been paid, such partner will give Applicant prompt notice of any change in such partner's financial condition or status that causes the information in the Table concerning such partner or in Section 2(b) to be incorrect.

(d)     The Capital Contribution specified in the Table for such partner constitutes Private Capital (as defined in 13 CFR §107.50), and that except as specified on Exhibit B, no part of such Capital Contribution constitutes Qualified Nonprivate Funds (as defined in 13 CFR §107.50).

(e)     Except for those partners listed on Exhibit C, each such partner who is an individual is a permanent resident of the United States.  Except as otherwise stated on Exhibit C, each partner listed on Exhibit C has filed with Applicant a written certificate or other agreement irrevocably appointing the person specified on Exhibit C as such partner's agent for service of process.

(f)     The Capital Contribution in Applicant of each partner owning or controlling, directly or indirectly, 10% or more but less than 33% of Applicant's capital, does not exceed 5% of such limited partner's net worth except as otherwise specified in the Table.

3.     Qualified Nonprivate Funds whose source is state or local government funds do not exceed 33% of Applicant's Regulatory Capital.

4.     Each partner listed in the Table as being an Institutional Investor by reason of subsection (2)(i)(A) of the Definition is listed on Exhibit D and for each such partner and for partners listed on Exhibit D by reason of Section 2(b) of this Certificate, Applicant has obtained, has and will keep in its possession, and in the event of default in payment of an Unfunded Commitment by such partner will exercise, an unconditional irrevocable letter of credit in favor of Applicant ("Letter of Credit") in an amount not less than such Unfunded Commitment issued by an Institutional Investor as provided in subsection (2)(i)(A) of the Definition or by 13 CFR §107.230(b)(4).  A copy of each such Letter of Credit is attached to this certificate with Exhibit D.  Applicant has no knowledge that any such Letter of Credit will not be renewed except as specified on Exhibit D.  If any such Letter of Credit expires or ceases to be in effect, Applicant will give SBA prompt notice of such event, and if such Letter of Credit is renewed or replaced, promptly shall give SBA a copy of the Letter of Credit or other document renewing or replacing such Letter of Credit.

5.     Pursuant to its partnership agreement, Applicant has obtained the written agreement ("Partner's Payment Covenant") of each partner identified in the Table as being an Institutional Investor to pay the Unfunded Commitment to Applicant subject only to those conditions excusing performance by the partner specified in SBA Annex PS or SBA Annex GDP (whichever is applicable) which is a part of Applicant's limited partnership agreement, and those additional conditions, if any, specified on Exhibit E.  Each such partner has represented to Applicant that such Partner's Payment Covenant has been duly authorized by all necessary actions of the partner and is the valid, binding and enforceable obligation of such partner (except as enforcement may be subject to the application of federal or state bankruptcy, insolvency, reorganization or moratorium laws or other laws affecting the rights of creditors generally).

6.     Without the prior written approval of SBA, Applicant shall not release, amend, extend, compromise, cancel, forgive or otherwise waive any Partner's Payment Covenant or the right of Applicant to receive payment when due of any Partner's Unfunded Commitment other than as provided in SBA Annex PS or SBA Annex GDP (whichever is applicable).

- 3 -

7.    To the best of Applicant's knowledge and belief, the information contained in the Table is true and correct and each Partner's Payment Covenant is the valid, binding and enforceable obligation of such partner (except as enforcement may be subject to federal or state bankruptcy, insolvency, reorganization or moratorium laws or laws affecting the rights of creditors generally).

8.    Applicant has "pre-investments" (investments made prior to licensing) in the Portfolio Concerns and in the amounts (stated at their cost) set forth on Exhibit F ("Pre-Investments"). To the best of Applicant's knowledge and belief, all such Pre-Investments are in eligible Small Concerns meeting the criteria set forth in 13 CFR Parts 107 and 121. SBA's Forms 1031 (Portfolio Financing Report), 480 (Size Status Declaration) and 652 (Assurance of Compliance for Nondiscrimination), if not previously submitted, are attached to Exhibit F for each such Portfolio Concern.

9.    Based on the information set forth in the Table, Applicant certifies to SBA that Applicant's Leverageable Capital and Regulatory Capital, each as defined in 13 CFR §107.50, are the respective amounts set forth on the first page of this Certificate.

10.    Applicant shall give SBA prompt notice if Applicant learns that any information contained in this certificate is incorrect in any material respect or if any partner fails to pay any required payment of such Partner's Unfunded Commitment within any applicable grace period.

11.    Applicant acknowledges that this certificate is to be considered material for the purpose of inducing SBA to issue a license as a Small Business Investment Company to Applicant and to disburse SBA funds in reliance upon Applicant's statements. Applicant acknowledges that any intentionally false statement or willful misrepresentation contained in this certificate is a violation of federal law subject to criminal and civil prosecution under 18 USC §§287, 371, 1001, 1006; 15 USC §645; and 31 USC §3729.

IN WITNESS WHEREOF, the undersigned has executed and delivered this certificate as of the date set forth above.

Coqui Capital Partners, L.P.
(Name of Licensee)

By: _____
Jeffrey Koffman
Its: Member of General Partner L.L.C.

By: _____
Ike Kier
Its: Member of General Partner L.L.C.

**EXHIBIT A**

## ENTITY INSTITUTIONAL INVESTORS

| Name and Address | Qualifying Subsection of Section (1) and Type of Entity | Capital Contribution | Paid-In Capital | Unfunded Commitment |
|---|---|---|---|---|
| **[See attached list of Entity Institutional Investors, p. 7]** | | | | |
| TOTAL | | $3,750,000 | $2,025,000 | $1,725,000 |

## INDIVIDUAL INSTITUTIONAL INVESTORS

| Name and Address | Qualifying Subsection of Section (2) | Capital Contribution | Paid-In Capital | Unfunded Commitment |
|---|---|---|---|---|
| **[See attached list of Individual Institutional Investors, pp. 8-10]** | | | | |
| TOTAL | | $9,588,750 | $5,177,925 | $4,410,825 |

## OTHER PARTNERS

| Name and Address | Capital Contribution | Paid-In Capital | Unfunded Commitment |
|---|---|---|---|
| Coqui Capital Management, LLC [1]<br>1775 Broadway, Suite 604<br>New York, NY 10019 | 143,826 | 77,666 | 66,160 |
| IRM Associates<br>17 Nottingham Road<br>Livingstone, NJ 07039 | 500,000 | 270,000 | 230,000 |
| Stella and Albert Schwartz<br>1994 Grandchildrens Trust<br>152 W. 57th Street<br>New York, NY 10019 | 100,000 | 54,000 | 46,000 |
| Schuyler Associates, L.P.<br>300 Plaza Drive<br>Vestal, NY 13850 | 100,000 | 54,000 | 46,000 |
| Vestal Venture Capital<br>P.O. Box 247<br>2521 Vestal Parkway East 12851 | 200,000 | 108,000 | 92,000 |
| TOTAL | $ 1,043,826 | $563,666 | $480,160 |

---

[1]  The $66,160 unfunded commitment of this investor is backed up by the "dual commitments" of Jeffrey and Mary Beth Davidson ($22,053.33); Isaac Kier ($22,053.33); and Jeffrey and Allison Koffman ($22,053.33), for a total of $66,160.

AGGREGATE
PARTNERSHIP TOTALS

| | | | | |
|---|---|---|---|---|
| (a) | All Institutional Investors | $13,338,750 | $7,202,925 | $6,135,825 |
| (b) | All Partners | $1,043,826 | $ 563,666 | $ 480,160 |
| | PARTNERSHIP TOTAL | $14,382,576 | $7,766,591 | $6,615,985 |

# EXHIBIT A

## Entity Institutional Investors

| Name & Address | Qualifying Subsection (1) & Type of Entity | Capital Contribution | Paid-in Capital | Unfunded Commitment |
|---|---|---|---|---|
| Platsky Family Trust<br>220 Milbum Avenue<br>Suite 202<br>Millburn, NJ 07041 | viii | 500,000 | 270,000 | 230,000 |
| Sunbelt Beverage Company, LLC<br>60 East 42nd Street<br>Suite 1915<br>New York, NY 10165 | viii | 750,000 | 405,000 | 345,000 |
| Tech Aerofoam, Inc.<br>3551 N.W. 116th Street<br>Miami, FL 33167 | viii | 1,000,000 | 540,000 | 460,000 |
| Chazen Capital Partners<br>767 5th Avenue, 26F<br>New York, NY 10153 | viii | 1,000,000 | 540,000 | 460,000 |
| Marlin Equities LLC<br>555 Theodore Friend Avenue<br>Suite-B<br>Rye, NY 10580 | viii | 250,000 | 135,000 | 115,000 |
| Club Side Holdings<br>Charlotte house/Shirley Street<br>P.O. Box N3950<br>Nassua, N.P. Bahamas | viii | 125,000 | 67,500 | 57,500 |
| Silver Lining Corp.<br>Charlotte house/Shirley Street<br>P.O. Box N3950<br>Nassua, N.P. Baamas | viii | 125,000 | 67,500 | 57,500 |
| Totals | | $3,750,000 | $2,025,000 | $1,725,000 |

**Individual Institutional Investors**

| Name & Address | Qualifying Subsection of Subsection 2 | Capital Commitment | Paid-in Contribution | Unfunded Capital |
|---|---|---|---|---|
| Martin Bandier<br>860 Park Avenue 7E<br>New York, NY 10028 | C | 1,000,000 | 540,000 | 460,000 |
| Louis Buck<br>205 E 63rd Street #18D<br>New York, NY 10021 | B | 150,000 | 81,000 | 69,000 |
| Lawrence Coben<br>c/o Bruno Culata<br>277 Fairfield Road<br>Fairfield, NJ 07004 | B | 250,000 | 135,000 | 115,000 |
| Arthur Davidson<br>8 Coddington Terrace<br>Livingstone, NJ 07039 | B | 50,000 | 27,000 | 23,000 |
| Jeffrey and Mary Beth Davidson<br>17 Nottinghom Road<br>Livingston, NJ 07039 | B | 510,000 | 275,400 | 234,600 |
| Jeffrey and Mary Beth Davidson [2]<br>*Dual Commitment - Backup* | B | [22,053] | 0 | [22,053] |
| Rick and Donna Davidson<br>10 Pleasant Way<br>Florham Park, NJ 07932 | B | 200,000 | 108,000 | 92,000 |
| Michael Delikat<br>c/o Orrick Herrington &<br>Sutcliff LLP<br>666 5th Avenue<br>New York, NY 10103 | B | 125,000 | 67,500 | 57,500 |
| S. Mark Erenstein<br>P.O. Box 588<br>New Vernon, NJ 07976 | B | 100,000 | 54,000 | 46,000 |
| Roger Gladstone<br>433 Plaza Real<br>Suite 245<br>Boca Raton, FL 33432 | A | 125,000 | 67,500 | 57,500 |
| Gabriel Golan<br>201 West 88th Street<br>New York, NY 10024 | B | 150,000 | 81,000 | 69,000 |

---

[2]   Reflects a "dual commitment" of $22,053.33 to backup an equal amount of the unfunded commitment of Coqui Capital Management, LLC, General Partner of the Licensee.

| | | | | |
|---|---|---|---|---|
| Richard Goldberg<br>98 Cutter Mill Road<br>Great Neck, NY  11021 | C | 600,000 | 324,000 | 276,000 |
| Lynda Goldschein<br>70 Sherwood Drive<br>Watchtung, NJ  07060 | B | 400,000 | 216,000 | 184,000 |
| Michael Grisanti<br>6 Overbrook Road<br>Louisville, Kentucky  40207 | B | 53,750 | 29,025 | 24,725 |
| Michael Hard<br>239 Central Park West<br>New York, NY | B | 100,000 | 54,000 | 46,000 |
| Efraim and Sara Kier<br>403 Del Parque Street, 5th Flr.<br>San Juan, Puerto Rico  00912 | B | 125,000 | 67,500 | 57,500 |
| Isaac Kier<br>15 West 81st Street<br>New York, NY | C | 2,250,000 | 1,215,000 | 1,035,000 |
| Isaac Kier<br>*Dual Commitment – Backup* [3] | C | [22,053] | 0 | [22,053] |
| Ralph Kier<br>4065 N.W. Road<br>Boca Raton, FL  33498 | B | 250,000 | 135,000 | 115,000 |
| Ellen Sue Kier<br>15 West 81st Street<br>New York, NY | B | 250,000 | 135,000 | 115,000 |
| Burton and Ruthanne Koffman<br>Hickory Lane<br>Binghamton, NY  13903 | C | 500,000 | 270,000 | 230,000 |
| David Koffman<br>300 Plaza Drive<br>Vestal, NY  13850 | B | 100,000 | 54,000 | 46,000 |
| Jeffrey and Allison Koffman<br>1088 Park Avenue #8f<br>New York, NY  10128 | B | 175,000 | 94,500 | 80,500 |
| Jeffrey and Allison Koffman<br>*Dual Commitment – Backup* [4] | B | [22,053] | 0 | [22,053] |

---

[3]   Reflects a "dual commitment" of $22,053.33 to backup an equal amount of the unfunded commitment of Coqui Capital Management, LLC, General Partner of the Licensee.

[4]   Reflects a "dual commitment" of $22,053.33 to backup an equal amount of the unfunded commitment of Coqui Capital Management, LLC, General Partner of the Licensee.

| | | | | |
|---|---|---|---|---|
| Ron Kramer<br>829 Park Avenue<br>New York, NY  10021 | B | 100,000 | 54,000 | 46,000 |
| Michael Kubin<br>1155 Park Avenue<br>New York, NY  10128 | B | 100,000 | 54,000 | 46,000 |
| David Layton<br>9090 South Sandy Parkway<br>Sandy, UT  84070 | C | 125,000 | 67,500 | 57,500 |
| Eric Osserman<br>44 Hawthorne Road<br>Short Hills, NJ  07078 | B | 125,000 | 67,500 | 57,500 |
| Howard Pearl<br>Microforum, Inc.<br>6050 Tomken Road<br>Missisaugua, Ontario  L5T 1X8<br>Canada | C | 250,000 | 135,000 | 115,000 |
| Frederick Poses<br>1125 Park Avenue #14-E<br>New York, NY  10128 | C | 500,000 | 270,000 | 230,000 |
| Joel Siegel<br>Orloff, Lowenbach, Stifleman & Siegel<br>101 Eisenhower Parkway<br>Roseland, NJ  07068 | B | 250,000 | 135,000 | 115,000 |
| Baron Silverstein<br>171 Middleneck Road<br>Sands Point, NY  11050 | B | 125,000 | 67,500 | 57,500 |
| Neil Silverstein<br>216 East 68th Street<br>666 5th Avenue<br>New York, NY  10103 | B | 125,000 | 67,500 | 57,500 |
| Kenneth Tuchman<br>P.O. Box 337<br>Alpine, NJ  07620 | C | 150,000 | 81,000 | 69,000 |
| Jeffrey Wilkes<br>941 Park Ave., #9H<br>New York, NY 10028 | B | 150,000 | 81,000 | 69,000 |
| Kevin Wolf<br>262 Central Park West<br>New York, NY | C | 125,000 | 67,500 | 57,500 |
| Totals: | | $9,588,750 | $5,177,925 | $4,410,825 |

## EXHIBIT B

## QUALIFIED NONPRIVATE FUNDS

| Name of Partner | Capital Contribution | Amount of Capital Contribution Which Is Qualified Nonprivate Funds | Qualified Nonprivate Funds Whose Source Is Federal Funds | Qualified Nonprivate Funds Whose Source Is State or Local Government Funds |
|---|---|---|---|---|

**[None]**

**EXHIBIT C**

**INDIVIDUALS WHO ARE NOT**
**PERMANENT RESIDENTS OF THE UNITED STATES**

Name and Address of
Non-Resident Partner

Howard Pearl
Microforum, Inc.
6050 Tomken Rd.
Missisaugua, Ontario
Canada  L5T 1X8

Name and Address of U.S.
Agent for Service of Process

Coqui Capital Partners, L.P.
1775 Broadway
New York, NY  10019

## EXHIBIT D

## LETTERS OF CREDIT

| Name of Partner | Unfunded Commitment | Amount of Letter of Credit | Issuing Institution | Expiration Date |
|---|---|---|---|---|

**[None]**

(Attach Copies of Letters of Credit)

# EXHIBIT E

## CONDITIONS TO EXERCISE OF RIGHT
## TO RECEIVE UNFUNDED COMMITMENTS

**[None]**

# EXHIBIT F

## PRE-INVESTMENTS

| Name of Portfolio Concern | Date of Investment | Number of Shares | Cost of Investment |
|---|---|---|---|
| 1. eDiet.com, Inc.<br>   Boca Raton, Fla. | November 17, 1999 | 125,000 | $225,000 |

# SBA CAPITAL CERTIFICATE

## Version 1.4

## CERTIFICATE OF LEVERAGEABLE CAPITAL AND REGULATORY CAPITAL

This document has been drafted by the law firm of Pepper, Hamilton & Scheetz, in collaboration with the law firms of Foley, Hoag & Eliot and O'Sullivan Graev & Karabell, the National Association of Small Business Investment Companies, and the Office of the General Counsel of the United States Small Business Administration.

The Small Business Administration does not endorse or approve law firms. The above legend is not an endorsement or approval by the Small Business Administration of any law firm identified therein, and no representation to the contrary by any party is authorized.

# EXHIBIT H

RECEIVED

2003 DEC -1 P 3: 02

INVESTMENT DIVISION

# SBA CAPITAL CERTIFICATE

## Version 1.4

## CERTIFICATE OF LEVERAGEABLE CAPITAL
## AND REGULATORY CAPITAL

————————————————————

This document has been drafted by the law firm of Pepper, Hamilton & Scheetz, in collaboration with the law firms of Foley, Hoag & Eliot and O'Sullivan Graev & Karabell, the National Association of Small Business Investment Companies, and the Office of the General Counsel of the United States Small Business Administration.

The Small Business Administration does not endorse or approve law firms. The above legend is not an endorsement or approval by the Small Business Administration of any law firm identified therein, and no representation to the contrary by any party is authorized.

11/19/03

## CAPITAL CERTIFICATE

NAME OF APPLICANT:                           Coqui Capital Partners, L.P.

APPLICANT'S "LEVERAGEABLE CAPITAL":          $9,923,977

APPLICANT'S "REGULATORY CAPITAL":            $14,103,576

DATE OF THIS CERTIFICATE:                    November 19, 2003

THE APPLICANT HEREBY REPRESENTS AND WARRANTS TO AND COVENANTS AND AGREES WITH THE U.S. SMALL BUSINESS ADMINISTRATION ("SBA") AS FOLLOWS:

1.      The table attached hereto as Exhibit A (the "Table") states the name of each general and limited partner of Applicant (other than SBA or its agent, trustee or representative), states the amount of such partner's total capital commitment to Applicant (the "Capital Contribution"), the amount of each partner's Capital Contribution which has been paid to Applicant ("Paid-In Capital"), and the unfunded balance of each partner's Capital Contribution ("Unfunded Commitment"). The Table specifies whether each partner is an "Entity Institutional Investor" as defined under Section (1) of the definition of Institutional Investor set forth in 13 CFR 107.50 (the "Definition"), a person who is an Institutional Investor as defined in Section (2) of the Definition, or is not claimed by Applicant to be an Institutional Investor. The Table sets forth the number of the subsection of Section (1) or (2) of the Definition and in the case of entities, the type of entity, pursuant to which Applicant believes such partner qualifies as an Institutional Investor.

2.      Applicant has obtained the representation, warranty and agreement from each partner listed in the Table as being an Institutional Investor that with respect to such partner:

(a)      Such partner is the kind of entity or person described in the subsection of the Definition set opposite such partner's name in the Table.

(b)      The Unfunded Commitment specified in the Table for such partner does not exceed ten percent (10%) of such partner's net worth if such partner has a net worth of less than $10 million or such partner is listed on Exhibit D and Applicant has obtained a Letter of Credit as defined in Section 3 of this Certificate; it being understood that in the case of entities described in subsections (1)(v) or (vi) of the Definition, references to "net worth" mean "net assets available for benefits."

(c)      So long as any portion of his (its) Unfunded Commitment has not been paid, such partner will give Applicant prompt notice of any change in such partner's financial condition or status that causes the information in the Table concerning such partner or in Section 2(b) to be incorrect.

(d)    The Capital Contribution specified in the Table for such partner constitutes Private Capital (as defined in 13 CFR §107.50), and that except as specified on Exhibit B, no part of such Capital Contribution constitutes Qualified Nonprivate Funds (as defined in 13 CFR §107.50).

(e)    Except for those partners listed on Exhibit C, each such partner who is an individual is a permanent resident of the United States. Except as otherwise stated on Exhibit C, each partner listed on Exhibit C has filed with Applicant a written certificate or other agreement irrevocably appointing the person specified on Exhibit C as such partner's agent for service of process.

(f)    The Capital Contribution in Applicant of each partner owning or controlling, directly or indirectly, 10% or more but less than 33% of Applicant's capital, does not exceed 5% of such limited partner's net worth except as otherwise specified in the Table.

3.    Qualified Nonprivate Funds whose source is state or local government funds do not exceed 33% of Applicant's Regulatory Capital.

4.    Each partner listed in the Table as being an Institutional Investor by reason of subsection (2)(i)(A) of the Definition is listed on Exhibit D and for each such partner and for partners listed on Exhibit D by reason of Section 2(b) of this Certificate, Applicant has obtained, has and will keep in its possession, and in the event of default in payment of an Unfunded Commitment by such partner will exercise, an unconditional irrevocable letter of credit in favor of Applicant ("Letter of Credit") in an amount not less than such Unfunded Commitment issued by an Institutional Investor as provided in subsection (2)(i)(A) of the Definition or by 13 CFR §107.230(b)(4). A copy of each such Letter of Credit is attached to this certificate with Exhibit D. Applicant has no knowledge that any such Letter of Credit will not be renewed except as specified on Exhibit D. If any such Letter of Credit expires or ceases to be in effect, Applicant will give SBA prompt notice of such event, and if such Letter of Credit is renewed or replaced, promptly shall give SBA a copy of the Letter of Credit or other document renewing or replacing such Letter of Credit.

5.    Pursuant to its partnership agreement, Applicant has obtained the written agreement ("Partner's Payment Covenant") of each partner identified in the Table as being an Institutional Investor to pay the Unfunded Commitment to Applicant subject only to those conditions excusing performance by the partner specified in SBA Annex PS or SBA Annex GDP (whichever is applicable) which is a part of Applicant's limited partnership agreement, and those additional conditions, if any, specified on Exhibit E. Each such partner has represented to Applicant that such Partner's Payment Covenant has been duly authorized by all necessary actions of the partner and is the valid, binding and enforceable obligation of such partner (except as enforcement may be subject to the application of federal or state bankruptcy, insolvency, reorganization or moratorium laws or other laws affecting the rights of creditors generally).

6.    Without the prior written approval of SBA, Applicant shall not release, amend, extend, compromise, cancel, forgive or otherwise waive any Partner's Payment Covenant or the right of Applicant to receive payment when due of any Partner's Unfunded Commitment other than as provided in SBA Annex PS or SBA Annex GDP (whichever is applicable).

- 3 -

7.    To the best of Applicant's knowledge and belief, the information contained in the Table is true and correct and each Partner's Payment Covenant is the valid, binding and enforceable obligation of such partner (except as enforcement may be subject to federal or state bankruptcy, insolvency, reorganization or moratorium laws or laws affecting the rights of creditors generally).

8.    Applicant has "pre-investments" (investments made prior to licensing) in the Portfolio Concerns and in the amounts (stated at their cost) set forth on Exhibit F ("Pre-Investments"). To the best of Applicant's knowledge and belief, all such Pre-Investments are in eligible Small Concerns meeting the criteria set forth in 13 CFR Parts 107 and 121. SBA's Forms 1031 (Portfolio Financing Report), 480 (Size Status Declaration) and 652 (Assurance of Compliance for Nondiscrimination), if not previously submitted, are attached to Exhibit F for each such Portfolio Concern.

9.    Based on the information set forth in the Table, Applicant certifies to SBA that Applicant's Leverageable Capital and Regulatory Capital, each as defined in 13 CFR §107.50, are the respective amounts set forth on the first page of this Certificate.

10.    Applicant shall give SBA prompt notice if Applicant learns that any information contained in this certificate is incorrect in any material respect or if any partner fails to pay any required payment of such Partner's Unfunded Commitment within any applicable grace period.

11.    Applicant acknowledges that this certificate is to be considered material for the purpose of inducing SBA to issue a license as a Small Business Investment Company to Applicant and to disburse SBA funds in reliance upon Applicant's statements. Applicant acknowledges that any intentionally false statement or willful misrepresentation contained in this certificate is a violation of federal law subject to criminal and civil prosecution under 18 USC §§287, 371, 1001, 1006; 15 USC §645; and 31 USC §3729.

IN WITNESS WHEREOF, the undersigned has executed and delivered this certificate as of the date set forth above.

Coqui Capital Partners, L.P.
(Name of Licensee)

By: _____
Jeffrey Koffman
Its: Member of General Partner L.L.C.

By: _____
Ike Kier
Its: Member of General Partner L.L.C.

By: _____
Jeffrey Davidson
Its: Member of General Partner L.L.C.

- 4 -

EXHIBIT A

## ENTITY INSTITUTIONAL INVESTORS

| Name and Address | Qualifying Subsection of Section (1) and Type of Entity | Capital Contribution | Paid-In Capital | Unfunded Commitment |
|---|---|---|---|---|
| [See attached list of Entity Institutional Investors, p. 13] | | | | |
| TOTAL | | $3,750,000 | $2,587,500 | $1,162,500 |

## INDIVIDUAL INSTITUTIONAL INVESTORS

| Name and Address | Qualifying Subsection of Section (2) | Capital Contribution | Paid-In Capital | Unfunded Commitment |
|---|---|---|---|---|
| [See attached list of Individual Institutional Investors, pp. 14-17] | | | | |
| TOTAL | | $9,588,750 | $6,616,237 | $3,017,099 |

## OTHER PARTNERS

| Name and Address | Capital Contribution | Paid-In Capital | Unfunded Commitment |
|---|---|---|---|
| Coqui Capital Management, LLC [1]<br>1775 Broadway, Suite 604<br>New York, NY 10019 | 143,826 | 99,240 | [44,586] |
| IRM Associates<br>17 Nottingham Road<br>Livingstone, NJ  07039 | 500,000 | 345,000 | 155,000 |
| Stella and Albert Schwartz<br>1994 Grandchildrens Trust<br>152 W. 57th Street<br>New York, NY  10019 | 100,000 | 69,000 | 31,000 |
| Schuyler Associates, L.P.<br>300 Plaza Drive<br>Vestal, NY 13850 | 100,000 | 69,000 | 31,000 |
| Vestal Venture Capital<br>P.O. Box 247<br>2521 Vestal Parkway East 12851 | 200,000 | 138,000 | 62,000 |
| TOTAL | $ 1,043,826 | $720,240 | $279,000 |

---

[1]    The $44,586 unfunded commitment of this investor is backed up by the "dual commitments" of Jeffrey and Mary Beth Davidson ($14,862.00); Isaac Kier ($14,862.00); and Jeffrey and Allison Koffman ($14,862.00), for a total of $44,586.00.

AGGREGATE
PARTNERSHIP TOTALS

| | | | | |
|---|---|---|---|---|
| (a) | All Institutional Investors | $13,338,750 | $9,203,737 | $4,179,599 |
| (b) | All Partners | $1,043,826 | $ 720,240 | $ 279,000 |
| | PARTNERSHIP TOTAL | $14,382,576 | $9,923,977 | $4,458,599 |

# EXHIBIT A

## Entity Institutional Investors

| Name & Address | Qualifying Subsection (1) & Type of Entity | Capital Contribution | Paid-in Capital | Unfunded Commitment |
|---|---|---|---|---|
| Plafsky Family Trust<br>220 Milbum Avenue<br>Suite 202<br>Millburn, NJ 07041 | viii | 500,000 | 345,000 | 155,000 |
| Sunbelt Beverage Company, LLC<br>60 East 42nd Street<br>Suite 1915<br>New York, NY 10165 | viii | 750,000 | 517,500 | 232,500 |
| Tech Aerofoam, Inc.<br>3551 N.W. 116th Street<br>Miami, FL 33167 | viii | 1,000,000 | 690,000 | 310,000 |
| Chazen Capital Partners<br>767 5th Avenue, 26F<br>New York, NY 10153 | viii | 1,000,000 | 690,000 | 310,000 |
| Marlin Equities LLC<br>555 Theodore Friend Avenue<br>Suite-B<br>Rye, NY 10580 | viii | 250,000 | 172,500 | 77,500 |
| Club Side Holdings<br>Charlotte house/Shirley Street<br>P.O. Box N3950<br>Nassua, N.P. Bahamas | viii | 125,000 | 86,250 | 38,750 |
| Silver Lining Corp.<br>Charlotte house/Shirley Street<br>P.O. Box N3950<br>Nassua, N.P. Baamas | viii | 125,000 | 86,250 | 38,750 |
| **Totals** | | **$3,750,000** | **$2,587,500** | **$1,162,500** |

## Individual Institutional Investors

| Name & Address | Qualifying Subsection Commitment | Capital of Subsection 2 | Paid-in Contribution | Unfunded Capital |
|---|---|---|---|---|
| Martin Bandier 860 Park Avenue 7E New York, NY 10028 | C | 1,000,000 | 690,000 | 310,000 |
| Louis Buck 205 E 63rd Street #18D New York, NY 10021 | B | 150,000 | 103,500 | 46,500 |
| Lawrence Coben c/o Bruno Culata 277 Fairfield Road Fairfield, NJ 07004 | B | 250,000 | 172,500 | 77,500 |
| Arthur Davidson 8 Coddington Terrace Livingstone, NJ 07039 | B | 50,000 | 34,500 | 15,500 |
| Jeffrey and Mary Beth Davidson 17 Nottinghom Road Livingston, NJ 07039 | B | 510,000 | 351,900 | 158,100 |
| Jeffrey and Mary Beth Davidson [2] *Dual Commitment - Backup* | B | *Remove brackets* [47,942] | 0 | 14,862 |
| Rick and Donna Davidson 10 Pleasant Way Florham Park, NJ 07932 | B | 200,000 | 138,000 | 62,000 |
| Michael Delikat c/o Orrick Herrington & Sutcliff LLP 666 5th Avenue New York, NY 10103 | B | 125,000 | 86,250 | 38,750 |
| S. Mark Erenstein P.O. Box 588 New Vernon, NJ 07976 | B | 100,000 | 69,000 | 31,000 |
| Roger Gladstone 433 Plaza Real Suite 245 Boca Raton, FL 33432 | A | 125,000 | 86,250 | 38,750 |
| Gabriel Golan 201 West 88th Street New York, NY 10024 | B | 150,000 | 103,500 | 46,500 |

---

[2]   Reflects a "dual commitment" of $14,862.00 to backup an equal amount of the unfunded commitment of Coqui Capital Management, LLC, General Partner of the Licensee.

| Name | Class | Amount | Amount | Amount |
|------|-------|--------|--------|--------|
| Richard Goldberg<br>98 Cutter Mill Road<br>Great Neck, NY 11021 | C | 600,000 | 414,000 | 186,000 |
| Lynda Goldschein<br>70 Sherwood Drive<br>Watchtung, NJ 07060 | B | 400,000 | 276,000 | 124,000 |
| Michael Grisanti<br>6 Overbrook Road<br>Louisville, Kentucky 40207 | B | 53,750 | 37,087 | 16,663 |
| Michael Hard<br>239 Central Park West<br>New York, NY | B | 100,000 | 69,000 | 31,000 |
| Efraim and Sara Kier<br>403 Del Parque Street, 5th Flr.<br>San Juan, Puerto Rico 00912 | B | 125,000 | 86,250 | 38,750 |
| Isaac Kier<br>15 West 81st Street<br>New York, NY | C | 2,250,000 | 1,552,500 | 697,500 |
| Isaac Kier<br>*Dual Commitment – Backup* [3] | C | [47,942] *Remove brackets* | 0 | 14,862 |
| Ralph Kier<br>4065 N.W. Road<br>Boca Raton, FL 33498 | B | 250,000 | 172,500 | 77,500 |
| Ellen Sue Kier<br>15 West 81st Street<br>New York, NY | B | 250,000 | 172,500 | 77,500 |
| Burton and Ruthanne Koffman<br>Hickory Lane<br>Binghamton, NY 13903 | C | 500,000 | ~~340,000~~ *SHOULD BE 345,000* | 155,000 |
| David Koffman<br>300 Plaza Drive<br>Vestal, NY 13850 | B | 100,000 | 69,000 | 31,000 |
| Jeffrey and Allison Koffman<br>1088 Park Avenue #8f<br>New York, NY 10128 | B | 175,000 | 120,750 | 54,250 |
| Jeffrey and Allison Koffman<br>*Dual Commitment – Backup* [4] | B | [47,942] *Remove brackets* | 0 | 14,862 |

---

[3]   Reflects a "dual commitment" of $14,862.00 to backup an equal amount of the unfunded commitment of Coqui Capital Management, LLC, General Partner of the Licensee.

[4]   Reflects a "dual commitment" of $14,862.00 to backup an equal amount of the unfunded commitment of Coqui Capital Management, LLC, General Partner of the Licensee.

| | | | | |
|---|---|---|---|---|
| Ron Kramer<br>829 Park Avenue<br>New York, NY  10021 | B | 100,000 | 69,000 | 31,000 |
| Michael Kubin<br>1155 Park Avenue<br>New York, NY  10128 | B | 100,000 | 69,000 | 31,000 |
| David Layton<br>9090 South Sandy Parkway<br>Sandy, UT  84070 | C | 125,000 | 86,250 | 38,750 |
| Eric Osserman<br>44 Hawthorne Road<br>Short Hills, NJ  07078 | B | 125,000 | 86,250 | 38,750 |
| Howard Pearl<br>Microforum, Inc.<br>6050 Tomken Road<br>Missisaugua, Ontario  L5T 1X8<br>Canada | C | 250,000 | 172,500 | 77,500 |
| Frederick Poses<br>1125 Park Avenue #14-E<br>New York, NY  10128 | C | 500,000 | ~~340,000~~ *SHOULD BE 345,000* | 155,000 |
| Joel Siegel<br>Orloff, Lowenbach, Stifleman & Siegel<br>101 Eisenhower Parkway<br>Roseland, NJ  07068 | B | 250,000 | 172,500 | 77,500 |
| Baron Silverstein<br>171 Middleneck Road<br>Sands Point, NY  11050 | B | 125,000 | 86,250 | 38,750 |
| Neil Silverstein<br>216 East 68th Street<br>666 5th Avenue<br>New York, NY  10103 | B | 125,000 | 86,250 | 38,750 |
| Kenneth Tuchman<br>P.O. Box 337<br>Alpine, NJ  07620 | C | 150,000 | 103,500 | 46,500 |
| Jeffrey Wilkes<br>941 Park Ave., #9H<br>New York, NY 10028 | B | 150,000 | 103,500 | 46,500 |
| Kevin Wolf<br>262 Central Park West<br>New York, NY | C | 125,000 | 86,250 | 38,750 |
| **Totals:** | | **$9,588,750** | **$$6,616,237** | **$~~3,062,099~~** *3,017,099* |

- 10 -

**EXHIBIT B**

**QUALIFIED NONPRIVATE FUNDS**

| Name of Partner | Capital Contribution | Amount of Capital Contribution Which Is Qualified Nonprivate Funds | Qualified Nonprivate Funds Whose Source Is Federal Funds | Qualified Nonprivate Funds Whose Source Is State or Local Government Funds |
|---|---|---|---|---|

[None]

**EXHIBIT C**

**INDIVIDUALS WHO ARE NOT
PERMANENT RESIDENTS OF THE UNITED STATES**

Name and Address of
<u>Non-Resident Partner</u>

Howard Pearl
Microforum, Inc.
6050 Tomken Rd.
Missisaugua, Ontario
Canada  L5T 1X8

Name and Address of U.S.
<u>Agent for Service of Process</u>

Coqui Capital Partners, L.P.
1775 Broadway
New York, NY  10019

**EXHIBIT D**

**LETTERS OF CREDIT**

| Name of Partner | Unfunded Commitment | Amount of Letter of Credit | Issuing Institution | Expiration Date |
|---|---|---|---|---|

**[None]**

(Attach Copies of Letters of Credit)

## EXHIBIT E

## CONDITIONS TO EXERCISE OF RIGHT
## TO RECEIVE UNFUNDED COMMITMENTS

[None]

# EXHIBIT F

## PRE-INVESTMENTS

| Name of Portfolio Concern | Date of Investment | Number of Shares | Cost of Investment |
|---|---|---|---|
| 1. eDiet.com, Inc. Boca Raton, Fla. | November 17, 1999 | 125,000 | $225,000 |

# SBA CAPITAL CERTIFICATE

## Version 1.4

## CERTIFICATE OF LEVERAGEABLE CAPITAL AND REGULATORY CAPITAL

———————————————————————

This document has been drafted by the law firm of Pepper, Hamilton & Scheetz, in collaboration with the law firms of Foley, Hoag & Eliot and O'Sullivan Graev & Karabell, the National Association of Small Business Investment Companies, and the Office of the General Counsel of the United States Small Business Administration.

The Small Business Administration does not endorse or approve law firms. The above legend is not an endorsement or approval by the Small Business Administration of any law firm identified therein, and no representation to the contrary by any party is authorized.

10/31/02

# EXHIBIT I

**Williamson, Jerry W.**

| | |
|---|---|
| **From:** | Williamson, Jerry W. |
| **Sent:** | Thursday, July 14, 2005 11:18 AM |
| **To:** | 'Ike Kier'; Jeff Davidson (jeffd@coquicapital.com); Jeff Koffman (jeffk@coquicapital.com) |
| **Cc:** | Green, Gail G.; Morris, Thomas G. |
| **Subject:** | Coqui Capital - Questions about Transfer to Liquidation |



Cash Flow Projs -
Coqui - 0308...

Ike, Jeff (Davidson) and Jeff (Koffman) -

I talked to Tom Morris this morning, and he has not yet talked to Ron Cibolski.  I would like to have you come in for another meeting with SBA to give us - the Liquidation Division - an update on your current expectations for your portfolio, similar to our previous meeting in Operations.  We can discuss whether you should call down your remaining capital at that time.

Please update the information you prepared for that meeting (based on Technote 10) and your  cash flow projections.  I'm attaching a copy of your previous cashflow projections, but I deleted the bottom section related to projected changes in Unrealized Gains/Losses.  When you update the projections, you should not include the new investments that were on the previous.

Please give me some dates that are convenient for you, and I'll coordinate setting up a meeting.

Jerry W. Williamson
U.S. Small Business Administration
Investment Division
409 3rd St. S.W.
Washington, DC 20416
Telephone:  (202) 205-6880
Facsimile:  (202) 481-0690


-----Original Message-----
From: Ike Kier [mailto:Ikier@coquicapital.com]
Sent: Friday, July 08, 2005 12:22 PM
To: Williamson, Jerry W.; thomas.morris@sba.gov
Cc: Jeff Koffman; Jeff Davidson; Gemma Leddy; whiteibis2@comcast.net
Subject: RE: Question about Notice of Transfer to Liquidation

Jerry and Tom,

In contemplating my response, I consulted with my partners and Ron Cibolski, who previously had helped us as our consultant in drafting our Wind-Down plan.

At Ron's suggestion, and with our support and authority, he will be calling Tom directly on our behalf. Hopefully Ron will be able to put you and the SBA at ease in our ability to repay the SBA debt without calling additional capital, through a self-liquidation plan.

Thanks for your consideration.

ike kier
1775 broadway
new york, ny 10019
212-247-4590 x.13

1

```
-----Original Message-----
From: Williamson, Jerry W. [mailto:jerrywilliamson@sba.gov]
Sent: Thursday, July 07, 2005 3:43 PM
To: Ike Kier
Subject: Question about Notice of Transfer to Liquidation
```

Ike - Even though your wind-down plan did not contemplate calling the remaining capital
and Operations may have allowed the remaining capital to be called as needed for operating
expenses and follow-on investments, I understand the Liquidation Division generally
requires that it be called unless there is a compelling reason to not do so.  Tom asked if
there is such a reason to not call it.

```
-----Original Message-----
From: Ike Kier [mailto:ike@coquicapital.com]
Sent: Thursday, July 07, 2005 3:37 PM
To: Williamson, Jerry W.
Cc: Davidson, Jeffrey S.; Koffman, Jeff; Leddy, Gemma
Subject: Re: Question about Notice of Transfer to Liquidation
```

Jerry, as you may recall we presented a plan of Wind-Down to you and Marja which did not
require calling additional funds. We had not presented this to Tom Morris but I did
mention it to him at the time. That is why I recollect his comments to this issue.

I will be in the office tomorrow if you would like to discuss this further. Thanks -----
```
Original Message-----
From: "Williamson, Jerry W." <jerrywilliamson@sba.gov>
Date: Thu, 7 Jul 2005 15:04:01
To:"'Ike Kier'" <Ikier@coquicapital.com>
Cc:"Gemma Leddy (gleddy@coquicapital.com)" <gleddy@coquicapital.com>
Subject: Question about Notice of Transfer to Liquidation
```

Ike - I discussed your question wih Tom.  Is there a reason why the
remaining commitments should not be called?

```
-----Original Message-----
From: Ike Kier   [mailto:Ikier@coquicapital.com]
Sent: Tuesday, July 05, 2005 1:47   PM
To: Williamson, Jerry W.
Cc: Jeff Koffman; Jeff    Davidson; Gemma Leddy
Subject: notice of transfer to   liquidation
```

Dear Jerry,


As per our telephone conversation    of today, I want to make you aware
of an
inconsistency in the letter I   received from you advising of transfer
to
liquidation and my conversation with    Tom Morris in April of this year.


In your letter you point to   Section 107.1820(f) of the Regulations and
your point #3 which advises that    "all your commitments from all
investors,
if any remain, are required to be    funded at the earliest time..." In
my
conversations with Tom Morris, he had   indicated that although the SBA
reserves the right to do so, depending on our   plan, our progress and
our
mutual coordination, the calling of the capital    from our partners

would
not necessarily take place.

I will wait to hear any further   clarification. Thanks.

Coqui   Capital
ike   kier
1775   broadway
new   york, ny   10019
212-247-4590   x.13

Sent wirelessly via  BlackBerry so excuse my typos

STEVEN WEINBERG, ESQ.
Gottesman, Wolgel, Malamy,
Flynn & Weinberg, P.C.
11 Hanover Square, 4th Floor,
New York, New York 10005
Tel.: (212) 495-0100
Fax: (212) 480-9797
E-mail: sweinberg@gottesmanlaw.com

ARLENE M. EMBREY, ESQ.
Trial Attorney
U.S. Small Business Administration
409 Third Street, S.W., Seventh Floor
Washington, D.C. 20416
Tel.:    (202) 205-6976
Fax:    (202) 481-0324
Email: arlene.embrey@sba.gov

*Attorneys for Plaintiff*
*The United States Small Business Administration as*
*Receiver of Coqui Capital Partners, L.P.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------x

| | |
|---|---|
| UNITED STATES SMALL BUSINESS ADMNINSTRATION AS RECEIVER FOR COQUI CAPITAL PARTNERS, L.P., | Civil Action No. 08-978 (LTS) |
| Plaintiff, | ***Affidavit of Service*** |
| v. | |
| COQUI CAPITAL MANAGEMENT, LLC., a New York limited liability company; et al, | *Assigned to:* |
| Defendants. | Hon. Laura T. Swain, U.S.D.J. |

-----------------------------------------------------x

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )

       MARIBEL PINEDA, duly sworn, deposes and says:

       1.       I am over eighteen years of age; I am not a party to the above captioned

action, and reside in the State of New York.

2.     On May 6, 2008, I served a true and complete copy of the Plaintiff's

OPPOSITION TO DEFENDANTS' MOTION TO DIMISS THE AMENDED

COMPLAINT AND COMPEL ARBITRATION, which opposition includes the Affidavit

of Terry George and the exhibits annexed thereto, and the Memorandum of Law in

Opposition, upon:

> NIA J.C. CASTELLY, ESQ.
> ROBERT W. RAY, ESQ.
> DONALD S. ZAKARIN, ESQ.
> Pryor Cashman LLP
> *Attorneys for Coqui Capital Management,*
> *LLC and other Defendants*
> 410 Park Avenue
> New York, New York 10022
> Tel.: (212) 421-4100
>
> GARY HOPPE, ESQ.
> Twomey, Hoppe & Gallanty, LLP
> 757 Third Avenue, 7th Floor
> New York, New York 10017
> Tel.: (212) 688-0400
> Fax: (212) 688-1929

by depositing same in a first class postpaid wrapper, properly addressed to the above

named person or attorney at the address designated by said person or attorney for that

purpose (or at that person's or attorney's last known address because no address was

designated), in a post office or official depository under the exclusive care and custody of

the United States Postal Service within the State of New York.

Sworn to before me on this
6th day of May, 2008

_____
MARIBEL PINEDA

_____
Notary Public

LASHINA WILLIAMS
Notary Public, State of New York
No. 01WI6033862
Qualified in Kings County
Commission Expires November 28, 2009